UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-82(EK)

-against- : United States Courthouse
Brooklyn, New York

CARLOS WATSON and OZY MEDIA, INC., : Tuesday, July 9, 2024
9:00 a.m.

Defendants.

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ERIC KOMITEE
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
BY: JONATHAN SIEGEL, ESQ.
GILLIAN KASSNER, ESQ.
DYLAN A. STERN, ESQ.
Assistant United States Attorneys

For the Defendant Carlos Watson: RONALD SULLIVAN LAW FIRM PLLC
1300 I Street NW, Suite 400E
Washington, D.C. 20005
BY: RONALD S. SULLIVAN, ESQ.
JANINE I. GILBERT, ESQ.

For the Defendant OZY Media, Inc.: SHANNON FRISON, ESQ.
75 State Street, Suite 100
Boston, Massachusetts 02109

Court Reporter: Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter
Telephone: (718) 613-2487
E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

(In open court.)

THE COURT: Good morning, everyone. Please be seated.

Are we ready to resume?

MR. SIEGEL: Yes, your Honor.

One thing I noticed in the transcript, when I admitted the indictment which I believe we marked as Court Exhibit 8. I might have misspoken or the transcript my be wrong but it says that I admitted Court Exhibit 9. So I just want to flag that and fix that at the beginning of the day. Other than that, we're ready to go.

THE COURT: Court Exhibit 8, the indictment is admitted for the limited purpose that we discussed.

(Court's Exhibit 8 was marked in evidence.)

THE COURT: I think I owe you a ruling on the line of questions about the attempt to bring cell phones and the ostensible false answers to CSOs about the question: Do you have a cell phone in your bag?

I think it's a close call but I'm going to exclude that given that extrinsic evidence on that subject is not going to be admissible and I think the risk of that becomes a side show is to too great relative to the potentially probative value even on cross.

MR. SIEGEL: Understood. Thank you.

THE COURT: All right.

MR. SULLIVAN: Your Honor, I just have one item. I have Mr. Watson's financial disclosure. We'd ask that it remain under seal and when Mr. Jackson gets back if we could mark it.

THE COURT: I think that's fine. Under seal as against the public but not ex parte, right?

MR. SULLIVAN: Correct.

THE COURT: Yes, that is appropriate here.

MR. SULLIVAN: Should Mr. Watson get on the stand.

THE COURT: I think so.

(Witness takes the witness stand.)

**CARLOS WATSON**, called as a witness, having been previously duly sworn, was examined and testified as follows:

THE COURT: I have a letter that's been printed for me this morning. A letter dated July 7th from the defense that in respect of 26.2 material for Mr. Saul Roddin that says, "Attached hereto is a spreadsheet." But I'm advised that no attachment was filed.

MS. GILBERT: It was e-mailed, your Honor, it was too large to file. It was e-mailed it Komitee_chambers, to Ashley and to Mr. Jackson as well.

THE COURT: The list of 26.2 material was too large to file?

MS. GILBERT: The spreadsheet was too large to

file, yes. I couldn't save it as a PDF.

THE COURT: How many documents are we talking about?

MS. GILBERT: So we turned over 274 --

COURTROOM DEPUTY: All rise.

(Jury enters courtroom at 9:29 a.m.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, good morning.

THE JURY: (Collectively) Good morning.

THE COURT: Thank you again for being with us bright and early on this fine Tuesday.

Mr. Siegel, you may continue.

MR. SIEGEL: Thank you, your Honor. Good morning ladies and gentlemen of the jury.

THE JURY: (Collectively) Good morning.

MR. SIEGEL: Good morning, Mr. Watson.

THE WITNESS: Good morning.

CROSS-EXAMINATION

BY MR. SIEGEL:

(Continuing.)

Q So I'm going to continue with the kinds of questions I was asking yesterday where it's all just going to correct or incorrect, or for whatever reason it's complicated, you can just say it's complicated and I'll either rephrase it or move on. Same if you don't know or you don't remember. But

if you can't answer correct or incorrect, just correct or incorrect; okay?
A You bet.
Q Okay. Is it correct, or is it incorrect, that you sometimes spoke to investors on behalf of OZY?
A Yes.
Q And is it correct, or is it incorrect, that you sometimes spoke to them by phone?
A Yes.
Q Is it correct, or is it incorrect, that you sometimes spoke to them by e-mail?
A Yes.
Q Correct or incorrect, you would sometimes call or e-mail people in New York City while you were in California?
A Yes.
Q Correct or incorrect, those communications crossed state lines between California and New York?
A Yes.
Q Is it correct or is it incorrect that you sometimes flew on airplanes to meet with investors?
A Yes.
Q For example, is it correct or incorrect you flew to Korea to meet with potential investors?
A Yes.
Q Correct or incorrect, when you flew to Korea, you flew

out of JFK Airport in Queens, New York?
A I'm not sure.
Q Okay.
MR. SIEGEL: We're going to put up an exhibit for the jury. It's in evidence. Which is Government Exhibit S-1.
I'm going to read it.
It's hereby stipulated and agreed by and between the undersigned parties that on or about May 11, 2019, the defendant Carlos Watson flew from John F. Kennedy International Airport, JFK Airport, in Queens, New York to South Korea.
Q Did I read that right?
A Yes.
Q Is it correct or incorrect that you flew to the United Arab Emirates to meet potential investors?
A Sorry. Just to be clear, I'm saying that you read it correctly. I'm not saying it's true, but I'm saying that you read it correctly.
Q Well, Mr. Watson, this is a stipulation; right?
A It may be. I'm not sure exactly what this is.
Q Okay. Well, let's take a second on this.
You see how it's labeled "stipulation"?
A I do.
Q It stays, "It is hereby stipulated and agreed by and

and between the undersigned parties"?
A I see that, yes.
Q And the undersigned parties include the Government, correct?
A Yes, I see your names.
Q And your attorney, Mr. Sullivan?
A Yes, I see that.
Q And counsel for OZY, Ms. Frison?
A I see that.
Q Okay. So my next question: Is it correct, or is it incorrect, that you flew to the United Arab Emirates to meet potential investors?
A Yes.
Q And is it correct or incorrect that one of the times you flew to the United Arab Emirates you flew out of JFK Airport in Queens, New York?
A I'm not sure.
Q I'm just going to go to the Paragraph 2 of the stipulation. This says, "On or about December 6, 2019, Watson flew from JFK Airport in Queens, New York, to the United Arab Emirates."
Did I read that correctly?
A Yes, you read that correctly.
Q Correct or incorrect?
A I apologize.

Q Mr. Watson, correct or incorrect, there were times that you flew to New York to meet potential investors?
A Yes.
Q Correct or incorrect, for some of those flights you flew into LaGuardia Airport in Queens or JFK Airport in Queens?
A Yes.
Q Let's talk more about revenue, specifically, 2018.
Is it correct or incorrect that Samir Rao lied to investors about 2018 revenue?
A I don't know.
Q Is it correct or incorrect that Suzee Han lied to investors about 2018 revenue?
A I don't know.
Q Correct or incorrect, Samir Rao told investors that OZY made $18.5 million in revenue in 2018?
A I believe on occasion, he did, yes.
Q And correct or incorrect, there were times that that happened and you knew that Samir Rao was telling investors that OZY made $18.5 million in 2018?
A I believe there was at least once where I was aware that he had written 18.5 because I think he came back to correct it and say I added stuff up wrong and it should have said 22.
Q Was that the board deck that you were talking about?

A I'm not sure whether it was the board deck or it was another deck. I do remember him coming back and saying I added it up wrong and the numbers came up to 22 but he had written 18.5.

Q So let's look at some examples.

I'm going to show you Government Exhibit 6067. This is an e-mail -- I'm sorry, wrong Exhibit 6167. 6176. I'm sorry.

So this is an e-mail from Samir Rao to Maurice Werdegar and copying you?

A Yes.

Q And it says, "In the body, please see attached"?

A Yes.

Q I'm going to Government Exhibit 6176-A. I'm scrolling to Page 7 and this is an exhibit where Mr. Rao said 18.5 million?

A It looks like it, yes.

Q All right.

MR. SIEGEL: And just one moment, your Honor.

THE COURT: Yes.

(A brief pause in the proceedings was held.)

MR. SIEGEL: We're going to pull something up on Ms. Menz' computer. This is in evidence.

Mr. Menz, this is Defense Exhibit 349. Can you go down a couple pages Mr. Menz.

Q This is Page 16, this is the material shared with OZY's board that also say 18.5 for 2018, correct?
A Correct.
Q And is it correct or is it incorrect OZY did not make $18.5 million of revenue in 2018?
A We made more.
Q I'm sorry, Mr. Watson, my question was: Is it correct or is it incorrect that OZY did not make $18.5 million in 2018?
A I can't answer that with a yes or no or correct or incorrect.
Q Okay. Is it correct or incorrect that Suzee Han also told investors that OZY made $18.5 million in 2018?
A I can't answer that.
Q Is it correct or incorrect that you were copied on e-mails where Suzee Han sent investors slide decks that claimed OZY made $18.5 million in 2018?
A I'm not sure. As I mentioned before, I believe at least on one occasion --
Q Mr. Watson, I'm just asking correct or incorrect. If you're not sure, say you're not sure?
MR. SULLIVAN: Objection to interrupting the witness.
THE COURT: If you can answer yes or no, answer yes or no. If you can't, say you can't.

Let's have another question, please.
Q I'm showing you Government Exhibit 6067.
Am I correct, or am I incorrect this is an e-mail from Suzee Han in September of 2019 that you are copied on?
A Correct, yes.
Q This has an attachment, correct?
A It appears so, yes.
Q I'm going to show you the attachment, Government Exhibit 6067-A. And on Page 18, this pitch deck says that OZY had $18.5 million of revenue for 2018. Is that correct or incorrect?
A This is not a pitch deck but, yes, it says 18.5.
Q And this was September 2019?
A But would you mind going back a couple slides just to make sure I say that correctly, please.
Q This was September 2019, correct?
A Can you go back, please, to the attachment. Let me look at the attachment.
Q What are we looking for in the attachment?
A I was looking for the date in the attachment.
Q I'm sorry, the date the e-mail was sent was September 2019?
A The date the e-mail was sent. Sometimes people have old attachments to it. I'm trying to understand whether or not this was a September 2019 attachment.

Q It might have been an older attachment?
A It could have been, yeah.
Q So this was at least six months or more before that board meeting where you still had 18.5 million?
A Again, based on that date of that e-mail, yes.
Q It could have been older?
A Correct, yes.
Q Now, correct or incorrect, Samir Rao told Abass Maniar that OZY made $22 million in 2018?
A I'm not sure but I assume, yes.
Q Well, correct or incorrect, you were you were copied on the e-mail when he did that?
A I suspect, yes. Feel free to show it to me but I suspect the answer is yes.
Q If you don't know, Mr. Watson you can just say, I don't know.
A Fair enough.
Q I'm showing you Government Exhibit 6039.
Okay. Is it correct or is it incorrect, or maybe you don't know, this is an e-mail from Samir Rao?
A Yes.
Q And this is an e-mail to Abass Maniar and to you?
A Yes.
Q And this e-mail has an attachment; is that correct?
A Yes, that is correct.

Q I'm going to show you what's in evidence as the attachment, Government Exhibit 6039-A. And I'm going to Page 19 and zooming in on the chart on the right. In this deck, it says that OZY had $22 million of revenue in 2018.
Is that correct or is it incorrect?
A Yes, that's what it says here.
Q Is it correct or is it incorrect, and my question is it correct or is it incorrect, OZY did not make $22 million in 2018?
A That statement is incorrect.
Q So OZY did make $22 million in 2018?
A And more than that, I believe, yes.
Q You told investors that OZY made $22 million in revenue in 2018. Is that correct or is that incorrect?
A Yes, I believe the e-mails at that I forwarded --
Q Mr. Watson, is it correct or is it incorrect?
A I can't answer it then correct or incorrect.
Q Okay. So I know there's a little bit of talk-back, so I want to make sure we're talking about the same question.
Is it correct or is it incorrect, that you told investors that OZY made $22 million of revenue in 2018?
A I can't answer that.
Q Okay. Let's look at Government Exhibit 6031.
Mr. Watson this is an e-mail from you, is that correct or incorrect?

A Drafted by Samir, but yes.
Q Mr. Watson, is it correct or is it incorrect that this is an e-mail from you?
A Yes.
Q And is it correct or is it incorrect this is an e-mail to Mark Lasry?
A Yes.
Q I'm going in on the paragraph that's labeled "Progress and Opportunity." I'm trying.
Government Exhibit 6031, sorry, for the bug, zooming in on the paragraph "OZY's Progress and Opportunity," and I'm just highlighting where you talk about "our resulting revenue growth, $22 million in 2018 compared to $18 million target."
Is that what it says in this e-mail from you?
A Yes.
Q Correct or incorrect?
A Yes.
Q Okay. Correct or incorrect, according to OZY's internal records, OZY made about $10 million in 2018?
A Incorrect.
Q I'm going to show you Government Exhibit 5033-D. And this is in evidence as materials that Janeen Poutre sent to OZY's accountants. Scrolling down, I'm going to the tab marked "income statements" under FY 2018 which is Column O.

Scrolling town to "total income," which is row 18.

Mr. Watson could you read that number, please?

A Sure. 10 million, a little over 10 million, $10,011,569.78.

Q Okay. Correct or incorrect, in addition to the e-mail we looked at Mark Lasry, for example, you also e-mailed Maurice Werdegar that OZY made $22 million of revenue in 2018?

A Again, I can't answer that but I'm sure you'll show it to me and I suspect once you show it to me --

Q Mr. Watson, if you don't know the answer, say I don't know?

MR. SULLIVAN: Objection.

THE COURT: Objection to the answer?

The answer stands and I think we got it in full to the extent the parties were talking over each other it was, "I can't answer that but I'm sure you'll show it to me and I suspect once you show it to me," actually, the answer is not fully will captured.

You can answer that question briefly.

A Sure. I suspect that that I did send -- that I did have such an e-mail drafted for me and I suspect that I did ultimately send that to Maurice. But I don't have, I couldn't give you a specific now, but I'm sure if you were to show it to me I could validate I did.

Q Okay. I'm going to show you Government Exhibit 5015. Just zooming in on the top.
This is an e-mail from you, correct?
A Yes, correct.
Q And it's an e-mail to Maurice Werdegar, correct?
A Yes.
Q And Samir Rao is blind copied, correct?
A Yes.
Q And in the bullet, in the paragraph labeled, "Three, Financial Outlook."
In this e-mail you sent, it says, "On the backs of a sold-out OZY Fest and two hit TV shows, OZY delivered $22 million in revenue."
Is that right?
A Yes.
Q Is it correct, or is it incorrect, that in this e-mail, you also claimed that OZY lost only $5 million that year?
A Yes, that's what it says.
Q Correct or incorrect, according to OZY's internal records, OZY lost over $14 million in 2018?
A Incorrect.
Q Let's look at Government Exhibit 5033-D. Let's go to the tab marked "Income Statements." All the way to the right, there's the income statement for 2018 in Column O. Scrolling down there is net income and that's a number in

parenthesis, correct?
A Yes, that is a number in parenthesis.
Q Parenthesis meaning negative?
A Typically, yes.
Q And that is -- well, could you read that number?
A $14,699,517.74.
Q Now, there's also -- when we talk about profit, there's different ways to measure property, for example, EBIT; is that right?
A Yes, that is one of the ways.
Q And EBIT is for earnings before interest and taxes? Yes, earnings before interest and taxes?
A Yes.
Q And just looking at Rows 141 to 148 that includes things like interest and taxes?
A It appears to. I'd have to look at the whole thing. Sometimes interest and taxes are listed in more than one place.
Q And if you could go up above that to Row 140 where it has net ordinary income.
That's another negative number; is that correct?
A Can you scroll down so that I can see it, sorry, the other direction, please.
Q My question is, in Row 140, Column O is that a negative number?

A It is, yes.
Q Could you read that number, please?
A $14,447,981.50.
Q And it's negative $14,447,981.50, correct?
A It appears so, yes.
Q So let's talk about 2019. Is it correct, or is it incorrect, that Samir Rao lied to investors about 2019 revenue?
A Again, I can't answer that.
Q Is it correct or is it incorrect that Suzee Han lied to investors about 2019 revenue?
A Again, I can't answer that.
Q Okay. Is it is correct, or is it incorrect, that according to OZY's internal records, OZY earned about $13 million of revenue in 2019?
A That's incorrect.
Q All right. Let's look at Government Exhibit 5096-A.
So this is an income statement for January 1, 2019, to December 31, 2019, in evidence. And scrolling to Column B, Row 23 where it says -- across from where it says, "Total Income."
Could you read the total income listed here?
A Sure. $13,004,235.39.
Q Okay. Correct or incorrect, according to OZY's internal records, OZY paid almost $7 million just in

interest in 2019?
A I can't answer that.
Q Okay. I'm going to scroll down. And at Row 129, you see there's a category labeled "9020-interest expenses"?
A I do, yes.
Q Can you read that number under Column D, Row 129?
A It says 6,961,255.73.
Q Okay. And is it correct or is it incorrect that according to OZY's internal records, OZY lost more than $17 million in 2019?
A Incorrect.
Q If you would just read where it -- Row 137 where it says "net income"?
A It says $17,054,172.51.
Q I'm sorry, Mr. Watson, is that negative 17,054,000 --
A I would assume so.
Q -- $172.51?
A I would assume so, yes.
Q Is it correct or is it is it incorrect, that you told Abass Maniar that OZY made $35 million in revenue in 2019?
A I would have to see it but I probably should see it. So I guess the answer to that question is I'm not sure.
Q I'm going to show you Government Exhibit 6103.
Is it correct or is it incorrect this is an e-mail from you?

A That's Samir drafted, but yes.
Q Mr. Watson, could you just read where it says "from" and whose name is listed after the line where it says "from"?
A Carlos Watson.
Q Mr. Watson, that's you?
A That is, yes.
Q And this is to Abass Maniar?
A It is, yes.
Q I'm going to look at what's in evidence as the attachment. Going it Page 2, this is 6103-A. And there's Paragraph 6, "financials."
And in this attachment that you sent, you wrote, or, excuse me, in this attachment that you sent, it says, "while we are still finalizing our numbers, early indication is that revenue grew about 50 percent last year to $35 million."
Is that what it says?
A Yes, "still finalizing our numbers, early indication," yes.
Q Is it your position that you did or you didn't make $35 million?
A I think when they ultimately -- so I believe we made something in that --
Q I'm asking you right now Mr. Watson --

A Yes.
Q As you sit here today --
MR. SULLIVAN: Objection. Can he finish his answer?
THE COURT: Can you ask another question?
MR. SIEGEL: I'll move on.
THE COURT: Well, I mean start over again.
Everybody should let everybody else finish what they're saying.
MR. SIEGEL: When it's nonresponsive, should I ask for a motion?
MR. SULLIVAN: Objection.
THE COURT: Let's have the question again.
MR. SIEGEL: Okay.
Q Sitting here today, is it your view that OZY made $35 million in revenue?
A Yes, thereabouts, yes.
Q So we're going back to Government Exhibit 6103.
Is it correct or is it incorrect this is sent January 4, 2020?
A Yes, it appears so, yes.
Q Is it correct or is it incorrect that two days later, you told Tom Franco that OZY made $30 million of revenue in 2019?
A I'm not sure but would be happy to look at anything.

Q Let's look at Government Exhibit 5045.
Mr. Watson, where it says "from," can you read who this is from?
A Carlos Watson.
Q And this is to Thomas Franco?
A Yes, correct.
Q This is sent January 6, 2020?
A You bet, yes.
Q That's two days after the e-mail that we looked at to Abass Maniar?
A Yeah, I think it's an updated version of the same note. It's not the same title.
Q Let's look at the attachment, Government Exhibit 5045-A and go to Page 2.
And is it correct that in this, what you're referring to as an updated version, it now says, "Financials: While we are still finalizing our numbers, early indication is that revenue grew about 50 percent last year to $30 million."
And my question is: Is that what it says?
A Yes, that is what it says.
Q All right. Correct or incorrect, OZY did not earn $30 million of revenue in 2019?
A Incorrect.
Q Is it correct or incorrect, on January 21, 2020, Suzee

Han sent you proposed financials for Mark Lasry listing 2019 revenue as $35 million?
A I'm not sure.
Q I'm going to show you Government Exhibit 6109.
Is it correct or is it incorrect this is an e-mail from Suzee Han?
A Yes, correct.
Q And could you read the people in the "to" line?
A Samir Rao, Carlos Watson.
Q And the subject, am I correct, says review in all caps and then in regular caps "Update for Lasry"?
A Yes, that's what it says.
Q And in this e-mail, Ms. Han writes attached below from are Mark, correct?
A Yes, she does. Correct.
Q And that's referring to Mark Lasry?
A I believe so, yes.
Q And No. 2, it says, "Financials. Samir, this is what we sent in June"?
A Yes, that is what it says.
Q And below that it says, "I've have 2019 revenue at about $35 million," correct?
A Correct, that's what it says.
Q Correct or incorrect, you told Suzee Han that 35 million seemed too high?

A I'm not sure.
Q I'm going to show you Government Exhibit 3003 which is in evidence and go to Page 6.
And this is a text from you?
A Yes, it appears to be, yes.
Q From January 21, 2020?
A Yes.
Q And is it correct you wrote, "Lasry, one, 35 million seems too high"?
A Yes, I wrote that, yes or, apologies, it looks like I wrote that assuming this is authentic, yes, I wrote that.
Q And correct or incorrect, that same day, Suzee sent you new proposed financials for Mark Lasry with revenue at $30 million?
A I'm not sure but happy to look at whatever you want to share.
Q So I'm going to show you Government Exhibit 6110.
This is an e-mail from Suzee Han, correct?
A Yes, it looks like that, yes.
Q And in the "to" line, it says, Samir Rao and Carlos Watson, correct?
A Yes.
Q And the subject is in all caps "REVISED/REVIEW." And then in regular caps, "Update for Lasry," correct?
A Yes.

Q And the body says, "Samir plus Carlos, I have updated the numbers to have 2019 revenue," rev, "at 30 million."
Is that what it says?
A Yes, that is what it says.
Q Let's talk about 2020.
Is it correct or is it incorrect that Samir Rao lied to investors about OZY's 2020 revenue?
A I can't speak to that.
Q Is it correct or is it incorrect that Suzee Han lied to investors about OZY's 2020 revenue?
A Again, I can't speak to that.
Q Is it correct or is it incorrect that on March 18, 2021, Samir Rao told Google that OZY earned $42 million of revenue in 2020?
A I'd be happy to look at it. I assume you have something to share.
Q Before I get to that, is it correct or is it incorrect OZY, OZY's revenue in 2020 was not $42 million?
A Incorrect.
Q So it was $42 million?
A I believe it was there about that, might have been more.
Q Okay. So I'm going to show you Government Exhibit 6386.
This is an e-mail from Samir Rao, correct?

A Yes, from Samir Rao.
Q And it's to people at Google?
A Yes, Albert Sono.
Q And correct or incorrect, you are copied?
A Yes, I am copied.
Q And I'm zooming in on the bullet labeled, "Overall OZY Performance Context"?
A I see that.
Q And there's a sentence in here that that says, "We reached about $42 million of revenue," excuse me, "We reached about $42 million revenue and 4 million EBITDA in 2020."
Is that what it says?
A Yes, that's what it says.
Q Okay. Now, is it correct or is it incorrect that on April 21, 2021, Suzee Han told Antara that OZY earned $46 million of revenue in 2020?
A I can't answer that.
Q Is it correct or incorrect that OZY's revenue in 2020 was not $46 million?
A I believe it was there about.
Q So it was about 42 and it was about 46?
A It was somewhere in that range, yes.
Q Between 42 and 46?
A Yes, somewhere in that general range.

Q Okay. So let's look at --
A And apologies, it may have been higher.
Q Let's look at Government Exhibit 6423. And I'm zooming in on the top this is an e-mail from Suzee Han.
A It look looks like that, yes.
Q And it's to Carlos Watson?
A Yes, I'm in the "to" line.
Q And it is copying Samir Rao and Chetan Bansal and Himanshu Gulati, correct?
A The way it's structured she's writing it to Chetan.
Q I'm sorry, let me repeat my question.
In the "copy" line, it's Samir Rao, Chetan Bansal, and Himanshu Gulati, is it correct or incorrect, they are from Antara?
A Yes.
Q All right. I'm going to show you Government Exhibit 6423-A which is in evidence as the attachment.
And about on Page 15 the chart on the right, is it correct or is it incorrect that the total revenue listed for 2020 is $46 million?
A Yes, that's what it says.
Q Okay. Is it correct or is it incorrect that on May 9, 2021, Samir Rao told Maurice Werdegar that OZY earned $53 million of revenue in 2020?

A I can't speak to that.
Q Well, correct or incorrect, you were copied on that e-mail?
A I'm sure you'll show it to me and if I was I'm happy to speak to it.
Q Is it correct or is it incorrect, OZY's revenue in 2020 was not $53 million?
A Unclear but, again, certainly in that realm.
Q Just so I want to make sure I understand your testimony. It was maybe 42. Maybe between 42 and 46 but also maybe 53?
MR. SULLIVAN: Objection, misstates his testimony.
THE COURT: Overruled. You can answer the question.
THE WITNESS: I think I shared before when we went through the exercise that, to the best of my recollection, given the 2020 was a year in which we had at that time the largest number of TV shows, I think we had five. I think we had five podcasts. We expanded our newsletters. I think we had four meaningful franchises and we had some relatively substantial anchor deals with people like GM, WPP, and JPMorgan and TikTok. My best understanding is we did somewhere in the $50 million region. Could that depending on how folks worked through the numbers end up being less than that, it could. Could it end up being, depending on

how you recognize the revenue, more than that, it could. But my best understanding is it is in the $50 million region. Understanding that, again, that there are a variety of ways to ultimately recognize revenue.

Q So I'm go going to show you Government Exhibit 6447. This is an e-mail from Samir Rao?

A It is, yes.

Q And it is an e-mail to Maurice Werdegar?

A It is, yes.

Q And blind copied on this e-mail is Suzee Han and you?

A It looks to be yes.

Q And there is an attachment to this e-mail. There are several attachments to this e-mail?

A Yes, there seem to be three. I think it looks like there are three.

MR. SIEGEL: I'm sorry, just one moment.

Q I'm going to show you 6447-C which is in evidence as one of the attachments.

And at Page 10.

A Sorry, can I see the other attachments just for a moment, please.

Q No. On Page 10, where it says "financials" under 2020 FY Actuals, it says total revenue, $53 million, correct?

A You mean where it says "pro forma can estimates subject to change" on that page? Is that the page you're talking

about?

Q Mr. Watson, let me repeat my question.

Under where it says "2020 FY Actuals," where it says "total revenue," it says $53 million?

A Yes, on that page.

Q This is about 2020, correct?

A Appears to be, yes.

Q And this e-mail was sent in May of 2021, correct?

A I asked to see the other attachments in order to try and place it properly, but I understand we can't to that.

Q Showing you Exhibit 6447. Where it says "sent," could you read the date listed there?

A May 9, 2021.

Q Okay. According -- is it correct or is it incorrect -- according to OZY's internal records, OZY earned, approximately, $11 million in 2020?

A Incorrect.

Q Showing you Government Exhibit 5126-A, Column C, has FY 2020. Scroll down to Row 39 which lists "total income."

So could you read the number for total income under 2020 which is cell C39?

A Sure. It says $11,210,611.40.

(Continued on the next page.)

(Continuing)
Q Okay.
Is it correct or is it incorrect that Samir Rao told Google that Ozy earned $4 million in 2020?
A I -- I'd have to see it again. I think we just looked at it just a moment ago. I'd have to see it again.
Q Sure.
MR. SEIGEL: Sir, I'm going to show you Government Exhibit 6386.
(Exhibit published.)
Q This is an email from Samir Rao, correct?
A Yes.
Q And correct, you are copied on this email?
A I am, yes.
Q And in the paragraph marked Ozy performance, there's a sentence that says: We reached about 43 -- excuse me --reached about 42 million revenue and 4 million EBITDA in 2020.
A Yes.
Q That's what it says?
A That's what it says, yes.
Q Correct or incorrect; two months later, in May 2021, Samir Rao told Maurice Werdegar that Ozy earned $6 million in 2020?
A Yes. I remember saying that just a moment ago.

Q And correct or incorrect; you were copied on that email as well?
A Yes, I believe I was. If it's the one we just saw a moment ago, I believe I was.
Q And you were blind-copied, correct?
A Actually, would you do me a favor, just because we've gone through them, I want to make sure I get it right.
Would you mind showing that to me, just so I --
Q Sure.
MR. SEIGEL: Government Exhibit 6447.
(Exhibit published.)
A Yes, it looks like I was Bcc' d.
Q Yes, so this is May 9th, 2021?
A At 11:00 p.m., yes.
Q And you are Bcc' d, which means blind-copied, on this email?
A Yes.
MR. SIEGEL: And in the attachment to this email Government Exhibit 6447C.
(Exhibit published.)
Q On page 10, under 2020 FY Actuals, it says: Projected EBIT $6 million.
A Yes, that's what it says there: Projected EBIT.
Q Correct or incorrect; according to Ozy's internal records, Ozy lost over $9 million in 2020.

A Incorrect.

MR. SEIGEL: I'll show you Government's Exhibit 5126A.

(Exhibit published.)

MR. SEIGEL: Under row C where it lists FY 2020, going to the bottom line, net income. So this is row 184, Column C.

Q Could you read the number written there.

A $9,513,426.17.

Q Okay.

Mr. Watson, is that actually negative $9,513,426.17?

A Yes, I believe so.

Q Correct or incorrect; you knew that Ozy was not profitable in 2020.

A Incorrect.

MR. SULLIVAN: I'm going to show you Government Exhibit 3525.

(Exhibit published.)

Q Mr. Watson, this is a text from you, correct?

A It is, yes.

Q And it's from August 12th, 2020, correct?

A Yes, from August 12, 2020.

Q And is it correct that what this text says is: Hiring. Charu is saying we have yet another person on visuals for WIYC, question mark, exclamation point.

Why? WTF. Are we profitable and I do not know it?
Am I correct that that's what you wrote?
A Yes, you read what I wrote, yes.
Q Thank you.
Correct or incorrect; you sometimes could not keep straight the different revenue numbers you provided to different investors?
A Incorrect.
Q Okay.
MR. SEIGEL: I'm going to show you Government Exhibit 3005.
(Exhibit published.)
MR. SEIGEL: Go to page 4. All right.
Q This is a text from you, correct?
A Yes.
Q And it's to Suzee Han and Samir Rao, correct?
A Yes.
Q And you wrote: Harry, what did we tell him our revenue was for the year, question mark, exclamation point.
A Yes.
Q And Samir Rao responds: 33.
Correct?
A Yes, that's what it looks like.
Q And you were -- you respond: Are you sure?
Correct?

A Yes.
Q Samir Rao writes back: Reference it as north of 40.
Correct?
A Are we missing any text in between? Are you sure you've captured the full text? You guys didn't cherry-pick text here? Because that doesn't flow naturally.
That's a very weird skip.
Q Mr. Watson, you said that you have a phone with your texts on it?
A I did, yes.
Q Do you want to take a break to check your phone and take a screenshot, see if there's any additional texts on there?
THE COURT: Let's take a break now regardless.
We will take our first break of the morning.
THE COURTROOM DEPUTY: All rise.
(Jury exits.)
THE COURT: So please be seated, everyone.
I paused us there because the Government just invited Mr. Watson to check his phone, which I think remains in the custody of the CSOs downstairs, given our dialogue yesterday.
If you want to withdraw the question, I think we can go forward. If you want to let the question persist, somebody should go get the phones for this purpose.
MR. SIEGEL: We're happy for somebody to go get the

phones.

THE COURT: Okay.

You have ten minutes here. They are checked. Have the Government, you know, have a paralegal go get them, subject, of course, to my admonishment not to -- for no Government personnel to review the contents of the phones.

(Pause in the proceedings.)

MR. SULLIVAN: Excused?

THE COURT: Yes.

This is an official break; same rules as yesterday.

(Recess taken.)

(Judge ERIC R. KOMITEE is in the courtroom.)

MR. SIEGEL: Your Honor, I understand this is becoming a little more of an ordeal with the CSOs, so I can just withdraw the question and we can move on.

THE COURT: I think we need to wait for Mr. Sullivan.

(Pause in the proceedings.)

THE COURT: Oh, I thought I saw him moments ago, but.

MS. KASSNER: Your Honor, he's here now.

THE COURT: All right.

We will bring the jury back when we are ready.

MR. SIEGEL: Your Honor, I'm going to move to strike his answer as nonresponsive to my prior questions.

THE COURT: What was the question and what was the answer?

MR. SIEGEL: I think the question is: Is that what it says?

And he says: Are you sure you're not cherry-picking these? Or whatever exactly it says.

THE COURT: Yes. Given that we would otherwise have to put the trial on pause and wait for the CSOs to do whatever is involved.

That question and answer are stricken.

(Pause in the proceedings.)

THE COURT: We are ready when the jury is.

THE COURTROOM DEPUTY: Okay.

THE COURT: Ms. Gilbert, please file the exhibit as soon as you can. We cannot exchange things by email. The emails are a courtesy just to make sure we see things, but they need to be on the docket.

MR. SIEGEL: And your Honor, obviously not right now, but we do have a response to what was filed, once the Court has it and once we have some time.

THE COURT: I have not seen it.

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Mr. Siegel, you can continue.

CROSS EXAMINATION
BY MR. SIEGEL: (Continuing)
MR. SIEGEL: All right.
Can we put the, I don't know if we're not plugged in. Okay.
Q So, Mr. Watson, just to clarify my question, I'm just asking you about the words that are written in this Exhibit in evidence.
So in this Exhibit in evidence, on page 5, under where it says: From Carlos Watson.
It says: Are you sure.
Is that what it says?
A Yes, that's what it says.
Q And this says at 10:51:33 seconds a.m.?
A Yes, that appears to be what it says.
Q And then at 10:51 and 42 seconds, which is nine seconds later, there's another text, correct?
A Or at least that's what it says.
Q Sure, that's what it says.
Correct?
A That's what it says, yes.
Q And then it says: From Samir Rao: Reference it as north of 40.
A Yes.
Q And then from Samir Rao it says: 3.

Correct?
A Yes.
Q Zero.
A Yes.
Q Then it says: Last year.
A That's what it says.
Q Then Samir Rao writes: 33.
A That's what that says, yes.
Q And then: This year 45.
A I apologize, will you scroll back to the prior message?
Q So, this one's -- this prior message at 10:51 and 58 seconds?
A Yes.
Q What's written here is: 33.
A That's what it says.
Q And then what's written in the next text is: This year 45.
A Yes.
Q Then on the right it says: From Suzee Han.
That's what it says?
A Yes.
Q And it says: I'm looking.
A Yes.
Q And then it says, the next text says: From Samir Rao: 7 through Q1.

A Yes.
Q Then it says: From Samir Rao.
And then under that it says: Send him the cheat sheet?
A Yes.
Q Then it says: From Suzee Han: We told Tom.
Correct?
A Yes.
Q The next text says: From Suzee Han: Q1 7 million; Q2 7 million; Q3 9 million; Q4 12 million; as to 35 million.
That's what it says?
A Yes.
Q And then, then another text it says: From Carlos Watson.
Correct?
A Yes.
Q And it says: What adds to 45 million.
Correct?
A That's what it says, yes.
Q And then the next text is from Suzee Han.
Correct?
A Yes.
Q And below that it says: We told Interlock in April we were doing 45 million in revenue.
Correct?
A Yes, that's what it says.

Q And then it says: From Suzee Han: As up to, colon.
Correct?
A Yes, that's what it says.
Q And then it says: From Suzee Han: Q1 6.4 million; Q2 10 million; Q3 17 million; Q4 12 million.
Correct?
A Yes.
Q Then from Suzee Han, in all caps: KEY NOTES.
And then in lowercase: We told Interlock this in April. The 45 million includes 6 million of the vets.
Correct?
A Yes.
Q And from Suzee Han: If we remove events, annual revenue ends up 39 million, which breaks down as 6.4 million, 10 million, 12 million, 10 million.
Correct?
A Yes.
Q Then Samir Rao says: Have to drop?
A Yes.
MR. SIEGEL: I'm going to show you another Exhibit, Government's Exhibit 3006.
(Exhibit published.)
MR. SIEGEL: At page 10.
Q And in this text chain, the first text that I'm focusing on from 11:58 and 41 seconds, that says from Carlos Watson,

correct?
A Yes, it does.
Q And you wrote: Harry, what revenue number does he have.
Correct?
A Yes, that's what it says.
Q And then it says from Suzee Han: 34 for 2019. 45 for 2020.
Correct?
A Yes.
Q Then it says: From Carlos Watson.
Correct?
A Yes.
Q It says: Have we given them any decks.
Correct?
A Yes.
Q Then it says: From Suzee Han: I'm looking through my inbox rights now.
That's what it says?
A Yes.
Q Then it says: From Carlos Watson: We should also reengage with Arya.
Correct?
A Yes.
Q Then from Suzee Han: No, we have not shared any decks. And should get a NDA in place.

Correct?
A Yes.
Q All right. Let's talk about Oprah.
Correct or incorrect; Samir Rao told investors that Oprah had committed to lead the Series D?
A Yes, I think I've subsequently seen that.
MR. SIEGEL: And I want to look at an example, so I'm going to show you Government's Exhibit 5026.
(Exhibit published.)
Q And zooming in on the bottom, and in the paragraph labeled: Growth capital: 100 million Series D.
Second sentence, it says: We are pleased to share that we have commitments from both Oprah Winfrey and Live Nation to lead our Series D financing round.
Correct?
A That's what it says, yes.
Q This email does not say Discovery, correct?
A I haven't read the whole email, but, but, but this sentence does not say Discovery. And I suspect that the -- I see elsewhere in here it says OWN, in the first paragraph, but I'm not sure it uses the word Discovery even though at this point I think OWN was owned by -- no pun intended -- it was owned by Discovery.
But I think it says OWN in the very first paragraph, but I guess several times.

Q Mr. Watson, my question was: In this sentence, does it say that there's a commitment from Discovery to lead our Series D?
A No. Not in this sentence.
Q And by the way, you said that you've subsequently seen this.
You're copied on this email, correct?
A I don't know that I was referencing this email, but, but if you're asking am I copied on this email, yes, I'm -- it looks like I'm -- it appears to be that I'm copied on this email.
Q Is it correct or incorrect that you told Samir Rao to send this email?
A Incorrect.
MR. SIEGEL: I'm going to show you Government's Exhibit -- well, let's see.
Q Before we leave 5026, this is from August 20th, 2019.
Correct?
A Yes. That definitely sets the date that's listed there, yes.
MR. SIEGEL: I'm going to show you Government's Exhibit 5020 -- Government's Exhibit 5025.
(Exhibit published.)
Q This is an email from August 20th, 2019, correct?
A Yeah, I, I apologize, will you remind me what the prior

email, the date of the prior email was, please.
Q Sure.
MR. SIEGEL: So I'm going to go back to Government's Exhibit 5026.
Q So this is August --
A Okay, I got it, thank you, appreciate that.
Q August 20, 2019, at 1:00 p.m. eastern time?
A Yeah, thank you, sorry about that.
MR. SIEGEL: And Government's Exhibit 5025.
Q From Carlos Watson, correct?
A Yes.
Q From August 20th, 2019, at 12:49 p.m. eastern time.
Correct?
A That's what it says there.
Q So, this is eleven minutes prior to that email we just looked at?
A Assuming these are authentic, yes.
Q And then the bottom email, this is a draft from Samir Rao of the email we just looked at, correct?
A Yes, he always wrote drafts of these.
Q And he wrote, in the second from the top: Are we good to send this note? Wanted to make sure we're aligned on the Series D timing, slash, details.
Correct?
A Yes, that's what it says there.

Q And you wrote: Yes send.
Correct?
A That's what it says there.
Q So, is it correct or is it incorrect that you told Samir Rao to send that email?
A Again, that's one of those answers that is nuanced and I realize that you've only asked me for correct or incorrect. So I apologize. I don't want to -- I don't want to give you two sentences when you're asking for correct or incorrect. So, I can't answer that simply.
Q That's fine.
Correct or incorrect; Samir Rao told investors that Live Nation and Oprah had agreed to invest $10 million in the Series D?
A I don't know that I see that here, but in the course of this trial I've seen it elsewhere.
Q Well, correct or incorrect; you told Samir Rao to say that.
A Incorrect.
Q Okay.
MR. SIEGEL: I'm going to show you Government's Exhibit 3507.
(Exhibit published.)
MR. SIEGEL: Go to page 6.
And this is a text message. I'm focusing on the one

at 9:07 and 24 seconds a.m.
Q And this says: From Carlos Watson.
Correct?
A Yes.
Q And the body of that text says: $10 million committed by LN and O each.
A Yes.
Q Is that what it says?
A Yes, that's what it says.
Q Okay.
Let's talk about Google.
Is it correct or incorrect that you told Google that Emerson Collective was leading the Series D?
A I think in one conversation I did, yes.
Q Correct or incorrect -- and I'm sorry -- correct or incorrect; that was in 2021?
A Yes. I -- yes, I believe so, yes, in 2021.
Q Correct or incorrect; Emerson Collective did not invest in Ozy at all in 2021?
A Again, nuanced answer, so if I'm permitted to give a sentence, I will. If I'm not permitted to give a sentence, I'll have to say I can't answer, but.
Q Okay.
MR. SIEGEL: I'm going to show you Government's Exhibit 19-A.

(Exhibit published.)

MR. SIEGEL: All right, so the fourth row. The fourth row from the bottom -- fourth row from the top is Emerson Collective Investments, LLC.

Q Is that what that says?

A That is what that says, yes.

Q And I'm -- this summary for 2021, there is nothing listed for Emerson Collective investments for 2021.

A Respectfully, you showed me this yesterday and you had a mistake that I found overnight that I think we're going to go over on my redirect. So, I don't know that I trust this data.

Q Mr. Watson, I'm just asking you a question about this document.

A Yeah.

Q And this document --

A This document that you have here that I did not create had nothing to do with --

Q Mr. Watson, my question is: In this document -- just correct or incorrect, and if you want to say you can't answer, that's fine, too.

A Sure.

Q Correct or incorrect; in this document, for Emerson Collective, under 2021, there is nothing listed.

A On my screen right now it's covering up 2021.

Do you mind taking down the highlight so that I can

make sure I see 2021 --
Q Sure.
A -- within Emerson.
Right now, your document is showing nothing for Emerson Collective.
Q For 2021.
A For 2021, correct.
Q Okay.
Correct or incorrect; you told Samir Rao and Suzee Han that you should have told Google that Marc Lasry was leading the Series D.
A Correct, yes.
Q Correct or incorrect; Marc Lasry did not invest in Ozy at all in 2021.
A Incorrect.
MR. SIEGEL: So I'm going to go back to Government's Exhibit 19-A.
Actually, there's an easier way to do this.
(Pause in the proceedings.)
MR. SIEGEL: All right, I'm going to show you Government's Exhibit 5.
(Exhibit published.)
Q So, in Government's Exhibit 5 it lists one investment for Marc Lasry for a million dollars in 2019, correct?
A That's what your document shows, yes.

Q It does not show anything from 20211 for Marc Lasry, correct?
A Your document does not show anything from 2021, but it's an incorrect document.
Q Right.
Correct or incorrect; Samir Rao told Google that Lasry was leading the Series D.
A I'm not -- I'm not sure, but I'm happy, I'm happy to look at that.
Q Well, correct or incorrect; you were copied on the email where Samir Rao said that to Google.
A Again, I'm very, very happy to look at it. I got a million emails, so I probably would do well to make sure I look at it.
MR. SIEGEL: Okay.
Well, I'm showing you Government's Exhibit 6386.
(Exhibit published.)
Q This is an email from Samir Rao, correct?
A Yes, it is.
Q And it's to Albert Lee and Sonal Somaiya at Google?
A Correct.
Q And you are copied on this email?
A Yes, I am.
Q And under the heading Ozy Series D, it says: Marc Lasry leading.

Correct?
A Yes.
Q And it says: Lasry is leading our existing investors (Emerson Collective, Interlock Ventures, et cetera) in Series D, whose initial close is April 19th.
Correct?
A Yes.
Q And correct or incorrect; Google was considering hiring you to work at Google.
A Yes.
Q Okay.
Correct or incorrect; Google was considering investing in Ozy as part of a deal to hire you.
A Yes. In 2021. Google made two offers to invest.
Q 2021, I apologize.
Now, correct or incorrect --
A Sorry, at least two.
Q Correct or incorrect; in 2021, you withdrew from the process before there was a final agreement.
A Yes, I respectfully turned them down around June the 1st of 2021.
Q Now, correct or incorrect; Suzee Han sent a deck to Antara claiming that Google was leading the Series D.
A I'm not sure, but she may have.
Q And correct or incorrect; you were copied on that email.

A Again, I'm, I'm sure you'll share that with me and, you know, I wouldn't be surprised if I was.

MR. SIEGEL: All right.

So, I'm going to show you Government's Exhibit 6423.

(Exhibit published.)

Q This is an email from Suzee Han, correct?

A Yes, back in April of 2021. So, about six weeks before I turned Google down.

Q And it's to you?

A Yes.

Q In the "to" line?

A Yes, I'm in the "to" line.

Q And copied are Samir Rao, Chetan Bansal and Himanshu Gulati, correct?

A Yes, right.

Q And?

MR. SIEGEL: And just to look it at the attachment 6423A.

(Exhibit published.)

MR. SIEGEL: I'm looking at slide 36, the center column.

Q It says: Lead investor Google $30 million.

Correct?

A Yes, under proposed Series D deal terms.

Q Correct or incorrect; Samir Rao told Maurice Werdegar

that Google was leading the Series D.
A I'm not sure, but I wouldn't be surprised.
Q Correct or incorrect; you were blind-copied on that email.
A Very happy to look at whatever you'd like to share.
MR. SIEGEL: All right.
So I'm showing you Government's Exhibit 6450.
(Exhibit published.)
MR. SIEGEL: This is an email from Samir Rao.
Q Correct?
A Yes, back in May before I turned Google down. So, about three weeks before, before I said thank you but no.
Q I'm sorry, I, I, I'm -- my question was this is an email from Samir Rao?
A Yes.
Q And you are blind-copied on this?
A Yes.
Q And in the paragraph: Labeled strong interest.
It says: We are proud to say that this Series D round has attracted more interest than we originally anticipated. Your participation would be part of a $65 million overall round, led by Google (with whom we've negotiated terms), Marc Lasry and a number of our existing investors.
Correct?

A Yes, that's what it says.
Q Now, you withdrew from consideration, you said, June 1st with Google?
A Right around there, yes.
Q And in 2021, Google did not invest?
A Because I turned them down, yes.
Q And when you turned them down, you had not yet reached a final agreement, correct?
A It -- if I had wanted to do it, there would have been more negotiation, that is correct.

We had done a lot of the negotiation over the prior six to nine months, but if I really was going to go all the way through with it, there probably would have been -- there probably would have been a meaningful two -- two weeks worth of negotiation that would have had to happen. Including timing, and who's going to take over for me, and when they would take over, and how -- when the money was going to arrive and all those sort of things. We would have had to work out those details.

MR. SIEGEL: Okay.

I'm going to show you Government's Exhibit 6453.

(Exhibit published.)

Q Now, am I correct or incorrect; you're not on this email.
A No, I'm not on this email.

MR. SIEGEL: I'm just going to the bottom of page 1.

Q This is an email from Samir Rao to Chetan Bansal, correct?
A Yes.
Q And in that second paragraph, at the last sentence, he says: Google gave us a heads-up that they should be closing tomorrow given the focus on their going the I/O conference today.
Correct?
A Yes, that's what it says.
Q And as you've -- as I you think you said, a couple seconds ago, even if you would have decided to go forward with this, you were still two weeks away from completion, about.
A From the deal that I would -- so --
Q Is it correct or incorrect?
A Can't answer that correct or incorrect.
Q Okay.
A Yeah.
MR. SIEGEL: And I want to show you another email, Government's Exhibit 6454.
(Exhibit published.)
MR. SIEGEL: Just a moment, I'm sorry, your Honor.
I apologize, your Honor, just one moment.
(Pause in the proceedings.)
MR. SIEGEL: I apologize. Wrong Exhibit.
Government's Exhibit 6455.

(Exhibit published.)
Q And this is another email thread that you're not on?
A Yes.
Q And the bottom email from Samir Rao, the last bullet he writes: Closing: Confirming that remaining investors are coming in this week, and in Google's case, facilitating the close is just mechanical at this point.
That's what he wrote?
A Yes, that's what he wrote.
Q Mr. Watson, do you agree that while at Ozy, Samir Rao engaged in fraud?
MR. SULLIVAN: Objection.
THE COURT: Overruled.
A Yeah, I can't answer that.
Q Will you agree that he sent a fake contract to a bank as part of getting a loan?
A He represented to me that it was a mistake.
Q I'm asking if he sent a fake contract to a bank.
A He represented to me that it was a mistake.
Q Mr. Watson, Mr. Watson, correct or incorrect; he sent a fake contract to a bank.
A Then, respectfully, I can't answer. I'm trying to be helpful, but I hear what you're saying, so unfortunately I can't answer it if those are the two options.
Q So, you can't answer whether it's true or not that he

sent a fake contract to a bank?

MR. SULLIVAN: Objection; asked and answered.

THE COURT: Overruled.

A Respectfully, I can't answer.

Q Okay.

THE COURT: Let's move on to another question.

MR. SIEGEL: I'm going to show you Government's Exhibit 6100.

(Exhibit published.)

Q This is the email that Tripti sent to you after Samir Rao sent that contract to a bank?

A Yes, I believe so.

Q And in her email to you she says: This email (from Samir to Sandy below) is illegal. This is fraud.

Is that what she wrote?

A Yes, that's what she writes.

Q And she told you: This is forging someone's signature with the intent of getting an advance from a publicly-traded bank.

Correct?

A That's what she writes.

Q And she wrote to you: This is reckless and unnecessary.

Correct?

A Incorrect. She wrote that to Samir.

Q Could you read just who she wrote this email to?

A That first line there says: Carlos and Samir.
Q Okay.
A But I think at different points in the email she addresses me and she addresses him them at different points.
Q So in this email addressed: Carlos and Samir.
She wrote: This is reckless and unnecessary.
Correct?
A And just before she said: Samir, because you initiated and then involved me in this.
Q Mr. Watson. Mr. Watson.
MR. SULLIVAN: Objection. Objection. Interrupting the witness again.
THE COURT: Let's have another question.
Q Correct or incorrect; she wrote that she saw this as a felony.
A Yes, I see that she wrote that to Samir there.
Q And she attached an email, correct -- Excuse me.
She attached the contract, correct?
A I see it says attachment, but I'm not sure what the attachment is.
MR. SIEGEL: Just one moment.
Let's look at the attachment.
(Exhibit published.)
MR. SIEGEL: So I'm showing you Government's Exhibit 6100A, which is in evidence as the attachment.

Q And Mr. Watson, this is not a real contract with OWN, correct?
A Correct.
Or, or -- apologies. My understanding is that this is -- this is not.
Q Correct or incorrect -- and my question is just is it correct or is it incorrect: You did not fire Samir Rao in 2019 after you received this email from Tripti.
A Yes.
Q Is it correct or incorrect that after Tripti resigned, you told Samir that you both had to move on.
A Yes.
Q And you told Samir that you had to make 2020 your breakthrough, correct?
A Yes.
Q Correct or incorrect; you did not fire Samir Rao in 2020.
A Yes.
Q Correct or incorrect; this fake contract with Hanmi was not Samir's only infraction in 2019.
A As, as I've come to learn.
Q Well, you said that you found out in late 2019 that Samir Rao had taken out loanshark loans without telling you.
A I think I more accurately said that over a period of time, beginning in late 2019 and going through 2020, I became aware that he had taken out multiple loans, including from

people who it turned out were loansharks.

And I did not find that out until I hired a lawyer -- actually, a series of lawyers -- to investigate it. And they were the ones who informed me that these folks weren't just lenders, but, in fact, they were closer to loansharks.

And so I asked these two senior partners at different law firms, one at Perkins Coie, one at Armstrong Greenleaf, to handle it and to unwind these various things and to make sure that everybody was paid back and make sure that we had properly documented all of that.

That wasn't the kind of business I wanted to be in and I instructed Samir to now work with someone different, someone like WTI, who was a more conventional lender and who had tried to loan us money a year earlier and we had turned them down.

MR. SIEGEL: Just for the Court and Counsel, please. On the ELMO.

Your Honor, I move to read to the jury transcript Page 3474, 18 to 25.

THE COURT: Yes, please do.

MR. SIEGEL: Okay.

Could we publish, Mr. Jackson.

(Exhibit published.)

MR. SIEGEL: All right.

So, I'm just reading to you from the transcript of your testimony, Mr. Watson.

THE WITNESS: Sure.

MR. SIEGEL: (Reading):

The Court: I'm sorry, it's not a question of what was a big year. It's a question about when and it just calls for a timeframe.

When did you first discover what you just described, discovering about loans taken out in your name?

The Witness: So, 2019 -- late 2019, I would say, was the heart. And then 2020, with some digging by Rafael, I got greater clarity on exactly what was going on.

THE WITNESS: Yeah, that's what I just said previously.

Q Mr. Watson, is it true that in late 2019 was the heart of when you discovered that these loans had been taken out?

A No.

What I say there is in 2020, with some digging by Rafael Zahlraddin, senior partner, I got greater clarity on exactly what was going on.

Q Mr. Watson, so, was your testimony: So, 2019, late 2019, I would say was the heart.

Is that -- did those words come out of your mouth?

A In response to the question of when the Court's asking when did I begin to learn it.

Q Okay.
A I'm not sure why we're quibbling. It's very obvious that I said in 2020 I got greater clarity, but so be it.
Q So, in 2019, you begin to learn that Mr. Rao has taken out these loans, correct?
A Correct.

(Continued on following page.)

CROSS EXAMINATION
BY MR. SIEGEL: (Continued.)
Q You didn't fire him for that, correct?
A I'm not sure that's a firing offense. Okay.
Q In 2020 you found out that he had forged your signature on loan documents. That's what you claimed in your testimony, correct?
A Correct.
Q And you didn't fire him for that, correct?
A Correct.
Q And so the timeline, I want to clear up the quibbling, as you put it, late 2019, you begin to learn that he had taken out secret loans, correct?
A Correct.
Q And you don't fire him?
A And, my apologies --
Q You don't fire him, correct?
A I don't know that I would call it secret loans, but that he had taken out loans.
Q Mr. Watson --
MR. SULLIVAN: Objection. Objection. Counsel said secret.
MR. SIEGEL: He's answering the question that no one asked.
THE COURT: Let's repeat a question and start again.

BY MR. SIEGEL:
Q You didn't fire him, correct?
A I didn't fire him when?
Q In late 2019.
A No, I did not fire Samir Rao in late 2019.
Q And at the end of 2019, he sends that contract to Hanmi and Tripti resigns saying this is a fraud, correct?
A Yes, correct.
Q And you don't fire him then, correct? Just correct or incorrect.
A I did not fire Samir Rao in early 2020.
Q And then in 2020 you found out that he had forged your name on loans is what you've claimed, correct?
A At some point in 2020, yes.
Q And you don't fire him, correct?
A Correct.
Q Correct or incorrect, Samir Rao impersonated Alex Piper in February 2021, correct?
A Correct.
Q And correct or incorrect, you did not fire Samir Rao from Ozy --
A We fired him --
Q Excuse me, Mr. Watson. I didn't finish my question. You did not fire Mr. Rao from Ozy as an employee in February 2021?
A That is correct, we put him on --

Q Mr. Watson, and then you did not fire him as an employee in March of 2021, correct?
A We did not. With the board and I --
Q In April --
MR. SULLIVAN: Objection. Objection.
Q In April of 2021 --
MR. SULLIVAN: Objection, your Honor. Counsel can't just start yelling over the witness.
THE COURT: Let's have a new question and new answer.
Q You did not fire him in April of 2021, and I'm just asking is that true or is that not true?
A It is true that the board and I --
Q Mr. Watson --
MR. SULLIVAN: Objection, your Honor.
Q Is it not true?
THE COURT: Come to the sidebar.
(Sidebar; continued on next page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: I think it should be, by and large, the Court admonishing the witness, rather than the lawyers, although I've obviously stated that as much as I could.

Are you aware of any authority, Mr. Sullivan, that it's improper for a Court to direct a witness to answer a question yes or no if he can?

MR. SULLIVAN: No.

THE COURT: Okay. I've given that instruction a number of times. The witness is obviously not following that instruction. Obviously the decision not to follow it is a choice that he's making. I'm going to give that instruction again, and then we'll start to think about --

MS. GILBERT: But, your Honor, you said if he can.

THE COURT: One lawyer. I'm sorry, what did I say?

MS. GILBERT: You said if he can.

THE COURT: And if he can't, he should indicate he can't. Full stop. Not answer a different question or give a longer explanation. Are you aware of any authority?

MS. GILBERT: No. But I think you should instruct him that.

THE COURT: Okay.

(Sidebar concluded; continued on next page.)

THE COURT: I'm going to instruct the witness, again, that when you're asked a yes or no question or a correct or incorrect question, you should answer the questions, if you can, yes or not or correct or incorrect. If you can't, you should simply so indicate.

THE WITNESS: Fair enough, your Honor. Understood.

Q I apologize. We were talking over each other. Let me go back a couple. Is it correct or is it incorrect that you did not fire Samir Rao as an employee of Ozy in February 2021?

A I can't answer that correct or incorrect.

Q Is it correct or is it incorrect that you did not fire Samir Rao in March of 2021?

A I can't answer that correct or incorrect.

Q Is it correct or is it incorrect that you did not fire him in April of 2021?

A I can't answer that correct or incorrect.

Q Is it correct that you did not fire him in May of 2021?

A You're going to go month by month?

THE COURT: If you can answer the question, you should answer the question.

THE WITNESS: I can't answer that.

Q Is it correct or incorrect that you did not fire him in June of 2021?

A I can't answer that.

Q Is it correct or is it incorrect you did not fire him in

July of 2021?
A I can't answer that.
Q Correct or incorrect you did not fire him in August of 2021?
A I can't answer that.
Q Correct or incorrect, if the Goldman deal had gone through you stood to make $6 million?
A I think I ultimately would have made more than that.
MR. SIEGEL: Your Honor, I ask that that answer be stricken and you reinstruct the witness.
THE COURT: Is that correct or incorrect, if you can say. If you can't, you can't.
THE WITNESS: Correct.
Q Is it correct or incorrect, if the Goldman deal had gone through, Samir Rao was going to get $3 million?
A I believe so.
Q And that was after you claim he forged your name on contracts -- on loans? I'm sorry.
A Yes.
Q And that's after the fake Hanmi contract, correct?
A Yes.
MR. SIEGEL: Just one moment, your Honor.
Thank you, your Honor. No further questions.
THE WITNESS: Thank you.
THE COURT: Let's begin with redirect. If there is

any we'll go about another 10 or 15 minutes and then take a break.

REDIRECT EXAMINATION

BY MR. SULLIVAN:

Q Good morning, Mr. Watson.

A Good to see you. Good morning.

Q Good morning, ladies and gentlemen of the jury. Let's pick up where Mr. Siegel left off. In May 2021 did you have authority to fire Samir Rao?

A I did not.

Q In June of 2021 did you have authority to fire Samir Rao?

A I did not.

Q In July of 2021 did you have authority to fire Samir Rao?

A I did not.

Q At any time after the Goldman call in 2021 did you have authority to fire Samir Rao?

A I did not.

Q Why?

A Because we had a board of directors. He was a co-founder and there's a fairly substantial process you have to go through to make a move like that.

Q And did you and the board fire him from the board?

A We did, yes.

Q Okay. So the Government asked you a series of questions with respect to the time frame 2017 through 2021. The

Government asked and they went through each year. I'll ask you globally.

The Government asked whether Samir Rao lied to investors and you said I can't answer that with a simple correct or incorrect.

What is your complete answer?

A My complete answer is I don't know everything that he did, but if the question is do I believe that the decs that we went through with our board, the decs that we went through with investors were fundamentally correct, I do believe they were correct.

Why I do believe they were correct? Because we had quarterly board meetings with some of the most sophisticated investors in the world who owned some of the biggest and most important media companies. Not only did we go through the numbers in the board meeting, but after every board meeting Samir had to meet with three different sets of investors and he had to go through number by number. We did this dozens of times. So if these numbers were funny, if they were off, he literally would have had to fool people like dozens of times.

These are sophisticated people who are going through one by one. As you heard, we had hundreds of contracts worth hundreds of millions of dollars, and the idea that some incomplete QuickBook-like software captured all of our numbers is just a joke. Even their spreadsheet doesn't

even capture all of the money that came into Ozy.

And so, not only would I not trust that, but I wouldn't trust what they're sharing on that. So the short answer is, we had a really good business. There's a reason why BuzzFeed tried five times to buy us. There's a reason why the CEO of the New York Times asked me to meet with him --

MR. SIEGEL: Your Honor, objection.

THE COURT: Let's have another question so the answers are responsive to the questions asked.

Q Now, the Government asked you the same sort of question with respect to Suzee Han during the period that she worked there, worked at Ozy, whether she lied to investors and you said you can't answer that with a simple correct or incorrect.

What is your complete answer?

A My complete answer is that it seems, based on what I'm learning, that Samir and Suzee took shortcuts on 10 to 15, 200 plus --

MR. SIEGEL: Objection.

THE COURT: Come to the sidebar, briefly.

(Sidebar; continued on next page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: What is the objection?

MR. SIEGEL: My objection is that he's giving his view on what he's learned at this trial.

THE COURT: Then the objection is sustained.

MR. SULLIVAN: I didn't hear it that way.

MR. SIEGEL: He said it seems based on what I learned.

MR. SULLIVAN: At the time.

THE COURT: Let's frame the question by a time frame.

(Sidebar concluded; continued on next page.)

Q Mr. Rao --
A Please don't do that to me. Treat me gently. Treat me gently.
Q I'm so sorry.
A No, don't do that to me.
Q We were talking about Mr. Rao, Mr. Watson. So with respect to Suzee Han, I'm limiting my questions to the time period that she worked there and the time period when you were at Ozy.

Why were you unable to say or answer with a simple yes or no whether she lied to investors? What was your view during that time period?
A Probably three reasons. One is that she worked for Samir. So I didn't see most of her work. So is it possible that she did some stuff? Maybe. Two is because, again, my clear understanding of what matters to start-up investors is content, people, and vision. I don't believe she lied about the fact that we had a dozen TV shows.

I don't believe she lied about the fact that we had five newsletters. I don't believe she lied about the fact that we had ten podcasts. I don't believe she lied about the fact that we had four festivals. I don't believe she lied about the fact that we had 200 plus contracts.

I don't believe she lied about the fact that we had a $75 million deal with Omnicom or a $36 million deal with

Dentsu, or a $20 million deal with WPP, or a seven and a half million dollar deal with Univision, or multiple $2 million deals with JPMorgan Chase, or multiple 2 to $5 million deals with Discover, or a million dollar deal with Volvo, or a million dollar deal with Coke, or a $2 million deal with Airbnb.

So no, I don't think she lied about the fundamental things that mattered to investors and that they based their decision on. In fact, the Goldman memo says even if we discount --

MR. SIEGEL: Objection.

A It's worth three times what they're saying.

MR. SIEGEL: Move to strike his answer.

THE COURT: Sustained as to the part of the answer that relates to the Goldman memo. Otherwise, we will not strike the answer. Let's have another question.

Q So I think you said there were three reasons. Did you give all three?

A Yes. One, again --

Q Don't repeat the first one. What is three, if you didn't give it? You may have. I'm sorry.

A I'll come back to it. My apologies.

Q I'll come back to it. You had a series of questions where the Government would show you what they characterized as Ozy's internal records, and then would show you some decs or

emails with some different numbers.

So let's just take 2020 as one example. So the Government asked you, according to Ozy's internal records, Ozy made $11 million. Your answer was incorrect.

Why do you say that's incorrect?

A Just because it's wildly off. I guess I would say three reasons. One is we heard Ms. Poutre here and others in that suite was incomplete and in disarray.

MR. SIEGEL: Objection.

THE COURT: Sustained.

MR. SIEGEL: Move to strike, your Honor.

THE COURT: Granted. The question is by reference to what you knew, believed at the time, not what you have seen in this trial.

A Fair enough. I knew that we had five TV shows that year, including our first shows on A&E, our first show on Lifetime, our first show on the History Channel, our first show on Hulu, and a significant show on You Tube.

I knew that we had at least five podcasts, including our first significant podcast with the BBC, a significant podcast with iHeart, a podcast on Apple, a podcast on Spotify. I knew that A&E came to us and paid us for it. I also knew that we expanded our newsletter franchise, so that now we not only had a presidential daily brief in the morning but we had Whiskey in Your Coffee in the morning.

I also knew that we had a tremendous one in the afternoon, Daily Dose still, and I knew that we did something special called Reset America. I knew that we had the Ozy Genius awards. So knowing that and knowing that we had 40 plus customers, and knowing that most customers had one to four contracts, I know that we had north of 150 contracts.

I know that many of those contracts were in the millions of dollars. That included with people like WPP, people like General Motors, people like American Family Insurance, people like Discover, people like JPMorgan Chase, people like Smartsheet. So I'm very clear on where -- generally, where the numbers are. I laid them out when I went through the board, as best I could.

But as I said before, you know, when they're asking did Suzee misrepresent --

MR. SIEGEL: Objection.

Q Let me ask another question.

A Sure.

Q At the time, did you think that this NetSuite platform captured all of your income?

A Definitely not. And asked each and every finance person to not leave things in different buckets. Some of it NetSuite, some of it in Samir's spreadsheet, some of it elsewhere, but actually putting it all together, if you look at Tripti's onboarding document --

MR. SIEGEL: Objection.

THE COURT: Is that document in evidence?

MR. SIEGEL: No.

THE COURT: Sustained.

BY MR. SULLIVAN:

Q When you're onboarding people in finance, did you give them any particular tasks?

A I did. One of the top three tasks you also see in the board dec that we looked at yesterday. So if you look at that board dec from May of 2020 board dec, if you go towards the back and it talks about challenges, it talks about hiring a CFO, and it talks about fixing the data infrastructure of Ozy. That included our financial data infrastructure. Not only did I know, but all of our board members knew.

MR. SIEGEL: Objection.

THE COURT: You can testify about what's in the document but not what's in another person's mind.

A What it had in the board document, what I discussed at the board meetings, was the need as a young company not only to keep growing our content and growing our team, but also to grow the back end support for that. And that back end support not only meant more people but it meant better processes, and it also meant collecting the data in a more holistic and comprehensive way.

I ultimately came to the conclusion that I needed

someone other than Samir to do it, which is why I ultimately hired a gentleman who had been a partner at McKenzie, Harvard business school grad, Princeton engineer, named Chris Kirk, who we extended the offer to and he signed.

I knew I needed someone who had that kind of robustness. And I did it out in the open, in coordination with the board, and in coordination with Samir, and he understood that he was on his way out and --

MR. SIEGEL: Objection.

A And Chris was going to takeover.

THE COURT: Sustained as to the final part about what Samir knew. Otherwise, the answer will stand. Let's have another question.

MR. SULLIVAN: I'm sorry, your Honor?

THE COURT: When I say let's have another question, I don't mean move on to another topic, even if you want to stay on this topic.

MR. SULLIVAN: Very well. I couldn't hear you.

Q So you mentioned in your answer that some revenue was recorded in NetSuite, but there were other pots where revenue were recorded.

Do you know how many other buckets Ozy at that time had revenue recorded?

A Probably at least three other places.

Q And what were they?

A At times I believe Samir stored some of the information in essentially they called them data rooms. They called them in the cloud. They called them data rooms, kind of investor data rooms, and he would upload things to that. That was one of the places.

A second place was on the spreadsheets that they either kept on Google Drive on the computers, and what have you; and the third place that I believe he kept stuff and the most comprehensive place was probably both in our board decs. And, again, after every board meeting, not some, every board meeting, he had three sets of meetings. He had to meet with the Axel Springer financial diligence people, not one but usually three people.

He had to meet with the Emerson Collective people and he had to meet with the GSB people. He had to go through the numbers with each of them, and you can't just have a general conversation. You have to share a screen and go line by line through these. And he went through dozens of those meetings, and so that is further what gives me confidence that these guys who own Politico, they own Business Insider, they own Morning Brew --

MR. SIEGEL: Objection.

THE COURT: Sustained.

MR. SIEGEL: Your Honor, could we have a sidebar?

THE COURT: Let's take our last break of the morning

now anyway, and we'll regroup shortly.

(Jury not present.)

THE COURT: What is the objection?

MR. SIEGEL: Your Honor, I think for every objection I've had during this redirect Mr. Watson has continued talking over the objection until Your Honor told him to stop.

THE COURT: I will remind the witness, if there's an objection you have to wait for a ruling before you continue with your testimony. What is this objection?

THE WITNESS: My apologies. I'm sorry about that.

THE COURT: Understood.

MR. SIEGEL: I thought you ruled on the objection and I asked for a sidebar.

THE COURT: Sorry. You asked for a sidebar.

MR. SIEGEL: I asked for a sidebar to ask the Court to --

THE COURT: So we're done?

MR. SIEGEL: We're done.

THE COURT: Okay. Then we're on break.

(Pause.)

THE COURT: There is a juror note. Is Friday, July 19th a day off or half a day?

MR. SIEGEL: Full day.

THE COURT: I think it's a full day, if we need it. That is next week.

MR. STERN: Full day, fingers crossed.

MR. SULLIVAN: If we're still here on the 19th.

MR. SIEGEL: I think, your Honor, you may not be available on the 19th. I might be mistaken.

THE COURT: I think I was planning to be unavailable on the 19th but hold on a second. Can I ask a dumb questions?

Do Massachusetts lawyers who spend more than six months trying cases in New York become New York State taxpayers if this trial goes to December?

MR. SULLIVAN: That's an "if" I hate to contemplate, but that's a question for my accountant.

MR. STERN: I assume not if they can avoid it, your Honor.

THE COURT: Let's get it done. I don't need a half day on the 19th.

MR. SULLIVAN: Okay.

(Recess taken.)

THE COURT: I'm going to tell the jury that this trial may conclude, the presentation of evidence may conclude in the next day or two. If anybody thinks that is a bad estimate, speak now. I'm seeing no hands. That is the message.

(Jury present.)

THE COURT: Mr. Sullivan, please.

I'm sorry. There is one thing I wanted to say

before we get started. We had an inquiry from one of the jurors on a scheduling question, which is will we be sitting a half day, the full day, or something else on July 19th, which is a week from this coming Friday. I have what I think are both good news and bad news in response to that inquiry.

The bad news is that if we need it, we will be sitting the full day on July 19th. The more welcome news is that I am led to believe that the testimony in this case may be wrapping up in as soon as a day or two. And so it is imminently possible, although there is no promises, it is possible that this matter would have concluded by July 19th. That is what I have for you. With that, Mr. Sullivan, back to you.

MR. SULLIVAN: Thank you, your Honor.

BY MR. SULLIVAN:

Q Could we have Government 6110 up, please, which is in evidence. Mr. Watson, do you remember being asked about this document?

A Yes, I do.

Q So not limiting you to correct or incorrect, why did you revise down or have Suzee revise down from 35 to $30 million?

A I knew they were still wrestling with it. There are sometimes contracts that come in late. Yesterday we looked at the Discover contract, which was a million dollars for just one month. So that can happen, especially in the holiday

season. And so, if I ever have to choose, I would rather be more conservative than overstate it. So knowing that it was probably going to take them several months to go through everything properly, I wanted them to pull back, as opposed to leaning forward. I thought it might ultimately end up at 35 or north of 30, but I didn't want them to do that without some real clarity if that was the case.

Q All right. Can we have Government Exhibit 6447-C, please. Do you recall being asked about this document on direct?

A Yes.

Q Could we scroll down, please, revenue page. There it is. If we could expand the table over here.

So Mr. Watson, on the top of this page labeled three financials, you have pro forma estimates. What does that mean?

A That means tentative draft, unaudited, you know, be careful. This is likely going to have what the next line says, which is it's going to likely have change.

Q And why did you include this on your financial estimates?

A We always did because we had a young team. I knew that they weren't savvy media CFOs, and even though we had it in our investment contracts, I also wanted to have, I guess, what people would call belts and suspenders and put it here just to say buyer beware, this is not like Ernst & Young came in and

did this, it's not like PricewaterhouseCooper came in and did this. There is almost certainly going to be change in this, whether there were missed contracts that are discovered, whether there's different accounting treatments, whether what have you.

Q Thank you. You can take this down. And please pull up Government Exhibit 3525. Do you remember this text thread?

A I do.

Q And do you remember testifying about it on direct?

A I do.

Q Can we scroll down, please.

A Was it near the top? Was it the second one maybe? It might have been the second one that they had shown me previously, all the way to the top. I think it might have been --

MR. SIEGEL: Your Honor, objection. There is no question pending.

THE COURT: The question is, do you remember this document and I think --

THE WITNESS: Yes.

THE COURT: Counsel is re-acclimating the witness to the document.

BY MR. SULLIVAN:

Q Let's take this down. I can't find it. I'll ask from your memory. Do you remember a text thread where you asked

the question, are we profitable?
A Yes.
Q Were you speaking about the entire company or something else?
A Something very specific in that text, which we just had for a moment there. It says WIYC, which is Whiskey in Your Coffee. That was our new morning email, newsletter. We had five or six people working on it. I mentioned before Aromo in Nigeria, Charo and Fiona in Paris, and others. The idea of adding yet another person to that particular one --
Q Mr. Watson, we found it here. Is this the --
A That's it, yes.
Q So yes. So did you say the words "are we profitable and I do not know it"?
A Yes.
Q Text the words.
A Yes. That was the last sentence.
Q Okay. And then you mentioned WIYC. What does that stand for?
A That stands for Whiskey in Your Coffee.
Q So your reference was not to Ozy generally?
A Correct.
Q And I cut you off. I'm sorry. Tell us what you were talking about in this text.
A It was all about do we hire one more person for that

specific newsletter, do we hire a photo editor. We say visuals here. We already had a photo editor, but they were about to hire a second photo editor.

I was saying hang on a second. Before we hire a second photo editor for a newsletter, let's see first if we can make this individual newsletter profitable like the others.

Q Earlier you testified that one of your implementations in the financial department was to capture revenue by a specific newsletter, by specific television program. Is this why?

A It is. So that we knew what was really working and what we should do more of. And yes, that was important because previously the team was in a rush and they would lump all the revenue together and not break it out either by category or by product.

But when you can see by product, you can say oh, this really is successful and we should do not just one more but several more of those.

Q Okay. Thank you. You can pull that down. Now let's talk about decs. I won't go through everything that the Government went through, but are there times when decs in the same year may include different financial numbers?

A Yes, definitely.

Q Why?

A Probably at least three reasons. One, again, is just

historical clean up. You can go back and realize that an agreement or a relationship that should have been counted in something might have been missed. That's number one.

Number two, there may be a different accounting treatment. So as you go along and you have conversations, you may come to understand that under this treatment, you know, this would be recognized instead of that, and that could be it.

And the third piece it goes along is that, you know, particularly during Covid there was just a lot in the air. So are we going to have an Ozy Fest, are you not going to have an Ozy Fest, are you going to do one TV show under our partnership with A&E, or are you going to do four. So there was a lot up in the air.

It was not surprising things could change literally day-to-day, month to month, quarter to quarter. In a big stable company, that's not the case. But in a young, fast startup, the kinds you see on Shark Tank and elsewhere, of course you're going to have day-to-day changes. That's not atypical. It's actually a sign of health that things are moving, and not just moving as you look forward but that you're trying to clean up things looking backwards. That's a good sign that the startup is trying to get stuff more right as they go along.

Q So when you saw on the board when you would send an email

or a text, you know, what numbers did we give to Mr. Wardegar, what numbers did we give Mr. Franco, why would you ask those questions?

A I assumed there was constant cleanup going on. I wanted to understand where the cleanup stood, and I wanted to understand not only where it stood is looking backwards but I wanted to understand where it stood as we looked forward.

I didn't know what conversations people had. You could tell from the text that -- and I can't remember without me showing my calendar here, but I'm often coming from three different meetings and I'm not typically having detailed meetings around financials with an investor. That's Samir's job.

I'm not having those conversations, so of course I'm asking what conversation did you have. Now, if the conversation with the investors about what we're doing in our newsletters or what's happening with our TV shows next, or where are you going with your podcast, or do you think you're going to do Ozy Fest beyond New York, or do you really believe in the Ozy Genius awards, then, yeah, I'm your guy and I will be given the notes on what we're doing. But I'm not -- that's not how I'm spending my time. That's not how my investors want me to spend my time.

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q What is your understanding of where your investors want you to spend your time?

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q Can we look at Government 5025, please. You recall that this is an email. It says from you to Samir Rao with a copy of Suzee Han, right?

A Correct, yes.

Q All right. Now you were -- this is another document where you were unable to give just a simple correct, incorrect answer.

So what is your complete answer?

A My complete answer is that Samir wrote north of a thousand notes for potential investors. Most of them were the same, which is they focused on our content. If you look at the note below, it starts with talking about a partnership with Oprah.

If we scroll up it doesn't move next to financials, it moves next to Ozy Fest. If you scroll down, rather, that is where our focus is, major strategic partnerships. That's where our focus is. I can't get into the weeds on every one of these. I have too much going on. One of the complaints that I consistently got from the Goldman folks and from Maurice and from other folks --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q It's fine in terms of you can't talk about what other people are saying.

A One of the things I understood is it was important for us to get back to people, and that there was an enormous level of frustration.

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q Why did you want to get back to people?

A I wanted to make sure that we were responsive. And so rather than go around and around, I'm probably in the middle of two meetings at this point. So I said yes, send.

I don't need to review something that has been sent out a thousand times. I don't have time to do that, and so yes, please send, you know, this is with Abbas. Abbas, by the way, is someone we were paying money to. He had a duty towards us. He's an investment banker.

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q Why were you comfortable having him send this to Abbas?

A When I hire an investment banker I'm expecting, in my experience, is they spend one to three months vetting all the information they get.

MR. SIEGEL: Objection.

THE COURT: Come to the sidebar. (Sidebar; continued on next page.)

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

MR. SIEGEL: Your Honor, as we've talked about at previous sidebars, it's not appropriate to say that I sent this and I thought they were sophisticated and I thought that they would figure it out if there was an issue.

THE COURT: So the banker is the recipient or the banker is somebody advising?

MR. SIEGEL: This is to Abbas Maniar, who testified that he was the pass through to investors.

MR. SULLIVAN: The investment banker.

THE COURT: This is not an investor recipient we're talking about. This is an agent of Mr. Watson. It may still be irrelevant, unless there is a foundation.

MR. SULLIVAN: They put this in evidence in order to show Mr. Watson was sending and made misrepresentations. Mr. Watson is saying that he trusted Samir, who wrote the drafts, and it was going to Mr. Abbas, who vets it anyway. So I asked why did he feel comfortable saying to send if he didn't have time to read. He testified he didn't have time to read all this. So it's just for that limited purpose and that's the last question.

MR. SIEGEL: The testimony Mr. Abbas was going to vet is not appropriate.

MR. SULLIVAN: His understanding. His understanding was that Mr. Abbas --

MR. SIEGEL: It's not a defense to fraud to say that I sent this information to a third party, and I thought if there was an issue they would catch it. The point is he authorized the sending of information, that is not true.

THE COURT: Who did he authorize it to be sent to?

MR. SIEGEL: To Abbas.

THE COURT: And Abbas is not an investor but a banker.

MR. SIEGEL: Abbas is not a banker. He testified he is a liaison.

THE COURT: He is a marketing guy.

MR. SIEGEL: He passes the information to investors.

THE COURT: I think it's misleading to call him a banker. He makes introductions and is in the marketing business.

MR. SULLIVAN: He's actually an investment banker. He's a founder of an investment bank, not a marketer.

THE COURT: We can go back through the testimony.

MR. SULLIVAN: It's the last question. It goes to the good faith. The mens rea is central to this question.

MR. SIEGEL: I will note to the extent this is about Mr. Abbas and whether he vetted things, that is also outside the scope of cross.

MR. SULLIVAN: It's their document they put up.
THE COURT: Did you use this document on cross?
MR. SIEGEL: I just asked if he said -- if Mr. Abbas sent this email.
THE COURT: The only question in my mind is, is there a foundation for the idea that Mr. Abbas is really a banker. That was not my understanding from the testimony.
I understood him to be a person who had relationships in the Middle East and made introductions. He may be a banker by training, but that was not the capacity in which he was engaged here.
MR. SULLIVAN: He introduced himself as founding an investment banking firm.
THE COURT: Pilot?
MR. SULLIVAN: I think that's it, yes.
THE COURT: Is his firm Pilot?
MR. SIEGEL: His firm is Pilot, and he testified that he makes connections.
MR. SULLIVAN: He also testified it's an investment banking firm. He's an investment banker.
THE COURT: Let's hold this question until we get back to that. We'll come back to it after lunch.
(Sidebar concluded; continued on next page.)

THE COURT: We're going to move on temporarily at least to another subject. Mr. Sullivan back to you.

EXAMINATION BY

MR. SULLIVAN:

(Continuing.)

Q Okay. Can we pull up Government 19-A.

Do you remember being asked by the Government about this document?

A Yes, I do.

Q And one question where you said "incorrect" was Government showed you a line that said, Mark Lasry, 1 million in 2019. And something that said zero in 2021.

Do you recall that?

A I do.

Q And you said you disagreed with that representation?

A Correct, it was wrong.

Q And why was it wrong?

A Because Mark Lasry struck an agreement with me to receive another $2 million.

MR. SIEGEL: Objection.

THE COURT: Are you talking about a written agreement or oral agreement?

THE WITNESS: Oral. Actually, I believe it's both written and oral. To become chair of the board which we announced publicly on Squawk Box.

THE COURT: My only question was, written or oral?
THE WITNESS: Yes.
THE COURT: The objection is sustained on that basis.
Q Just about the oral agreement?
A Yes.
Q We'll deal with any writing later?
A Yes.
Q Was it your understanding that --
What was your understanding with respect to his investment in 2021?
A That, in exchange for becoming chair of our board, which was a big deal, and which we announced on Squawk Box and Axios and elsewhere, Mark would get $2 million, essentially, a $2 million interest in the Series D, as in dog.
Q And is this the sort of strategic partnership deal that you've described to us before?
A Hugely strategic. Hugely strategic.
Q Why hugely strategic?
A This guy owns the Milwaukee Bucks. He's one of the prominent investors in the world. He helped me close a million dollar deal with TikTok. He helped me close a $36 million deal with Dentsu. Incredibly helpful. He's hosting VIP parties for other potential investors that then

makes people like Don Gogel and other people invest. Again, I know the Government tried to minimize, but the truth of the matter is --

MR. SIEGEL: Objection.

THE COURT: Sustained. Let's have another question.

Q Not talking about -- --

A Sure.

Q -- what the Government did.

A Yeah.

Q So that's sufficient.

Your view was that there was -- that that constituted your investment?

A Yes. And that kind of validation is just when you're a young company, you're doing your best to make it whether it's Oprah or BBC or Mark Lasry, it moves the needle to helps you grow the business.

Q Okay. You recall this would have been yesterday being asked a series of questions about some notes that you had about revenue?

A Yes.

Q So why did you make notes?

A Honestly, because this is a serious situation and I'm a responsible person and how am I going to come up and have a conversation about six years worth of things and not try and

be somewhat thoughtful about it. Of course, like, who would not try and do that?

Q Did you think anything was wrong with having notes?

A Completely not.

Q Okay. And you stand by the notes you made?

A Stand by the notes, yes.

Q Now, were some of your notes different than what was on the big whiteboard we had?

A Yeah, you ended up asking different questions.

Q You've actually forecasted what I was going to ask. Why were he were they different?

A Because you just ended up, again, there are different ways to bucket things. As I said before, like, you know, sometimes you bucket podcasts and TV together. Sometimes you bucket podcasts and digital together. Sometimes you bucket live events with stuff. So different ways to bucket it. So depending on how, you know, whoever I'm having the conversation with wants to understand it, there are different ways to bucket it. In general, it should be roughly the same but there are different ways to separate it out.

Q So the whiteboard was -- everything on the whiteboard you stand by?

A Yeah, I based it based on real products that we had and real customers that we had. And so, yes, I went year by

year. I explained the newsletters we had. I explained the TV shows we had. I explained the podcasts, the festivals, the awards. I talked about our biggest clients. And so, yes, I'm very comfortable with that.
Q Right. And cash, do you recall yesterday the Government asking you a series of questions about whether you received cash and cash only in investments?
A Yes.
Q Is cash the only way that you, you as in OZY, can receive investments?
A No, there are other ways.
Q How else?
A Barter and in-kind is one very, or what we call strategic partnerships. Whether it's with Alex Rodriguez or Mark Lasry or iHeart or Alchemy Media or others.
Q And the Government asked you yesterday, well, a question in form similar to, well, you can't pay your rent with a barter. And you answered, well, in fact, we did. Please explain?
A Yeah, no, I really appreciate you giving that example.
So we actually literally did that in Chicago. We were creating a small office. We had a team there, we began to have some good business there. We thought we would have more business. Chicago is where Discover is based or Discover is based right outside of Chicago. And as they

began to do more and more work with us, they wanted to have people --

MR. SIEGEL: Objection.

THE COURT: Sustained as what they wanted.

A So, anyhow, for Chicago, for an office, we had a small space that we could pay for or in exchange for some advertising, the landlord was willing to give us a bigger space. And so, we were happy to do a deal where, instead of paying rent on the space, we allowed that landlord's group, that landlord owned multiple things, to advertise.

THE COURT: Who is the landlord?

THE WITNESS: I can't remember the names, it's an individual.

THE COURT: An individual person?

THE WITNESS: Yes.

THE COURT: Okay.

Q Let's move to the questions about the Goldman call that you got yesterday.

Do you have to those in mind?

A Yes.

Q Right.

MR. SULLIVAN: I'm sorry, did I hear?

THE COURT: I don't think there was an objection.

Q Now, do you recall the time or time period that Samir Rao impersonated Alex Piper on that telephone call?

A Yes, I believe I do.
Q Okay. What's your pest recollection?
A My best recollection as I shared it was in the morning. I believe that it was in the 8:00 a.m. range.
Q Prior to the call, whatever time the call was, did you have any idea what he was going to do?
A Definitely not.
Q Do you remember yesterday being asked questions about your tax returns?
A I do.
Q And do you remember them showing you, them, the Government, showing you the 2017 and 2018 tax returns?
A Yes, I do.
Q All right. Did you personally do company tax returns?
A Definitely not.
Q Is there a difference between revenue for tax purposes and revenue for management purposes?
A Yes, there is.
Q What is it?
A Well, there are a number of things, but...
Q What are they?
A Generally, the IRS numbers, as I understand them, in my experience with them, both as an entrepreneur as an investor as a board member, are smaller and less inclusive than the numbers that are called financial accounting or management

accounting. So they are consistently, in my experience, having either advised or served probably three-dozen boards, I've never seen them be the same and I've always seen them be substantially different.

Q Okay. Can we pull up Defense Exhibit 627 which is already in evidence. Do you remember the Government asking you about Defense 627 on, I believe, yesterday?

A Yes.

Q So, first, what is 627?

A Term sheet that we received in October of 2017.

Q The Government asked you whether you see the word "Oprah" anywhere in this document and you answered that you don't see the word "Oprah" in here.

Do you recall that?

A I do.

Q Did you understand at the time in 2017 through 2019 that you were -- whom did you understand that you were contracting with?

A With OWN/Discovery, the Oprah Winfrey Network, which, as I understood it at that point, had gone from a joint venture to being majority owned by Discovery.

Q And did there come a time when, during the course of the deal, you were advised that people had to run things by Oprah?

A Yes.

Q Can you tell us more?

A Eric Logan, president of the Oprah Winfrey Network. Bruce Campbell, chief legal officer I think is his title, or chief investment officer at Discovery. Ben Horowitz, who you see the name Andreessen Horowitz. He's one of the founders of this big venture firm who also is and was close to Ms. Winfrey all confirmed to me that we had to get her sign-off.

MR. SIEGEL: Objection.

THE COURT: Sustained.

MR. SIEGEL: Move to strike.

MR. SULLIVAN: May we be heard?

THE COURT: Granted.

MR. SULLIVAN: May we be heard on that one?

THE COURT: Yes.

(Continued on the next page.)

(Sidebar held outside the presence of the jury.)

MR. SULLIVAN: This is not offered for the truth of the matter asserted, rather, offered to show that it was said and that Mr. Watson believed it and relied on it in making representations that Oprah was the person signing off on this deal. So not at all for the truth of the matter asserted to Mr. Watson.

THE COURT: Ben Horowitz, who were the three names he said?

MR. SULLIVAN: I don't remember the names.

MR. SIEGEL: He said Bruce Campbell, Eric Logan, and Ben Horowitz.

THE COURT: What's the response to the state of mind exception argument?

MR. SIEGEL: The objection is that he's not just saying this is what they told me, he's saying this is the information that they confirmed. So he's presenting it not just this was my understanding but this is what was true.

THE COURT: Can you lay more of a foundation for who these conversations were with, when, and where they happened, approximately, and then we're tree question.

MR. SULLIVAN: All right.

(Sidebar discussion concludes.)

(Continued on the next page.)

(In open court.)

EXAMINATION BY

MR. SULLIVAN:

(Continuing.)

Q So, Mr. Watson, in terms of the conversation you had with the individuals that owned Discovery can you tell us, approximately, when you had these conversations?

A August, September, October to begin with.

Q And what was the context in which --

MR. SIEGEL: Your Honor, I apologize, just the year.

THE COURT: What's the year?

THE WITNESS: Sorry, 2017.

THE COURT: And who are you talking to?

THE WITNESS: You want me to say who?

THE COURT: Yes, let's go person by person if we can.

THE WITNESS: Great. Eric Logan whose the president of the Oprah Winfrey Network. Bruce Campbell, who is basically the chief development officer overseas, the investments and acquisitions that they make at Discovery. And then Ben Horowitz who is the cofounder and runs Andreessen Horowitz and was helping to put the whole deal together.

Q Right. So let's start with Eric Logan. I'll just go

in the order that you spoke in.

So do you recall having conversations with Mr. Logan?

A I do, yes.

Q And you said he is with, OWN?

A He was. He was Oprah's -- president of Oprah Winfrey Network for, I think, over a decade.

Q And you recall having conversations about a potential investment with OWN/Discovery?

A Very much so, yes.

Q In the course of those conversations, did Mr. Logan tell you that Oprah Winfrey would have to sign off on any deal?

A Yes. Yes.

Q Let's move to Bruce Campbell. Who is he again?

A Bruce is, this is not his title, but he's basically in charge of making investments or making acquisitions for the Discovery company.

Q All right. Did you have conversations with him about a potential investment between 2017 and 2019?

A Yes. Yes.

Q He was with Discovery, you said?

A Correct, yes.

Q Did he make any statements to you about Oprah needing to sign off?

A Yes. Yes.

Q And what were they?
A That she had to sign off.
Q And last, Ben Horowitz?
A Same.
Q Conversations in that time period?
A Conversations in that time period and clear that Ms. Winfrey had to sign off.

THE COURT: What's the context of the Ben Horowitz conversation?

THE WITNESS: If you see here, it says Andreessen Horowitz. It was Andreessen Horowitz and Google and OWN/discovery who were coming together to put together a $60 million syndicate and offering to invest in OZY.

THE COURT: Just one conversation with the three of them or three separate conversations?

THE WITNESS: I had conversations with everybody plus another gentleman David Drummond from Google. Sometimes it would be one-off. So I would have breakfast with Bruce or I'd have lunch with Eric, or I'd have -- he's an early morning guy, he's a surfer -- so I would have calls with him super early.

THE COURT: Okay.

Q Okay. Thank you, Mr. Watson.

Can we have -- you can take that down -- and can we have Defense Exhibit 525 which is in evidence.

Mr. Watson this is one of the two conversations with A-Rod Corp. that are already in evidence, do you recognize it?

A I do.

Q Do you remember the Government asking you questions about it?

A I do.

Q All right. Can we go to the terms and commencement -- you just passed it -- there we go. I'm sorry, go to the commitment, OZY commitment.

THE COURT: We're going to break in the next five or seven minutes.

MR. SULLIVAN: I'm just about finished, your Honor.

THE COURT: Okay.

Q So in terms of OZY commitment, you recall the Government asking you a question in form similar to the flow of cash is going from OZY to A-Rod?

A I do.

Q Now, can you explain to the jury why and how this is a commitment from A-Rod to OZY?

A Sure, in two parts. So Alex explained for whatever his own reasons were that he wanted some in cash but that I should expect that that cash would come back to OZY as an investment. So that he would immediately up front at least

get a minimum of $500,000 cash and a minimum of half a million dollars in stock, but that I should expect that all of that was coming back to us. And, in addition, you can note that he very specifically called it "minimum," meaning, that his expectation and my expectation --

MR. SIEGEL: Objection.

THE COURT: Sustained.

Q Just talk about the document.

A No problem. So my understanding of this document is that, and my planning in the conversation that I had with my board, is that we should see this as a two to $3 million deal and that we should ultimately expect that, you know, Alex is going to, you know, get north of 2 to $3 million of OZY stock.

(Continued on the next page.)

(Continuing)

Q Now, the second register you spoke about with respect to Mr. Rodriguez on direct, had to do with the strategic partnership aspect of this as well.

Can you explain to the jury how that constituted revenue?

A Yeah. I mean, Alex -- again, I -- even though we were both from Miami, both from same neighborhood, I was very grateful he stepped all the way up. We got meetings with potential sponsors like JP Morgan who came through.

He got, I think, on the Late Show to talk about Ozy Fest, which was a coup. He went on the Breakfast Club, which was a coup-coup. Went on the Today Show, which was a coup.

He actually helped us invite other good speakers, he actually had really good ideas for other speakers who should be a part of this. He was -- he was super helpful and I -- I didn't have to chase after him.

Sometimes you have to, even once people say that they will help, you're constantly, in one form or another, having to beg them. Didn't have to happen here. He consistently stepped up and even when he was busy, he made himself available to help us secure deals with potential advertisers to secure new speakers for the festival, to secure good promotion, which, in turn, helped sell tickets, which in

turn put money in our pocket.
Q And if Ozy had to have hired Mr. Rodriguez to do the things you described, what did you estimate that would have cost it, Ozy. At the time?
A At the time to do what I was asking him to do, which is not just host, but all the things around that, probably would have cost me 3 to 4 million dollars, maybe more.

And I apologize, first of all, the thing I keep saying is that there's one thing for someone to do it, there's another thing for someone to do it with enthusiasm. Those are different. What we saw from Ms. Winfrey on the screen, that's with enthusiasm. That's not going through the motions. That's enthusiasm.

And when you're a young company, that's what you need. You don't need someone who is lukewarm about you. You need someone who is stepping up. You're still -- you're young, you're trying to make your way. You need someone to be enthusiastic.

So it was -- it was worth more than technically just money and just showing up and checking a box.
Q And final question, Mr. Watson, from me. And apologies, but you reminded me that I forgot to ask this question.

Do you recall on direct -- I'm sorry, on cross yesterday, Mr. Siegel showed the video --

MR. SULLIVAN: You can take that one down.

Q You showed us the video of Oprah Winfrey?
A Yes.
Q And stopped it after five seconds and said: Oh, is this worth $3 million?
A Yes.
Q And you said: Yes.
You recall that?
A I recall that. I recall him stopping it after five seconds saying is this worth, you know, X amount.
Q Okay.
So you ultimately valued it at how much over two years?
A We thought it was worth 50 million, but we were conservative and marked it --
THE COURT: I am sorry. Who is you?
Q You, Mr. Watson, as CEO, and you as board member.
THE COURT: You personally, yeah, not --
THE WITNESS: Yes. Correct.
THE COURT: -- question.
Q Now for -- in terms of you personally, for your evaluation, what are the data points? What were the factors that you considered to value that commercial at $50 million?
A I looked at a couple of things, probably most prominent and would have been fairly recent, was I studied what had happened with Weight Watchers where she had sent out one tweet

and it effectively had paid her $82 million for it.

So 12 million in cash and an incremental 70 million in stock. And so, you know, knowing that one tweet moved that. And obviously, I had studied -- there's been a substantial amount of work on what is called the Oprah effect, whether it's been books, whether it's been food places, whether it's been backing Dr. Phil or Rachael Ray or Dr. Oz, but her ability to -- her ability to really grow a business, I think, is unparalleled in modern times. I don't think we've seen anyone who that consistently, across that many different categories, whether you love her or not, she has got a 25-year track record of turning an unknown book into a best seller, of turning an unknown person into Rachael Ray, of turning a struggling business like Weight Watchers, you know, tripling their stock.

Like, I can't do that, so I definitely have a lot of admiration for anyone who -- who can.

Q Okay.

MR. SULLIVAN: I think I am done.

Your Honor, can, before we let the jury go, may I approach just on a very brief scheduling issue?

THE COURT: Yes.

(Side-bar conference held on the record out of the hearing of the jury.)

(Continued on following page.)

(Side-bar.)

MR. SULLIVAN: I'm just wondering if we can have a, you know, efficient lunch. Our next witness is back the second time from Asia and has to leave again today. We just want to get him on the stand.

THE COURT: What does efficient mean?

MR. SULLIVAN: An hour.

MS. GILBERT: Or less. He's got to be at La Guardia by 3:00.

THE COURT: The jury has to be able to go out and come back and use the bathroom.

MS. GILBERT: And just along those lines, I have one topic, one question.

MS. FRISON: Two questions.

MS. GILBERT: One main topic to do with Mr. Watson, so it will be along with redirect. So, we were hoping to do it before lunch, but -- for that same reason.

THE COURT: I think we are going to break for lunch now.

MR. SIEGEL: Just, do you have a sense of how long the direct of Mr. Kalliarekos is going to be?

MR. SULLIVAN: Fifteen, 20 minutes.

MR. SIEGEL: -- just because I want to make sure we have time to cross.

MR. SULLIVAN: Sure. I'm pretty sure. In light of

schedule, I'm going to go fast.

MR. SIEGEL: All right.

I think that will be fine.

THE COURT: Okay.

MR. SIEGEL: Thank you.

(Side-bar end.)

(Continued on following page.)

(In open court.)

THE COURT: All right.

Ladies and gentlemen, we are going to break for lunch now. For reasons having to do with scheduling, we will ask you to be back in an hour today, which I know is a little bit shorter than we typically target for lunch.

We will see you at or about 1:35.

Thank you.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: All right.

Please be seated, everyone.

All right. So that is -- I think we have mapped out at least the next hour to hour-and-a-half.

Does the defense have two more witnesses here today or one more witness here?

MS. FRISON: Two. Two, your Honor.

THE COURT: Two.

Which includes Mr. Zahlraddin.

MS. FRISON: Yes.

THE COURT: All right.

Let's have the witness step down.

(Witness excused.)

THE COURT: I have not seen the -- I have not had a chance to digest, I should say, the exhibits that the

Zahlraddin letter that came in. This is dated July 7th, but I think it was filed more recently than that.

MS. FRISON: Yes, your Honor.

I had written it on July 7th and I forgot to change the date. My apologies.

(Pause in the proceedings.)

MS. FRISON: I wrote the letter on July 7th and forgot to change the date, my apologies. I did file it on July 8th.

THE COURT: Okay.

And I know there were spreadsheets filed this morning.

I looked at the dates of production on those, which to me was the most important thing.

I know we have outstanding relevance objections as to Mr. Zahlraddin's testimony, as well as the objections relating to the alleged 26.2 and other notice and discovery violations.

Does the Government want to be heard on Mr. Zahlraddin specifically at this point?

MR. SIEGEL: Yes, your Honor, just a couple things.

So in the spreadsheet -- I haven't looked at the spreadsheets filed today, but from the spreadsheet that was emailed last night, there are 3,346 documents listed for Mr. Zahlraddin. 279 of those were produced by the defense and

all of those were produced in the last week of June, right around the time that we rested.

THE COURT: I think it was the 26th and 28th, if I'm remembering.

MR. SIEGEL: That's exactly right, your Honor.

The remaining several thousand documents, I believe it's the remaining over 3,000 documents, those are all documents that were seized as part of a seizure of Mr. Watson's phone and were produced by the Government -- well, were produced by the Government's filter team to the defense. And if you look at the Bates numbers, they all have a filter Bates number because Mr. Zahlraddin is an attorney and the defense repeatedly asserted privilege.

So those have all been on the privilege side of the Government and we actually haven't seen those documents.

THE COURT: The Government -- sorry. The defense was due, we can talk about why that was, if it was, to produce a privilege log as to those materials, but did not.

Am I remembering that correctly?

MR. SIEGEL: That's right.

And, you know, when that happened, we had sort of an -- we had a question of what do we do about that.

Given that Mr. Zahlraddin was an attorney for Ozy during the time period of this investigation, although I think that we could have made an argument that this was waived, we

decided that we're not going to try and look at his communications with attorneys during the time period that he's under investigation by us.

THE COURT: Right.

This was an attorney who was not, as far as you know, operating under a license suspension at the relevant time.

MR. SIEGEL: No.

He is a partner at a law firm.

And that links also --

THE COURT: Just pause there for a moment.

Mr. Sullivan, why was a privilege log never delivered to the Government?

MR. SULLIVAN: Ms. Gilbert is handling these arguments, your Honor.

THE COURT: Ms. Gilbert.

MS. GILBERT: Your Honor, I do not know.

THE COURT: Okay.

Then, yes.

MR. SIEGEL: And then the issue of the 26.2 really links up with the issue of relevance. And they're not -- because they are intertwined.

All of the documents that are identified -- well, there's 128 that have a date of 1969, which I assume is a error. But all of the rest are from 2022 or 2023. To the

extent that his only involvement with Ozy was 2022 or 2023, then it is not clear what possible relevance he could have, any information he has about the conspiracy period, would be hearsay.

To the extent he's going to testify about something before 2022 or 2023, then even based off -- on the spreadsheet Ms. Gilbert gave us, we don't have any materials for that.

And to just be super specific, when Mr. Watson testified, he said in 2020 is when he really began to understand that Samir Rao has forged his name on loans, supposedly, and he said that Mr. Zahlraddin was one of the attorneys who helped him with that, and that's one topic that is the defense said that he's going to testify about.

There is not a single document that we have that has been produced to us that is on the spreadsheet from 2020. All of them are from 2022 or 2023 and, actually, there are some from 2021, but starting October 31st and after.

THE COURT: Okay.

Why are there no emails, Ms. Gilbert, from the period in which Mr. Zahlraddin was assisting, if this was the case, in the investigation of these loan documents?

Ms. Gilbert, I am asking you.

MS. GILBERT: I'm -- I will answer your question in one moment, your Honor.

(Pause in the proceedings.)

MS. GILBERT: We provided what we had.

THE COURT: What you had from whom?

MS. GILBERT: From our e-discovery vendor.

THE COURT: Mr. Zahlraddin was an agent of Ozy and likely Mr. Watson personally, right? So everything he has in his law firm databases, I would think, and correct me, please if I am wrong, is deliverable under Rule 26.2.

Is that incorrect?

MS. GILBERT: That is -- that is correct, your Honor.

THE COURT: Okay.

But no effort, I take it, has been made to have him search his law firm files for responsive documents.

Is that also correct?

MS. GILBERT: I will confirm with him whether he checked any.

THE COURT: We cannot get new information now. We are past a minute to midnight here.

Has an effort -- have you made an effort -- and this is a question within your personal knowledge right now.

MS. GILBERT: I have not.

THE COURT: You have not made an effort to get any responsive materials relating to the work he did that he is going to testify about.

MS. GILBERT: No.

In fact, he asked me for his emails. So I provided them to him with what I had.

THE COURT: His testimony will be excluded. I will write briefly on that matter as well.

These are -- and this will be the last thing I say on this matter -- egregious violations of the Rules of Federal Procedure, as well as the schedule that you agreed upon and that the Court ordered.

Let's break for lunch. I will see you all at 1:35.

(Continued on following page with AFTERNOON SESSION.)

(Continued.)

THE COURT: We are waiting on two jurors. Is there anything we need to raise?

MS. GILBERT: Your Honor, when I looked at Mr. Zahlraddin's discovery, the 26.2 materials that we had produced to them, I had not been paying attention to the dates. I looked at them again and spoke to Mr. Zahlraddin. And number one, we did produce the 2020 and 2021 emails and they are in the information that we provided to the Government.

THE COURT: When you say the 2020, 2021, or whatever date range emails you just said.

MS. GILBERT: 2020, 2021 emails.

THE COURT: How are you defining that universe? What search was made and by whom?

MS. GILBERT: The search was of Ozy as the repository of emails between Ozy and Mr. Zahlraddin. Mr. Zahlraddin has changed law firms two times, and does not have access to his other emails, which makes sense as to why he had asked me to send him his emails.

He left the initial law firm that he worked at, which was Elliot Greenleaf, when he initially was working with Ozy. He then changed to a second law firm. He has since left that law firm and now is at a third law firm.

But during the time periods that are relevant to

this case, he was at the first two law firms. So he does not have access to his emails, and so Ozy, as the repository of emails between Ozy and all people within Ozy and Mr. Zahlraddin, we searched Ozy's materials and that's how we got all 200 and -- I believe it's 74 or 79, I don't remember, emails which we did produce to the Government and they cover the time period from 2020 through 2022. I'm sorry. 2023.

THE COURT: What is the period about which he'll be testifying?

MS. GILBERT: 2020 and 2021.

THE COURT: Okay. And the subject matter is?

MS. GILBERT: The subject matter is what we said in our production to your Honor. He will be testifying about the liens and clearing up the liens, and the restructuring of the company, as well as -- you're making a face.

THE COURT: No, I'm not. I'm thinking.

MS. GILBERT: As well as --

THE COURT: Tell me, the liens and cleaning up the company, can you give me a little more color on that?

MS. GILBERT: Sure. In the spring of 2020, Mr. Zahlraddin was called into the -- called in to assist the company on cleaning up some of the liens that were high yield liens, that they were trying to get rid of so that they could get themselves in a better financial position, and so he helped them with that. After that --

THE COURT: I'm not understanding the relevance of these liens, but liens on what assets, just to start?

MS. GILBERT: On the company. On the assets of the contracts, the contracts, your Honor, on the contracts themselves.

THE COURT: Okay.

MS. GILBERT: And so it's relevant as to revenue but secondly --

THE COURT: Why is that relevant to revenue? I genuinely do not understand.

MS. GILBERT: Because the liens would have taken the revenue, your Honor. Starting in 2020, which is the period of time that the Government is referring to, and so he helped to clean that up and then --

THE COURT: What does clean that up mean?

MS. GILBERT: He helped to get rid of the liens. He helped to restructure and get rid of the liens.

THE COURT: Push out the maturity dates.

MS. GILBERT: Yes. And then --

THE COURT: And that had the effect, let me paraphrase this to see if I understand, that had the effect of, I think it's inherent or implicit in what you're saying, reducing the carry, the monthly interest payments associated with these loans, which had the effect of increasing revenue.

MS. GILBERT: Yes, your Honor.

THE COURT: Okay.

MS. GILBERT: And decreasing debt. Furthermore, he then was brought back into the company after the Ben Smith article came out and the company started spiralling to help to restructure, and that whole time period he can testify to.

He can also testify to the existence of the contracts and what was happening with the contracts, because he helped to deal with those, as well, and that goes straight to revenue as it relates to that time period, 2020, 2021.

He is able to testify about those because he was actually one of the people who was negotiating with the companies that they had the contracts with.

THE COURT: Okay. So what is the disputed fact, if any, that he will speak to?

MS. GILBERT: The revenue, your Honor, whether it existed, whether the contracts were real.

THE COURT: Whether what contracts were real?

MS. GILBERT: Whether the contracts were real, whether the revenue and the projections were accurate. Your Honor, he is able to testify to all of that.

THE COURT: What contract will he say is real that somebody is arguing is not real?

MS. GILBERT: Sorry. There is one other thing, your Honor.

THE COURT: Can we stick with that question before

we move on to another thing?

MS. GILBERT: Yes. Which contracts, sure. He will testify about the Omnicom, Dentsu, General Motors, and the WPP or Group M contracts.

THE COURT: And his testimony will have the effect of tending to show or allowing a jury to conclude that those were real contracts?

MS. GILBERT: Yes.

THE COURT: As opposed to paid contracts. Has there been a claim that those contracts were fake?

MR. SIEGEL: No, your Honor, never. And they're in evidence.

MS. GILBERT: And what the value of those contracts were. In fact, in the cross-examination of Mr. Watson, there was a suggestion that with respect to -- specifically, with respect to Dentsu, that there were questions whether as to -- whether as to what amount and whether there was actually revenue that was tending to come from those contracts, and when that revenue was going to be attributed to the company. And Mr. Zahlraddin is able to discuss when the revenue can be attributed to what year.

THE COURT: He's not an accountant, right?

MS. GILBERT: No. He's a restructuring lawyer. He's a bankruptcy lawyer. This is what he was dealing with.

THE COURT: And he's going to say I have an opinion

on revenue recognition, what's proper and what's not?

MS. GILBERT: He's going to say this is what was happening with these contracts at the time.

THE COURT: So he's a fact witness.

MS. GILBERT: Yes.

THE COURT: Not an expert witness.

MS. GILBERT: No.

THE COURT: And not an expert on revenue recognition, what was properly recognized and when.

MS. GILBERT: No. But he's going to talk about how it was -- how it was -- I'm sorry. I'm having a word moment.

THE COURT: Me too. I'm having a lot of those moments lately, mostly because of lack of sleep. So take your time.

MS. GILBERT: Believe me, we can all relate.

How it was recognized at the time.

THE COURT: Say more about that. He's going to testify about how the revenue was recognized.

MS. GILBERT: Meaning that at the time, for instance, with -- I'm making this up. This is me making it up. I'm not using his specific examples. But on the Omnicom contract, they had a certain contract for a certain amount of money.

He is able to testify to the fact that as a result of having this contract over X period of years, three years

starting from, I don't remember the term, but let's say it was signed in 2020 and it goes from 2021 to 2023, that they would have started to receive and recognize some of the revenue in 2020 and it should be attributed to 2020 because they would have been starting to actually act on what would have been happening for 2021 during 2020.

So that these questions that have been raised by the Government, specifically on cross-examination, about well, how can you say that this revenue, that this term says 2021 to 2023, so how are you attributing this to 2020? I don't remember the specific questions because I don't have the transcript in front of me at the moment, but I do remember some questioning along these lines.

Mr. Watson was trying to answer and he was, in fact, questioned more and, quite honestly, made to look as though he were making something up. Mr. Zahlraddin can actually answer that and speak to that.

THE COURT: Let me paraphrase there, because I think I might be zeroing in on some part of the testimony that is implicated by what you're saying, although I think a number of different areas are implicated here.

MS. GILBERT: And then there's one more area after that.

THE COURT: There was testimony yesterday in which, and I'm paraphrasing also, and I'm going to be nebulous here

and maybe not get the testimony verbatim or anything close to it, but the Government was showing Mr. Watson a contract that had a given term. Right?

So this contract is in effect from January 1st of year X to December 31st, how is it that you can recognize revenue from this contract, from a period that predates the contract's effectiveness.

MS. GILBERT: Correct.

THE COURT: I don't understand how a lawyer, who is not schooled in GAAP or any other accounting doctrines -- he might be able to testify -- is he a fact witness about when money came in?

He's not going to be permitted to give accounting testimony. He's not a revenue recognition expert. He's not an accountant, and he wasn't noticed as either. So tell me, give me the example, what is he going to say as to my example about a contract? Let me just finish the hypo. If there's a contract that's in effect from January 1st to December 31st of a given year, what will he say that would buttress the assertion that it was proper, as you say, to recognize revenue from that contract prior to its effective date?

MS. GILBERT: Your Honor, he was doing the restructuring of the company at the time, and he was at the time working on having -- determining how this, these contracts would be utilized, and how they would come in and

how the money would come in at the time. This is not --

THE COURT: Be specific. Somebody has prepped this guy. Right? They're going to know what he's going to say. Let's not be too mysterious.

MS. GILBERT: You constantly accuse me of trying to be mysterious. I'm not trying to be mysterious. I'm trying to be as transparent as possible. I would appreciate it if you stop accusing me of that.

THE COURT: I genuinely do not understand, and I'm not accusing you of anything, I'm just saying I don't hear anybody answering the question of how --

MS. GILBERT: I'm trying to answer the question. I'm making every effort to answer your question.

THE COURT: Okay. What will he say is the reason in a particular case why revenue associated with a contract that doesn't go into effect until year two can be recognized in year one?

MS. GILBERT: That is what I answered earlier, which is that because it is related to year one, in order for them to do work on things in year one because of the type of business that it is, broadcasting, they had to actually hire people in year zero. They had to start planning and creating and developing in year zero, so revenue was actually coming in in year zero in order to produce in year one.

Is that clearer?

THE COURT: That sounds like fact testimony. So he's going to say --

MS. GILBERT: That is fact testimony.

THE COURT: That the counterparties started paying money on a contract before it was effective?

MS. GILBERT: Before the term in the contract, correct, yes.

THE COURT: The counterparties were paying money before a contract was in effect?

MS. GILBERT: Absolutely.

THE COURT: Okay. You could get that out of the ledgers of the company, but I don't see why -- that sounds like fact testimony. Put aside the 26.2 issues for the moment, and let's just talk about relevance, from the Government's perspective why is that not relevant?

MR. SIEGEL: So there's a couple different categories there. What Ms. Gilbert started talking about was the 2020 period, and I'm going to put that to the side for a moment.

MR. SULLIVAN: I'm sorry to interrupt, Mr. Siegel. Your Honor, I wonder if we could revisit this after Mr. Kalliarekos.

MS. GILBERT: We have a time issue.

MR. SIEGEL: Can I just respond while we're in the middle of thinking about this?

THE COURT: Take two minutes.

MR. SIEGEL: The issue is for the period that Ms. Gilbert was talking about when he was restructuring --

MS. GILBERT: He was restructuring the whole time, just to clarify.

MR. SIEGEL: Okay. Well, if he's restructuring for the whole period, I have the spreadsheet Ms. Gilbert sent and it includes dates for the documents. There is no document from 2020.

MS. GILBERT: There are several emails from 2020.

MR. SIEGEL: This is just going to prolong this.

THE COURT: Let's get the jury. There are either emails from 2020 or there aren't.

MS. GILBERT: There are, and I can show them to you.

THE COURT: If you can hand them up.

MS. GILBERT: I didn't print them because there are 274, but I can show you on my computer, your Honor. We sent them to both you and the --

THE COURT: Can you give me an identifying number for these emails?

MR. SIEGEL: We have the spreadsheet, if she gives the Bates number. There's a date listed for all of these.

THE COURT: This is on the docket now. I should be able to pull this up. We're going to do this after Mr. Kalliarekos so we don't keep him waiting. Remind me where we

are with respect to Mr. Watson.

MR. SULLIVAN: Redirect, but our side is finished.

THE COURT: Everybody on your side is finished?

MR. SULLIVAN: Everybody on our side is finished.

THE COURT: So recross?

MR. SULLIVAN: I don't think the Government has any recross. I'm kidding.

MR. SIEGEL: We have recross.

THE COURT: Is that what we're doing now, recross?

MR. SIEGEL: If they're done, yes.

MS. FRISON: I did have one area. There is an objection. For the same time constraint for the next witness, I'm just foregoing that topic.

MS. GILBERT: Your Honor, is there any chance that we could have a break with Mr. Watson, put on Mr. Kalliarekos, and come back to Mr. Watson after?

THE COURT: Yes. If it's truly like a few questions from Ms. Frison, I don't see why that should be a problem. I think you just said there is an objection to something.

MS. FRISON: It's actually an attachment to a contract that was discussed on cross, that we have. The attachment discusses the money, and I wanted to enter that with Mr. Watson. I understand from Mr. Siegel that they have a couple of objections to that. We discussed it but it would need to be discussed with your Honor.

THE COURT: Okay.

MS. FRISON: That's it.

THE COURT: So tell me, roughly, how many minutes we're talking about here, ten?

MS. FRISON: Ten to fifteen.

THE COURT: Does the Government object to taking Mr. Kalliarekos out of order when it's not in the middle of Mr. Watson's testimony anymore but relatively towards the end?

MR. SIEGEL: No, we don't object, your Honor. Thank you.

MS. GILBERT: Thank you.

THE COURT: I think we're going to excuse Mr. Watson from the witness stand and you'll call Mr. Kalliarekos in front of the jury.

(Jury present.)

THE COURT: Welcome back, ladies and gentlemen. We're going to take a witness a little bit out of order here for scheduling purposes.

Mr. Sullivan, do you want to call the next witness?

MR. SULLIVAN: Thank you, your Honor. The defense calls Kosmas Kalliarekos.

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: State your name for the Court and spell your name for the Court reporter.

THE WITNESS: Yes. My name is Kosmas Kalliarekos. My first name is spelled K-O-S-M-A-S; last name, K-A-L-L-I-A-R-E-K-O-S.

THE COURT: K-O-S-M-A-S, first name?

THE WITNESS: K-O-S-M-A-S. But people call me Kosmo, but formal name is Kosmas.

(Continued on the following page.)

**KOSMAS KALLIAREKOS**,

called as a witness by the Defense, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SULLIVAN:

Q Good afternoon, Mr. Kalliarekos.

A Good afternoon.

Q Good afternoon, ladies and gentlemen of the jury. So first, Mr. Kalliarekos, are you an investor in Ozy?

A Yes, I am.

Q For how long did you invest?

A Quite a few years. Not right at the beginning, I believe, but very close to the beginning.

Q And do you have, at least a ballpark figure, of how much you invested over the years?

A Several hundreds of thousands of dollars.

Q Now, I'm going to come back to that a little, in a few minutes.

But first, just to get some background information on you, would you tell the ladies and gentlemen of the jury where you work?

A I work with an investment company based in Hong Kong. The investment company is called EQT Partners.

Q What do you do for the investment company?

A I'm a partner with the investment company, and I invest in private companies and try to grow them, and then generate returns for our investors.

Q How long have you been in that capacity?

A About 17 years.

Q What is your educational background?

A Yes. I hold a bachelor's degree from Wharton School of the University of Pennsylvania, which is a business school, an undergraduate business school, and a graduate degree with distinction from Harvard Business School.

Q Now --

THE COURT: Can I ask a question? You said you're an investor. Is that in your personal capacity or is EQT the investor?

THE WITNESS: Professional. EQT, generally, your Honor, we raise funds from investors -- I mean from institutions.

THE COURT: So the Ozy investment is in the fund?

THE WITNESS: No, no. The Ozy investment was a personal investment. I happen to be, my profession is an investor.

BY MR. SULLIVAN:

Q Mr. Kalliarekos, do you recall when you first met Carlos Watson?

A Yes, I do. I started my career as a consultant, as a

management consultant. And in the course of my career in consulting I specialized in education, in advising both non-profits and government in education, as well as companies that serve the education industry.

And as I was a consultant in that space, I first met Carlos when he was a partner, or a managing director I would say, at Goldman Sachs. He organized a very sought after conference where a lot of people from the industry would come together to really discuss issues around the state of our education and how can we invest behind it. So that's how I first met Carlos.

Q Did you form any impressions about Carlos when you first met him?

A Oh, yeah. I mean, he was impressive both in terms of the knowledge of the subject matter, but also his ability to connect and bring people together and have us think through effectively solutions or new opportunities.

Q I want to fast forward you to when you first learned about Ozy. Do you have a date or a date range in the year when you first were introduced to Ozy?

A Yes. I mean -- well, we had -- we ended up having Carlos being a member of the board of one of our companies that was in education. And as he was moving on from that company, from that board, he started pursuing entrepreneurial activity. So this must have been 2018, 2019, about that time.

Q All right. So at that time did you decide to invest?
A Yes, I did.
Q And this was your personal money?
A Yes, I did. Yes, my personal capacity.
Q Can you tell the ladies and gentlemen of the jury why you decided to invest in Ozy?
A Ozy is not the first, what I would say, early stage investment that I've made in my personal capacity. And generally speaking, when you make early stage investments, effectively startups, or very early, you really are looking at a couple of things.
MR. STERN: Objection.
THE COURT: Overruled.
A You're looking at the individual that comes up with the idea, the idea itself, so both. And over the course of, you know, a long time, I've gotten to know Carlos, his business acumen, his overall character and his overall talent.
And I thought that Ozy was, you know, very well suited for what Carlos was passionate about, which is to bring a different message in media.
And I thought that this combination of the person and the idea, which is fundamental, really, to entrepreneurship, to starting a company, was ideal. It didn't mean that it would work, but I thought it was a good investment opportunity.

(Continued on next page.)

EXAMINATION BY
MR. SULLIVAN:
(Continuing.)
Q So why is it that you believe that the individual and the idea are fundamental to the entrepreneurial endeavor?
A Well, because that's how everything starts, isn't it? It's not -- you start out with a passion that an individual can bring to bear and the quality of the idea. That's how every company starts. Whether that's Amazon, whether that's Facebook, whether that's General Motors. They start with an idea and it started with a person and a vision. And, generally speaking, when you are very early in that investment decision.
MR. STERN: Objection, your Honor. Generally speaking versus his own personal experience.
THE COURT: Overruled. I think this is background.
A That's how -- that's why one focuses and, you know, you try to match the power of the idea with the power of the individual and you invest behind it.
Q Now, for you personally when you're making your personal investments in startup companies, how important is the company's revenue in your decision to invest?
A I mean, early on, the financials of the company are not determinative or predictive of what's going to happen with

that company. If you look at a lot of startup or early stage businesses, a lot of them don't have any revenues. If you look, for example, to at the biotech industry. For many, many years they will go just investing. So looking at the financials of the business, actually, for the early years of an enterprise may not be the best indication of the success of that business. It's one, but sometimes not even the most important one.
Q What do you consider the most important predictors of a business, a new business, a startup?
A The product. The product and the organization, the team around it. You want to see early on whether the idea that was there as an idea is taking shape. It actually -- something is being created whether it is a drug that, you know, goes through stages of development. Whether it is a car that one designs it. Whether it is a media company where you're beginning to really see, you know, what is being produced. Is that of quality, is that something that could potentially, you know, get people excited.
And I think that that's early on that's what you want to see. Revenue is an outcome, it's not an input. It's what happens when you're good, when you develop a product and a market. And that follows, it doesn't come ahead, that follows a good product and a good team.
Q Were you able to experience, view, OZY's product over

the years that you were associated with OZY?
A Yes, and that's why I continued to invest. Because, you know, interestingly enough --
THE COURT: What do you mean when you said "continued to invest."
THE WITNESS: I mean, there were successive rounds. There were periods so that's what I meant, your Honor.
Q Just to clear that up before I let you finish the question.
You told us you started investing around 2018. For how long did you invest?
A I continued to invest even after the article came in. And, in fact, I continued to invest behind the company up until, you know, Carlos was arrested or indicted.
Q Okay. I was asking whether you had a chance to experience OZY's product?
A Yes. And I think that that was actually in the nature of the media business, it's not obviously like a car business or like a drug business. You can actually see the product, you can engage with it where you can read it, you can experience it, and that's what I was seeing. I was seeing product that I liked, interviews that I liked, that engaged me.
And I felt that the organization and Carlos himself was

actually creating something that was very real. Something that I could, you know, experience. And ultimately, that's what a media business really is: It's that ability to learn from it, experience it. And, for me, that was a very good indication about the potential future of the company.

Q So even more specifically, did you read the newsletters?

A Yes. I mean, I read the newsletters, listened to the podcasts, saw some of the YouTube. And that's the other thing, I am in Hong Kong so I could actually -- this is the other thing about the product, it's immediately available to you because it's obviously digital. And it was the combination, unfortunately, i couldn't get to OZY Fest. But I felt the overall thesis, the overall nature of what was being created, is something that I was getting increasingly excited about.

Q So you mentioned that you continued to invest after the article came out, right?

A Yes.

Q And by the article, you are referring to the New York Times article about Samir Rao's impersonation?

A Correct.

Q Now, why did you stick with the company even after that article went out?

A Well, because the very sort of commercial and

professional view. I mean, this didn't impact the product. I mean, to me, the most significant evidence of the reality of the business was what was being produced. And I didn't see anything there that indicated that this was being produced by, you know, that affected the product itself. And it felt to me that particular article to me, personally, it felt that it was, like, a one competitor attacking another competitor. And that's what happens in a competitive business. So that's why I continued to stick with it.

Q Now, in terms of revenue, you said that, certainly, one of the factors you consider but not in the top echelon of factors, did I get that right?

A Correct.

Q Now, if for a -- in your experience with startups, how sophisticated do the financial departments tend to be in these startup organizations?

MR. STERN: Objection.

THE COURT: Sustained.

Q Did you have a view with respect to the sophistication of OZY's financial department when you decided to invest?

MR. STERN: Objection.

THE COURT: Overruled.

A You know, I felt it was just like any other startup. I mean, it had some basic financial capability, but frankly,

that's, as an investor, you don't want to see a lot of your investment going towards building a big finance department. You want your investment to be going to producing something real, not accounting. I mean, it's important but this is not what will determine the success of the business. What will determine the success of the business is what the business actually does and it produces for its customers and its audience.

So I didn't see anything particularly unusual about the finance department. I didn't have a reason to go into it any further. But it wasn't anything unusual or anything unique about it relative to other startups.

Q And, Mr. Kalliarekos, if OZY were off of pause and operating again today, would you still consider investing?

A Yes, provided the content stuck to the original session and the quality of the reporting, the quality of the thinking was there, of course.

Q And last question. What is it about the content of OZY that so attracted you?

A Yeah, I think that's an important one. We live in a world where divisions are all around us. Forces that are trying to push us to one end versus another end. People shouting to make their point and sometimes not listening to each other. I think OZY came in with a thesis that said, listen, we are going to be welcoming as opposed to

attacking. And we're going to respect people's opinions and thoughts and create a space where we can find a common solution which is, again, part of what I felt Carlos always did.

And I felt that this was something that the world needed. And I felt that that's what most of us really want. So I felt it was the right product for the right time that would appeal to, you know, the underlying instincts of most of us, not just of the minority of us.

MR. SULLIVAN: Very well. Thank you. And thank you for making the long trip here, Mr. Kalliarekos.

THE WITNESS: Thank you.

THE COURT: Cross-examination. Oh, sorry, examination by the companies.

MS. FRISON: No, your Honor, no questions.

THE COURT: Cross.

CROSS-EXAMINATION

BY MR. STERN:

Q Good afternoon, Mr. Kalliarekos.

A Thank you. Good afternoon.

Q So please remind me, sir, where do you work currently?

A I work for an investment company called EQT.

Q And I think you testified you've been there for 17 years; is that right?

A Yes, actually, to be more precise, I joined at the

beginning of 2008. The company was called Baring Private Equity Asia that was based in Hong Kong. Two years ago, we merged with a company called EQT. And so, we're now EQT. So, technically speaking, I've been with Baring and now with EQT because we merged.

Q So, fair to say, from 2008 you've been at Baring or EQT; is that right?

A Correct.

Q So you never worked at OZY, right?

A I never worked at OZY, correct.

Q So you didn't review OZY's books and records yourself, right?

A Only some of the materials that were sent to me but even that was of secondary importance to me. But you're correct, sir.

Q But you didn't review the books and records yourself, right?

A Correct.

Q And you said that certain financial information was sent to you, correct?

A Correct.

Q And, fair to say, you assumed that the financial information that was sent to you was accurate?

A Yes, that's a correct assumption.

Q So, Mr. Kalliarekos, I think you said that you were

most interested in OZY's content when you decided to invest; is that fair?
A The content, the vision, the business model that included content in different forms which is in podcasts, in newsletters, in, of course, OZY Fest. So it was a combined idea.
Q So one of the reasons is OZY's content. You liked the content?
A Correct.
Q Fair to say you knew and you thought highly of Carlos Watson?
A Correct.
Q I think you said you first met Mr. Watson when he was working at Goldman Sachs, right?
A Correct.
Q So that's -- you've known him for at least ten years?
A Correct.
Q And that was another reason to invest, right, you've known him for ten years, right?
A Correct.
Q You wanted to support him because you liked him, right?
A Correct.
Q So now we got two reasons. One is OZY's content and the other is that you know and like the CEO; fair?
A Correct.

Q So fair to say that there were multiple factors in your decision to invest in OZY?
A They still were the most important ones.
Q My question, though, Mr. Kalliarekos, fair to say there were multiple factors underlying or supporting your decision to invest in OZY?
A Principally two.
Q You said principally two?
A Correct.
Q I think you testified that OZY's finances were not the most important factor; is that right?
A Yes, in the general context that financials for startups are not necessarily an indication of the future of that startup, it's just one indication.
Q I understand that, Mr. Kalliarekos, your explanation. But you testified, just to be clear, about the question that finances were not one of these two most important factors; correct?
A Yes.
Q But you also testified that finances were one of the factors in the mix, right?
A Correct.
Q And, by the way, when you got these financial figures from Carlos Watson or members of his leadership team, you thought that they were true and accurate, right?

A Generally speaking, yes.
Q You were also told, weren't you, who were going to be lead investors of OZY's fundraising rounds?
A I knew, generally, who would be investors but not, you know, I'm pretty confident of my own decisions. So, you know, I could make my own decisions about where to invest my own money. It's important to know who the other investors are but they were not really going to sway me one way or the other.
Q So you just testified, though, it is important to know who the other investors are, correct?
A I didn't say that. I said it's one factor. I mean, it's -- but it's not, you know -- there are a lot of companies, for example, a lot of investors and a lot of startups that will say they don't want to disclose who are the other investors and, in fact, that happens a lot of times. You still need to make that decision yourself. Ultimately, you have to make the decision for investing yourself, not depending on anybody else.
Q Mr. Kalliarekos, you were told who was going to be the lead investor in OZY's fundraising rounds, correct?
A I don't recall that, sir.
Q So would an e-mail exchange between you and Mr. Rao help refresh your recollection about whether you were told who was leading OZY's fundraising rounds?

A He may have sent it to me but it was not something that --

THE COURT: Sir, the question is: Might it refresh your recollection?

THE WITNESS: Yes, sure. Go ahead.

Q So I'd like to show just the witness what's been marked for identification as Government Exhibit 7301.

A Am I supposed to see something?

Q I think shortly, Mr. Kalliarekos, it will come up on your screen.

A Oh, sorry.

Q I want you to take a minute to review.

A I still don't see anything, I'm afraid.

Q I'm sorry, could you say that one more time?

A I don't see anything on my screen.

Q Let's take a minute and make sure we can take care of that.

COURTROOM DEPUTY: Can you see it now, sir.

THE WITNESS: Yes. Thank you.

Q We could scroll down a bit and I could even direct your attention to that first bullet?

A "Which is the strong interest."

Q Yes, but I ask you not to read it. Just review and let us know when you're done?

A I am just trying to understand whether the first bullet

starts with "strong interest," is that correct? Yes, there we are. Thank you. Okay. Yes.

Q So does that refresh your recollection that you were told that Google was leading OZY's Series D fundraising round?

MR. SULLIVAN: We should take it down. This isn't refreshing.

THE COURT: You can take the document down.

THE WITNESS: Thank you. Okay, I received that. I don't think that it was something that was, you know, very important in my decision.

Q My question wasn't was whether it was important, Mr. Kalliarekos, my question was: Did that refresh your recollection?

A I didn't recollect it, but now that I read it, I believe that this is something that was sent to me, correct. I have no doubt that this was sent to me.

Q So, Mr. Kalliarekos, when you were told that Google was leading?

A Yes.

Q The OZY Series D fundraising round, did you believe that to be true?

MR. SULLIVAN: Objection. I don't believe the witness' recollection was refreshed.

THE COURT: Overruled.

A Could you repeat the question, please.
Q Sure.
When you were told that Google was leading OZY's Series D fundraising round, did you believe that that was true?
A Presumably. I mean, yeah.
THE COURT: Don't presume. You either remember that or you don't.
THE WITNESS: I don't remember that I made any assessment whether that's true or not. I didn't stop to think is this true or not true.
Q Generally speaking, when representations were made to you by OZY's leadership including Mr. Watson and Mr. Rao, did you believe what they were telling you was true?
A Yes, correct. But I would say, at the end of the day --
Q Mr. Kalliarekos, yes or no, did you believe what they were telling you was true?
A Yes, but you have to verify. Somebody tells you something, you know, you have to make sure that it's true; or, you know, anybody can say anything. What I believe it's true but at the same time, you have to make sure that, you know, the company continues to move forward. When a company comes to me and says I have all these plans, all of this and they believe this to be true, you still need to make your

own assessment about how things will work out.
Q Mr. Kalliarekos, you testified earlier you didn't review OZY's books and records before you invested, did you?
A I didn't review it in any significant detail.
Q You didn't audit their financials?
A I did not audit their financials.
Q Mr. Kalliarekos, one at a time.
You didn't audit the books and records before you invested, did you?
A Correct.
Q And you testified earlier when it came to the finances you believed what they told you was true, correct?
A Yes, I had no --
Q You didn't independently verify before you invested, did you?
A No, I did not.
Q You also recall receiving periodic updates from Carlos Watson and Samir Rao about developments in OZY's business?
A Correct.
Q Including new television shows or additional seasons of current programming, things like that?
A Correct.
Q And when they sent you these updates about new developments, you believed that those were true, correct?
A Correct.

Q Isn't it true that on November 1, 2019, Samir Rao sent you an e-mail copying Carlos Watson telling you that "Black Women OWN the Conversation" was already renewed for a ten episode second season?
A I have no recollection of that but I'm assuming the e-mail exists.
Q Well, let me show you the e-mail and see if at that refreshes your recollection?
A I don't doubt that this -- I just don't have any recollection but I'm sure it was sent to me.
Q I'd like to show you the e-mail and see if it refreshes your recollection. So I'm going to show you what's been marked for identification as Government Exhibit 7302.
Are you able to see that Mr. Kalliarekos?
A Yes.
Q We can scroll for you. And I could focus you in on that first bullet point there. Just let us know when you've had a chance do review?
A Yes.
Q So has your recollection been -- excuse me -- been refreshed that Samir Rao sent you an e-mail copying Carlos Watson telling you that as of November 1, 2019, OWN had already renewed "Black Women OWN the Conversation" for a ten-episode second season?
MR. SULLIVAN: Objection. The exhibit still can't

be up.

THE COURT: Yes. Let's have another question on the same subject.

Q Is it fair to say, Mr. Kalliarekos, that when you received updates about television shows, you took Carlos Watson and Samir Rao at their word?

A Yes, but if anybody deals with entrepreneurs, and I've dealt with a lot of entrepreneurial companies, everybody will tell you things are going great. There is not an entrepreneur or a company or a startup where they're saying, oh, you know, we are doing very poorly. You're always optimistic, you're always saying --

THE COURT: Sir, listen to the question.

A I just want to say, yes, correct. But the context of it is wrong.

Q Mr. Kalliarekos?

A In my own personal opinion.

Q I understand.

The question was, when Carlos Watson and Samir Rao gave you updates about OZY content, you took then at your word; yes or no?

A With a pinch of salt. I didn't totally believe how excited they are, no serious investor will do that with an early-stage company if you've invested in several ones. You just say okay. You assume it's partly true because they're,

you know, selling stuff. They're entrepreneurs, that's what they do; that's their job.
Q When they told you that the season had already been renewed, there is no pinch of salt in that, is there?
MR. SULLIVAN: Objection.
THE COURT: Overruled.
A Things can change. You'll be amazed how many things you think are going to happen and they don't.
Q Mr. Kalliarekos, there's no pinch of salt in the phrase "already renewed," is there?
MR. SULLIVAN: Objection.
THE COURT: Overruled.
MR. SULLIVAN: Phrase not in evidence.
A I'm not sure what the definition of pinch of salt is, but for me, I took it as a given but with the understanding that things may change because these are early-stage companies. People can change their minds, it happens all the time.
Q Mr. Kalliarekos, you would agree, actually --
MR. STERN: Withdrawn.
Q You testified about the importance of Carlos Watson as a leader for the company, correct?
A Yes.
Q And you would agree that the integrity of a leadership team is important in deciding whether and how much to

invest, right?
A Correct.
Q Would your opinion of the integrity of a leadership team change if you found out they were faking television contracts?
A Yes. I mean, I would imagine that's a -- of course.
Q Of course.
Would your opinion of a leadership team change if you found out they were forging signatures of their business partners?
A I think that's self-evident.
Q And that's a yes?
A Yes. I mean, it's self-evident.
Q Would your opinion of the integrity of a leadership team change if you found out that they were making up historical revenue numbers to share with investors like yourself?
A Making up, you mean, again, the financials of an early-stage company is not necessarily the most important thing.
Q Mr. Kalliarekos, I didn't ask you whether you thought that the financials were the most important thing.
My question was: Would your opinion of the integrity of a leadership team change if you found out that they were making up historical financial numbers?

A I'm assuming in any investment that I'm looking at is that the management team is trying to pump up the figures in whatever way they can. So I have to do my own independent analysis on whether I truly believe the numbers that I see or not. This is the job of an investor.

Q I'll try this one more time.

Would your opinion of the integrity of a leadership team change if you found out they were making up historical financial numbers, yes or no?

Or it's complicated and we can move on?

A It's complicated.

Q Would your opinion of the integrity of a leadership team change if you found out that they were lying about the other people who were investing in the company?

A There's a difference, I have to say, between an outright lie and indicating that somebody may invest. I mean, when an entrepreneur tells me, oh, this person is going to invest here and this person is going to invest here, you know, sometimes, you know, because you've gone through it 50 times that some of that may not happen because you'd be naïve if you believed everything, you know, an entrepreneur who is really trying to sell his business and his idea tells you it's true.

MR. STERN: Your Honor, I move to strike that as nonresponsive.

THE COURT: We can take that question up later. Let's have another question.

Q Okay. Mr. Kalliarekos, you talked about may invest or express of optimism, fair?

A Correct.

Q Let's say it's not an expression of optimism, let's say it's an outright lie about who had committed to invest. Would that change your opinion of the integrity of a leadership team?

A I mean, of course.

Q Of course?

A Of course. But some person's lie may be another person's, you know, hopeful thinking. I mean, you have to be able to discriminate again what you're hearing if you're an investor. You can't be academic about it, you have to be real and you have to be practical.

Q Mr. Kalliarekos, would your opinion of a leadership team change if you found out that he were impersonating people on reference calls?

A Yes, of course.

MR. STERN: Thank you. No further questions.

THE COURT: Redirect.

MR. SULLIVAN: Yes. Thank you.

REDIRECT EXAMINATION

BY MR. SULLIVAN:

Q Mr. Kalliarekos, would your opinion of the integrity of the leadership team change if you knew the CEO never faked a contract?

A Of course.

MR. STERN: Objection.

THE COURT: Sustained.

MR. STERN: Move to strike.

THE COURT: You can rephrase the question but the motion is granted.

Q Would your opinion of the integrity of the leadership team remain the same if you knew that the CEO himself never faked a contract?

MR. STERN: Objection.

THE COURT: You can answer that question.

A Yes.

Q Would your opinion of the integrity of the leadership team remain the same if you learned that the CEO himself never impersonated anyone for a reference call?

A Yes. May I say something to that, sir?

Q Well, I wish we could there are some formal rules. I have to ask you a question and you have to answer it?

A My apologies, it's my first time in a court.

Q So just to short circuit this. All of those questions that Mr. Stern asked about would your opinion change, if you knew that the CEO had nothing to do with any of those

things, would your opinion about the integrity of the leadership team remain the same?

A Yes. Carlos Watson was the head of the audit committee in one of my largest investments. Head of the audit committee, public company, for several months. He did an outstanding job.

Q And you trusted him?

A Of course.

Q Those e-mails that Mr. Stern showed you, do you have any independent recollection of receiving those?

A I do not.

MR. SULLIVAN: No further questions. Thank you, sir.

MR. STERN: Nothing further, your Honor, thank you.

THE COURT: The witness may step down.

THE WITNESS: Thank you, sir. Thank you, your Honor.

(Witness leaves the witness stand.)

THE COURT: Yes, let's return Mr. Watson to the stand, please.

(Witness takes the witness stand.)

**CARLOS WATSON**, called as a witness, having been previously duly sworn, was examined and testified as follows:

THE COURT: Actually, I think we're due for the first break of the afternoon. My apologies. We will see you all shortly. Usual rules as always are in effect.

(Jury exits courtroom at 2:40 p.m.)

THE COURT: I'll see everybody shortly.

MR. SULLIVAN: Thank you.

(Witness leaves the witness stand.)

(A recess in the proceedings was taken.)

(Continuing)

(In open court; outside the presence of the jury.)

(Judge ERIC R. KOMITEE enters the courtroom.)

THE COURT: We are ready, I think, for the jury.

MR. SIEGEL: Your Honor, would it make sense to take up the objection.

THE COURT: Well, let's take up the objection.

What is the objection?

MR. SIEGEL: So there is a -- as I understand it, the defense wants to admit Defense Exhibit 133-A. 133-A was produced to us yesterday.

THE COURT: Okay.

MR. SIEGEL: There's a couple issues with 133-A. And just to orient you.

This is an agreement with Dentsu and if you recall, when I was cross-examining Mr. Watson about the Dentsu agreement that was in the defense exhibits and that was admitted into evidence, I asked is there anything in this agreement that says that there's a payment? He said, well, there's an attachment that has the payment.

They've now produced 133-A and said this is the attachment.

The issue is -- is two-fold. One, in addition to the fact that it's late, based on the email --

THE COURT: What do you mean, when you say it's

late -- and again, was it responsive like -- let's go step-by-step.

Is it late relative to the deadline for pre-marked exhibits? Is it late relative to the deadline in my order to compel compliance with Grand Jury subpoenas? Late how?

MR. SIEGEL: Well, it's certainly late on the pre-marked exhibits. My recollection --

THE COURT: Defense is going to say in response to that -- that it is rebuttal document, not a case-in-chief document.

MR. SIEGEL: No, your Honor. This is their case-in-chief. This is their case-in-chief.

THE COURT: But it came up on cross.

MS. GILBERT: Yeah.

MR. SULLIVAN: Redirect.

MR. SIEGEL: But so the larger issue -- so, one, I believe it is also, it would have been responsive on the motion to compel.

THE COURT: Can you take a moment and firm up your position on that?

MR. SIEGEL: Yes.

THE COURT: Look at the subpoenas and in the meantime, the defense should be looking at whether this was produced pursuant to the motion to compel or otherwise.

(Pause in the proceedings.)

MR. SIEGEL: Well, so there's -- that gets to another issue.

So --

THE COURT: Before we get to the other issue, can you tell me if it is responsive to the subpoena or not.

MR. SIEGEL: Well, it's related and it's a little unclear if it was responsive -- produced in response to the subpoena.

THE COURT: Okay.

MR. SIEGEL: There is a -- the exhibit they gave has a Bates number on it, and that Bates number is within the range of things that were produced pursuant to the subpoena.

THE COURT: Okay.

MR. SIEGEL: This document, however, is different from the document with the Bates number that we received under that Bates number in response to the subpoena.

MS. GILBERT: It's actually identical, but has different formatting. They are identical documents. If you do a word-by-word check, they're identical.

THE COURT: But what happened? Why is it --

MS. GILBERT: We don't know why the formatting is different. They have the same Bates numbers on them. They are the same document.

THE COURT: You are saying this is just some issue with --

MS. GILBERT: So for some reason --

THE COURT: -- the document management system?

MS. GILBERT: For some reason when we pull it up this time, it came up with a different format.

We have it in our system, the same document, with the same number, with their formatting the way it was originally produced to them, as well as with the formatting that we had today.

So we actually have the same document identically.

THE COURT: Does the Government have any reason to believe that there is a substantive difference?

MS. GILBERT: And we're happy to use the original one if that's what they would prefer. That's fine, too.

MR. SIEGEL: Well, so then that, I guess, on that issue, then we should use the original one that was produced.

The issue with the late production in terms of this being a redirect, is the testimony from Mr. Watson is that there was an attachment to that contract.

THE COURT: He testified to that on direct.

MR. SIEGEL: Yes, that's right.

THE COURT: Not on cross.

MR. SULLIVAN: No, cross.

MS. GILBERT: No, he testified to it on cross.

MR. SIEGEL: No, he testified to it on cross.

THE COURT: Okay.

MS. GILBERT: And the jury was led to believe --

THE COURT: Let's let the Government finish. And I will --

MR. SIEGEL: These documents, so 133-A and 133 are all attachments to emails. And they're attachments to separate emails with no indication in the emails that these documents are in any way related.

So the issue of -- part of the reason we have these pre-trial deadlines, or just early deadlines for exhibits, is to understand what these exhibits are. And so for 133, we were able to look at that and be aware that there was no attachment to that email -- there was no attachment to that contract in any of the emails where that contract was attached.

But now they're marking a new exhibit that is attached to different emails with no indication that they're actually part of the same contract, that they want to admit and say, well, actually this is an attachment to that.

THE COURT: But then you are just making an argument that they will have no foundation for the idea that the document is what they claim it is, right?

MR. SIEGEL: Well, Mr. Watson testified whatever he needs to testify, but the issue is, is that our ability to challenge that has been hampered by the fact that this was sprung on us. After he claimed there was an attachment, we

could verify that there wasn't an attachment, at least in any of the emails that we were produced with.

THE COURT: So here is how I am understanding the issue.

The Grand Jury subpoenas and the motion to compel, we are setting aside entirely.

MR. SIEGEL: Yes.

THE COURT: There may be a formatting or a visual difference between the two documents, but you are not really disputing that this document was produced in compliance with my order to compel. Point 1.

You are saying that the introduction of this document now would violate the Court's order regarding the exchange of pre-marked trial exhibits, and that argument hangs on the assumption that this really is case-in-chief material, not rebuttal. And so let me just play that through in my mind.

The testimony on direct about this document was what, nothing?

MR. SIEGEL: The testimony -- well, about.

THE COURT: About Dentsu and Dentsu revenues, was that in the chart on the white board or what happened with Dentsu.

MR. SIEGEL: So there's Defense Exhibit 133. Ms. Frison admitted that, not with the white board and

Mr. Watson said --

THE COURT: Can somebody hand up everything we are talking about?

MR. SIEGEL: Sure.

THE COURT: I may be able to actually... Defense Exhibit 133, you said?

MR. SIEGEL: Yeah. And I'm just going to hand up a copy of what's been marked as 133-A, and then the version I guess we're going to use at 133-A, which was the version that was produced.

THE COURT: 133-A is the new one?

MR. SIEGEL: That's right.

THE COURT: Sorry. You said 133 and now it is 133-A.

(Pause in the proceedings.)

MS. GILBERT: Your Honor, it's something that we...

THE COURT: I'm sorry.

MS. GILBERT: They just handed it up.

THE COURT: This is both of them?

MR. SIEGEL: That's the two different versions of 133-A.

THE COURT: Okay.

I am looking for 133 so I can understand what happened on direct testimony.

MS. GILBERT: I have a copy of that..

You have it?

THE COURT: I do.

133 is a cooperation agreement effective as of February 2021 between Ozy Media on the one hand, and Amplify, Inc., a Delaware corporation, on the other hand.

Is that right?

MR. SIEGEL: That's 133.

THE COURT: Okay.

MS. GILBERT: And Amplify is also known as Dentsu.

MR. SIEGEL: That's right.

THE COURT: And Dentsu is D-E-N-T-S-U?

MS. GILBERT: Yes, correct.

THE COURT: Okay.

MR. SIEGEL: So that was admitted on direct. And as I recall, Mr. Watson testified that this was a $36 million contract for Dentsu.

THE COURT: Okay.

MR. SIEGEL: I crossed him about that and said there's nothing in here about 36 million.

THE COURT: Got it.

MR. SIEGEL: He said, well, there's an attachment.

THE COURT: He said on direct it is a 35 million?

MR. SIEGEL: 36 million.

THE COURT: 36 million.

MR. SIEGEL: I crossed him on that, on 133, and said

there's nothing in 133 about a $36 million.

THE COURT: Got it.

So 133-A was clearly case-in-chief material. It was just omitted at that point, is what you are saying.

MR. SIEGEL: Well, and what he's claiming is that 133-A is actually part of 133 or I --

THE COURT: Well, if it is part of 133, it should have been bound up with and labeled 133.

Let me just paraphrase what I think you are saying. This may be very simple if I am understanding it correctly.

The point on direct was we have a Dentsu contract that gives rise to 35 or, $36 million in revenue. 133 was introduced through Mr. Watson on direct for that purpose. You look at 133, you see there is nothing in here that, in your mind, gives rise to $36 million worth of recognizable revenue and you cross-examine on that basis.

And then the defense comes back with 133-A, which now they are telling you, this is actually where the 36 million that Mr. Watson testified to on direct, comes from.

MR. SIEGEL: Exactly.

THE COURT: Okay.

So on that understanding, if I have it correct, it does very much sound like this is case-in-chief material and not rebuttal case.

Does anybody for the defense want to explain what I

I am missing?

Ms. Gilbert, I take it?

One lawyer per issue. I think this is Ms. Gilbert or Mr. Sullivan.

MR. SIEGEL: I think this is a Ms. Frison issue.

THE COURT: Ms. Frison.

MS. FRISON: And to your -- to your point, Mr. Watson did testify about the what I'm calling the original contract, 133, and how much it was for. At that time, I did not know that the attachment has the rate card and the cost information on it.

Once we found that, that is when we marked it.

THE COURT: Right.

MS. FRISON: The way the questioning was left on cross with Mr. Siegel indicates to the jury that this is not in existence or somehow made up. I think that for completeness, and not to mislead the jury about what actually is in evidence, they should have the whole contract.

THE COURT: But for the -- I mean, I think you are conceding. You are saying it would mislead the jury. But I think you are conceding at the same time that there is a violation here of the obligation to turn over pre-marked exhibits for your case-in-chief.

Is that fair to say?

MS. FRISON: Yes.

THE COURT: Okay.

MR. SIEGEL: So -- and, your Honor, the prejudice to the Government is --

THE COURT: Is obvious.

MR. SIEGEL: The defense did something that was arguably misleading, perhaps by error, but left an impression in the jury that 133-A said $36 million. In cross we sought to correct that. And now we're put in a place where there's going to be an aha moment of well, of course there's 36 million and the Government just didn't know it.

THE COURT: Right.

MR. SIEGEL: But because there's an exhibit that hadn't been pre-marked for us, and that when we understood the contracts that have been marked in this case, that that wasn't there.

And, your Honor, and to the point that this is an attachment or that part of 133, that's also something that we would have been able to know if there was any email or any document that was linking these. But as far as we can tell from the production, they're actually two entirely separate contracts.

THE COURT: What is the date on the attachment?

MS. FRISON: They're one day apart. February 16th is what we're calling the contract, 133. And February 15th of 2021, both of them.

February 15th is the date of the attachment.

THE COURT: So what has been handed up here are basically the two versions of 133-A.

MS. FRISON: Yes.

MS. GILBERT: Yes, they're identical, your Honor.

THE COURT: Spend goal.

MS. GILBERT: Just a formatting issue.

THE COURT: Yeah, it looks like the font changed, basically and that is it.

MS. GILBERT: Yes.

THE COURT: And I am not worried about that.

MR. SIEGEL: Well, your Honor, one issue is that the Schedule-A media rate card is pulled up that makes it look -- in the version they marked, the Schedule-A media rate card, is pulled up in a way that makes it look like this document could be Schedule-A media rate card, when the original produced document makes it clear that there is a Schedule-A media rate card attached to 133-A that also is not attached.

THE COURT: So you are saying what? You are talking about this difference at the bottom of the signature blocks?

MR. SIEGEL: Yes.

THE COURT: That is a difference. But it is -- oh, yes. The difference is that in what is now identified as DX 133-A, there is a suggestion that the media rate card is contained in Schedule-A, whereas -- what?

MR. SIEGEL: It -- in the version that --

MS. GILBERT: No, they both have that, your Honor. Because the --

THE COURT: Oh, yes. It is on the other page.

MS. GILBERT: Yes, correct.

THE COURT: Oh. Okay.

This is a conundrum. It looks like, as a result of the omission to produce this on the exhibit deadline, one party or the other is going to have to look bad here.

MS. GILBERT: Well, your Honor.

THE COURT: This is a question of how the equities shake out.

MS. GILBERT: Your Honor, we could do it as a stipulation between the parties that that exists. If in order to make everyone look equal, and then it wouldn't have to make the Government look bad or --

THE COURT: Yeah.

MS. GILBERT: -- or us.

MR. SIEGEL: But, your Honor, we're not equal. Because this is a problem entirely of the defense's making.

THE COURT: Put aside though who is responsible.

Is there, I think the question is, a way through a stipulation or otherwise, for the defense to say something in a stipulation like: The parties agree -- I am just spit-balling here, the parties agree that Document 133 did

not, in fact, on its face, show anything about $36 million in revenue, but that a later discovered document, or something -- I am not saying like this idea, I am just putting it out there -- fills in the picture somehow.

MR. SIEGEL: No, your Honor, because it -- so two things.

One, there actually isn't a dispute that there was this $36 million deal. Mr. Rao testified about it. The issue is, is that there was direct testimony that on cross we pointed out was actually potentially misleading to the jury. And so the stipulation that's being provided shows that, well, maybe that was misleading, but also the Government didn't know what was going on.

And the reality is --

THE COURT: So I think, if I can just paraphrase what I understand you to be saying and you tell me if I get this wrong.

You promise, by virtue of what you just said, not to argue in summation that, in fact, there was no -- what if I just strike all this testimony on direct, and I guess the defense is saying they need this revenue in order to get to their numbers. But you are not disputing that this revenue is, in fact, recognizable?

MR. SIEGEL: Yeah. Well, what -- but --

THE COURT: Just to finish my initial thought.

You are not going to argue in summation that, in fact, the $36 million of claimed revenue associated with the Dentsu contract is a mirage.

Correct?

MR. SIEGEL: Well, it's a little bit more complicated than that.

The agree -- 133-A does match what Mr. Rao talked about, and I think Ms. Han may have as well, that there was a endeavor. It's in 133-A if you read it, that there was sort of a pledge that we will try to spend $12 million a year for three years. We may or may not do that.

THE COURT: Where is that here? Oh, spend goal?

MR. SIEGEL: Spend goal.

THE COURT: It shall be considered an endeavor and not a commitment, and as such, no penalties will be incurred. And any earned entitlement to ROI added value by Dentsu.

What does this -- I know what ROI stands for, but what is this contract using it to mean? As ROI added value, Ozy will provide Dentsu with the following.

MR. SIEGEL: So this is the exchange. It's -- adds the ROI added value, this is what Ozy's committing to do.

THE COURT: But what are the parties doing?

MR. SIEGEL: I'm sorry?

THE COURT: Dentsu gets a first look at all Ozy new media offerings and opportunities 30 days prior to any Dentsu

competitor or media agency.

What is Dentsu?

MR. SIEGEL: It's a media agency.

MS. GILBERT: It's an ad agency.

THE COURT: Okay.

Ozy will provide five hours of consultation services for any of Dentsu's clients spending more than a million dollars annually, including a virtual appearance by Mr. Watson at internal corporate events.

Okay.

MR. SIEGEL: So Ozy --

THE COURT: Okay.

So I think you are conceding that this all leads to $36 million in revenue, but how does that --

MR. SIEGEL: I mean, I'm not sure how that gets to 36 million, but it's -- Ozy agrees to do the things laid out in paragraph 2. In exchange, Dentsu's agreeing to endeavor to spend 12 million. And then, but if they don't spend that, there's no consequences. A commitment, they don't have to give back any of the services they're getting from Ozy.

So that's how it was described by Mr. Rao and Ms. Han, that there's a commitment but that's not actually -- you don't actually have -- it's an endeavor, but you are not actually getting any revenue until you sign with Dentsu's client.

THE COURT: Right.

It is not for me to say at this point, but it seems like there might be a consideration issue with the idea of considering this a contract.

MS. GILBERT: Apparently, this is how all of these contracts are written.

THE COURT: Just -- we are going to try to spend X and to the extent we do it -- what is an ROI added value?

Is that term, ROI added value defined in here anywhere? Or is that just a term of art in the media industry and everybody knows what it is?

THE WITNESS: Your Honor, do you want me to weigh in on this?

THE COURT: Please.

Actually, if your lawyer -- but make sure your attorney is comfortable with you weighing in on this.

But if he is the only person in the room who can solve this mystery, then...

MR. SULLIVAN: I am comfortable, your Honor. Thank you.

THE COURT: All right.

THE WITNESS: So your Honor, these contracts are hard to come by and they do these very rarely. When they do do them, they announce them and, hence, you saw in all of our documents that they were announced in Ad Age and Ad Week,

which are the two dominant kind of things in the industry.

Actually, I'm really glad that you're reading the piece you are. Remember how I said that often you have a written agreement, and then you build on top of it a barter relationship and, in fact, you call it strategic? You're literally reading barter revenue right there.

So you're reading us consulting. You're reading me making an appearance. You're reading us developing a consumer trends product together. And so it's -- so it's incredibly valuable and it's why not only did they announce it publicly, but we announced it publicly. Not only that --

THE COURT: But what is ROI added value?

THE WITNESS: Return on investment added value.

THE COURT: Is that a term of art or that just means something of added value?

THE WITNESS: That's what they were using in this particular one -- sorry.

THE COURT: Okay.

THE WITNESS: People say what else are we getting in a lot of different ways. Some people say in kind, some people say barter, some people say added value, some people says ROI added value. That's a different way of saying what else are we getting.

THE COURT: All right.

I am going to think about this for five or ten

minutes. The parties should continue to think about whether there is some way of fixing this that is agreeable to both sides.

MR. SIEGEL: Yeah, and, your Honor, I just want to be clear. In terms of what we just described of how there's this endeavor that Dentsu will spend money with Ozy, we're not going to contest that. That is something that our own witnesses said.

So to the extent there is a dispute about that, it's not. The point that we wanted to point out is that the contract put in front of the jury didn't say what Mr. Watson said. And that point still stands.

MS. GILBERT: Your Honor, he didn't read every point by point in the contracts. He looked at the contracts and knew, based on what that contract was, what that agreement was.

So suggesting that he was -- I mean, I think their argument is that he was sitting there lying about the contract. That is a misrepresentation and, quite honestly, very harmful and inaccurate.

THE COURT: Well, it was not a misrepresentation when made. You are saying --

MS. GILBERT: No.

THE COURT: -- they said something that turned out to be inaccurate based on later-produced documents.

MS. GILBERT: I'm not saying that it was in bad faith on their part.

THE COURT: Right.

MS. GILBERT: I don't make those representations.

I'm saying that it is also not on bad faith on Mr. Watson's part because he assumed that it was the whole contract.

THE COURT: Yeah.

MS. GILBERT: It is our mistake, not his.

THE COURT: And we all, having read Taylor over and over again over the last couple of weeks, are familiar with the Supreme Court's observations about --

MS. GILBERT: Willful misconduct.

THE COURT: No, no, no. That is not what I was raising Taylor for. It was the question of making lawyers' problems the client's problems, and the degree to which we have to worry about that.

All right. I will be back shortly.

MR. SIEGEL: Thank you.

(Recess taken.)

(Judge ERIC R. KOMITEE enters the courtroom.)

THE COURT: Everyone please be seated.

MR. SULLIVAN: The parties are cooperating, your Honor.

THE COURT: I was going to say. Maybe I should

leave the room again.

(Pause in the proceedings.)

THE COURT: If there are productive negotiations going on, you all should use this time.

MS. GILBERT: Yeah. I think there are, your Honor.

MS. FRISON: There are. Yes. There are.

THE COURT: All right.

I will be back. Just let Mr. Jackson know when you are ready.

THE COURTROOM DEPUTY: Yes, Judge.

(Recess taken.)

(Judge ERIC R. KOMITEE enters the courtroom.)

THE COURT: Where are we?

MR. SULLIVAN: So we have an agreement among the lawyers, but we need permission to talk to Mr. Watson to show him.

THE COURT: Okay.

I will sit here.

(Pause in the proceedings.)

MR. SULLIVAN: Okay. Your Honor.

THE COURT: Okay.

This is a written stipulation we are talking about?

MR. SIEGEL: I think -- it's a written stipulation that we're going to just read into the record because we don't have printers.

THE COURT: Perfect.

I think we are ready for the jury.

THE COURTROOM DEPUTY: Okay.

MR. SIEGEL: Your Honor, do you want to bring in the jury or do we also, want to finish the Zahlraddin conversation?

THE COURT: Bring in the jury.

MR. SIEGEL: That's cool by me.

MR. SULLIVAN: Mechanically, your Honor, when he's done -- so what should we -- what should Ms. Frison do?

MS. FRISON: Should he stay on the stand while we read the stipulation? Or just...

THE COURT: I think he can.

Were we going to read the stipulation first, before the testimony? Is that the desired order of operations here?

(Witness resumes stand.)

MR. SULLIVAN: Ms. Frison doesn't have any other questions.

THE COURT: I am sorry?

MR. SULLIVAN: Ms. Frison does not have any additional questions.

MS. FRISON: I have no further questions.

MR. SULLIVAN: Her one question was going to be the substance of the stipulation.

THE COURT: Oh.

So there is recross?

MR. SIEGEL: Yes, your Honor.

THE COURT: All right.

So first the stipulation and then the recross?

MR. SIEGEL: Yes, your Honor.

MR. SULLIVAN: Okay.

(Pause in the proceedings.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Please be seated, everyone.

Ladies and gentlemen, thank you for your patience. I think we are going to begin with a stipulation that the parties have agreed to and that someone is going to read into the record.

Ms. Frison?

MS. FRISON: Thank you.

The parties agree that beginning in 2021, Dentsu and Ozy had an agreement that Dentsu would endeavor, on behalf of its clients, to spend $12 million across Ozy Media offerings and services in 2021. This agreement was an endeavor by Dentsu and not a commitment, and as such, no penalties would be incurred by Dentsu if it did not meet its endeavor.

This agreement included an option upon mutual agreement to extend the agreement for an additional year, and increase the endeavor to $25 million.

THE COURT: Thank you.

All right. I think we are going to resume with Mr. Watson's testimony.

And, Mr. Siegel, the floor is yours.

MR. SIEGEL: Thank you, your Honor.

(Pause in the proceedings.)

MR. SIEGEL: Your Honor, just to start on -- with an administrative clean-up?

THE COURT: Yes.

MR. SIEGEL: I think yesterday I misspoke when I referred to the indictment as Court Exhibit 9 or -- but I think it was labeled as Court Exhibit 8.

So I want to move to admit Court Exhibit 8 under the same limiting instruction the Court gave. I don't think there actually is a Court Exhibit 9.

THE COURT: I will note that my decision is already in the record to admit Court Exhibit 9, if that is what was offered, is actually as to Court Exhibit 8.

MR. SIEGEL: Thank you, your Honor.

(Court's Exhibit 8 received in evidence.)

RECROSS EXAMINATION (Continuing)

BY MR. SIEGEL:

Q Okay.

Mr. Watson, good afternoon.

A Good afternoon.

MR. SIEGEL: Mr. Menz, could we put up Defense Exhibit 627.

THE COURTROOM DEPUTY: In evidence?

MR. SIEGEL: Yes.

THE COURTROOM DEPUTY: Thank you.

(Exhibit published.)

MR. SIEGEL: Okay.

Q Mr. Watson, do you see that document?

A I do.

Q And you recall, this is for -- this is the draft term sheet for that Essence deal that we talked about?

A It's a term sheet, and I think somewhere it says draft, yes.

Q I don't want to get into semantics, but you agree it's a draft term sheet?

A I agree it's a term sheet and that there are certain provisions that have the word draft next to it.

Q Okay.

And this is relating to the purchase of Essence Communications?

A That's part of it, but not all of it.

Q Okay.

And this is the agreement where I asked you on cross, and Mr. Sullivan asked you on redirect, that the word Oprah isn't in here, correct?

A Yes, I believe -- I believe that happened.
Q And you testified on redirect that you had the understanding that Oprah was involved in the investment through Discovery, correct?
A Via her partners in Discovery. And the Oprah Winfrey Network, yes.
Q And when you testified on redirect, you said that was based on conversations with Eric Logan, Bruce Campbell and Ben Horowitz, correct?
A Among others, yes.
Q It was also based on conversations with Dan Fox; is that right?
A I'm not sure that I had conversations with Dan. Dan's a little bit -- Dan's a bit more junior.
Q Sorry. Again, it was just a yes-or-no.
A I'm not sure -- I guess that's one of those it's complicated. Dan is -- Dan is junior to Bruce, so he wouldn't necessarily get to be in those conversations.
Q Mr. Watson, just yes or no.
A It's complicated.
Q Okay.
You have testified yesterday that you had conversations with Bruce Campbell and Dan Fox, correct?
A Among other people, yes.
Q And you said that you flew to New York to meet with Dan

Fox and Bruce Campbell, correct?
A I don't think I said that.
Q Okay.
MR. SIEGEL: Could we just, for the Court and counsel. On the ELMO, please.
THE COURTROOM DEPUTY: Yes.
MR. SIEGEL: Your Honor, I propose to read to the jury -- this is a transcript page 3099, lines 11 through 14.
THE COURT: You may.
MR. SIEGEL: Could we publish this?
(Exhibit published.)
MR. SIEGEL: (Reading):
ANSWER: We had a series of conversations with some of her investment team at Oprah Winfrey Network. A gentleman named Dan Fox, a gentleman named Bruce Campbell, both in person -- I flew out to New York.
Q And Mr. Watson, you testified again that, your understanding, that Ms. Winfrey was going to invest was based on conversations with Dan Fox and Bruce Campbell and Eric Logan, and others, correct?
A I don't think you were formulating that in the way that I said.
I think what I said is Oprah Winfrey investing through the Oprah Winfrey Network --
Q It's a yes-or-no question.

MR. SIEGEL: Your Honor, can we put this to Court and counsel?

THE COURT: I mean, if this -- you are asking him about what he said yesterday.

MR. SIEGEL: I just said is that what he said yesterday.

THE COURT: Do you want to just go through the testimony?

MR. SIEGEL: Sure.

So this is transcript line 3103, I propose to read lines 17 through 21.

Your Honor?

THE COURT: Yes.

MR. SIEGEL: Please publish.

(Exhibit published.)

QUESTION: And is that term sheet the basis of your belief that Ms. Winfrey was going to invest $10 million during that series?

ANSWER: Yes, in addition to conversations with Dan Fox and Bruce Campbell and Eric Logan and others.

Q Mr. Watson, when I cross-examined you yesterday, you said that you were talking to Dan Fox and Bruce Campbell and others about an investment in 2019; yes or no?

A I would have to see that. Again, I'm trying to be very thoughtful about how you are labeling things. So please show

it to me to make sure.

But yes, I did reconnect subsequent to 2017. I believe in 2018 and I believe in 2019.

Q Just a yes or no.

A And I believe in 2020.

Yes.

MR. SIEGEL: Your Honor, I move to strike.

THE COURT: That motion is granted.

If you can answer the questions yes or no, please do. And if you cannot, please let us know that.

MR. SIEGEL: All right.

Just for Court and counsel, please, the ELMO.

Your Honor, this is page 3691 of the transcript from the cross. I propose to read pages -- lines 12 through 14.

THE COURT: Yes.

MR. SIEGEL: Okay.

If we could publish, Mr. Jackson.

THE COURTROOM DEPUTY: Yes, sir.

(Exhibit published.)

MR. SIEGEL: So it's part of a question: In 2019 you were talking to Dan Fox and Bruce Campbell about an investment?

ANSWER: And others as well. People on her business team.

Q Mr. Watson, is it correct or is it incorrect that in your

direct testimony and on cross you repeatedly talked about your conversations with Dan Fox?
A Yes, that is true.
Q Is it correct or is it incorrect that on redirect today, when you talked about people you mentioned, you did not mention Dan Fox.
A On redirect.
Q With Mr. Sullivan.
A I don't remember, but I should include Dan Fox as part of the people I spoke to, yes.
Q Mr. Watson, isn't it the case that the reason you omitted Dan Fox today is because last night the Government informed your defense team that Dan Fox was coming to testify?
MR. SULLIVAN: Objection. He didn't say --
THE COURT: Overruled.
Is that?
A No, that's not true.
Q Okay.
MR. SIEGEL: No further questions, your Honor.
MR. SULLIVAN: No questions.
THE COURT: The witness is excused.
You may step down.
THE WITNESS: All right.
Thank you. Thank you.
THE COURT: Ms. Frison, just for the sake of the

record, you have no --

MS. FRISON: I'm sorry, no further questions.

THE COURT: Yes, I made that decision based on facial gestures.

But Mr. Watson, you may step down.

THE WITNESS: Thank you very much.

Thank you.

(Witness excused.)

THE COURT: I think we have a conversation to have before we hear from the next witness, correct?

MR. SIEGEL: Yes, your Honor.

THE COURT: All right.

Let's ask the jury to step outside again. We are sorry for the unavoidable delay, but we will be back with you.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: All right.

So what documents should I be looking at here? We have a spreadsheet, which I am going to pull up now, but also a dispute of fact on what I would have thought was the rather straightforward question of what emails from the relevant time period have or have not been turned over.

Ms. Gilbert, have we resolved that question?

MS. GILBERT: Not quite, your Honor. We're -- we -- we've been trying.

THE COURT: Okay.

So what is the defense position on what was turned over?

MS. GILBERT: Well, I'm actually in the process of trying to figure that out right now because we send them things via links. FTP links, file transfer links.

THE COURT: Right.

But there is a cover letter, no, that says that at least has Bates numbers or exhibit numbers or --

MS. GILBERT: It doesn't have Bates numbers. It has a -- a spreadsheet attached to it, not Bates numbers.

THE COURT: Does the spreadsheet refer explicitly to emails from the relevant time period?

MS. GILBERT: The spreadsheet has Bates numbers on it. It doesn't have the, the --

THE COURT: So no descriptions?

MS. GILBERT: Correct.

So, I am -- the Government doesn't believe that they received these emails and I'm just trying to find the link where I believe I sent it to them. So that's what I'm doing right now.

THE COURT: Okay.

MR. SIEGEL: And, your Honor, can I --

THE COURT: Just before we go on, do we have Ms. Gilbert on the microphone?

THE COURTROOM DEPUTY: Turn the mic on and pull the mic.

MS. GILBERT: Sorry.

Can you hear me now?

THE COURT: I think we can hear you better, yes. Okay.

MR. SIEGEL: And, your Honor, can I give the Government's position about where we are?

THE COURT: Yes.

MR. SIEGEL: So the reason we don't think we've gotten these is a couple reasons.

One, every time we're sent a link, we do download that. We have a record and we have a folder of each thing that's in each link, and the documents that Ms. Gilbert is describing is not in any of those folders, and even the dates that she's told us, we do have the documents we downloaded from that link, and it's not included in there.

In addition, there are the -- there's the index that Ms. Gilbert filed today and also sent last night. That index does match up with what we downloaded and does not include any of these 2020 documents.

THE COURT: Okay.

I mean, that sounds fairly straightforward, but if there is any complicating information, we will hear about it from Ms. Gilbert.

MR. SIEGEL: And your Honor, could I also just talk about the relevance issues?

THE COURT: Yes.

MR. SIEGEL: So, again, as I understand the proffer, it's not that Mr. Zahlraddin was involved in negotiating these contracts, it's that he was involved in renegotiating these contracts after The New York Times article.

To the extent he's going to offer any testimony about how these contracts would have operated before that period, it -- that can only be coming from two bases. One, it could be hearsay, if what he was told about what was happening before he was involved --

THE COURT: Why can't it be that he read the original contract? That is not what you are saying.

MR. SIEGEL: Then he's offering expert testimony.

That would not be: This is how I negotiated the contract, this is I'm involved.

This is: I'm a lawyer reading the contract and telling you what I think.

THE COURT: That may or may not line up with reality, but if it is as simple as: There was a contract, a loan agreement that called for us to pay $100,000 a month, and I renegotiated that where we were going to pay over a longer time period but only $50,000 a month, is that really expert testimony or is that just --

MR. SIEGEL: Well, as to the renegotiating, that's fact testimony. But the fact testimony is irrelevant because that's all post-New York Times and post-conspiracy.

As to the here was the original terms of the contract, and it's either he's saying this is what the contract explicitly says --

THE COURT: Right.

MR. SIEGEL: -- in which case it's not helpful, or he's giving some kind of legal opinion --

THE COURT: Right. In which have case they should just call a real fact witness who had some involvement in the --

MR. SIEGEL: And they did. They called Mr. Watson --

THE COURT: Lightfoot.

MR. SIEGEL: They called Ms. Lightfoot. They called several people who can speak to how these actually operate, but now what they want to do is call a lawyer to give his opinion about how these contracts work in the period before he was renegotiating them.

THE COURT: So let me say something that maybe is obvious, but that I did not say before, which is that if the indictment period ends -- is there a specific date or do we just have a year, 2021?

MR. SIEGEL: I don't have the indictment in front of

me, but I mean, the testimony in the case, I mean, it's a Court Exhibit, we could check.

But testimony in the case --

THE COURT: Let's check.

MR. SIEGEL: -- within a week of the New York Times article everyone stops speaking, the conspiracy's over.

THE COURT: Drew, will you hand that up to me.

THE COURTROOM DEPUTY: Yes.

(Continued on following page.)

(Continued.)

THE COURT: I have been handed Court's Exhibit 8 for identification. Roman numeral three is entitled the fraudulent scheme. Reading, in or about and between 2018 and 2021, and I'm flipping through the speaking portion of the indictment and seeing lots of portions, lots of dates from within that range.

MR. SIEGEL: Your Honor, in Count 1 and Count 2, the conspiracy is defined as January 2018 to October 2021.

THE COURT: Yes. And Count 3 is going to be in 2021, presumably, and also not related to this testimony, presumably.

MR. SIEGEL: 2020, 2021.

THE COURT: This witness has nothing to do with Count 3, right? I'm asking defense that question.

Ms. Gilbert, does this witness -- he has nothing to do with Count 3, correct?

MS. GILBERT: Correct.

THE COURT: So all right, Counts One and Two specify a period that concludes in or about October 2021. And this witness, he's engaged when?

MR. SIEGEL: It sounds like there's two things that they're talking about. There's some involvement in liens in 2020, for which at this point we have no 26.2 material. Then there's a discussion of him renegotiating certain contracts

after the New York Times article.

THE COURT: You dispute the relevance, take the liens issue, not the -- sorry. I'm not sure I understand the difference.

MR. SIEGEL: Just different time periods. So there is -- Ozy has a number of lenders. They have liens on Ozy. There's been testimony from both Mr. Rao and Mr. Watson about this. There were liens in 2020.

They had to get those liens cleaned up. As Mr. Rao testified, they had to get those liens cleaned up because that was a condition for WTI's investment. WTI wouldn't invest while there were still outstanding liens. So they had to get all their liens cleared.

THE COURT: In 2020?

MR. SIEGEL: Yes.

MS. GILBERT: Yes.

MR. SIEGEL: I don't know what Mr. Zahlraddin is going to say about that process. I don't think there has been a clear proffer on that. I don't see what he's going to say that would be relevant, or really in dispute, but I don't know.

As to the comment that he's going to have testimony about revenue and about contracts, at least as I understand the proffer, his involvement in that is helping to renegotiate these contracts and restructure contracts, because he's a

restructuring lawyer, after the New York Times article comes out, and now Ozy is in crisis or in pause or disrupted, figuring out what they do with these contracts.

THE COURT: What do they do with them, meaning we have interest payments due and we can't pay them?

MR. SIEGEL: No, no. The examples they gave are like, for example, the Dentsu contract, the Omnicom contract or contracts with clients. Again, as I understand it.

THE COURT: What is the point of restructuring the contracts with clients?

MR. SIEGEL: For example, let's say you're Discover, and this is a hypothetical, I don't fully understand the facts. Say you're Discover. You have a contract to advertise on Ozy. The New York Times article comes out. Ozy becomes a pariah. Nobody wants to advertise --

THE COURT: You're negotiating with a 90 percent discount or something?

MR. SIEGEL: So there's some renegotiation where the clients say we want out, Ozy says we have a contract.

THE COURT: That's very different from what I heard earlier this afternoon, I thought, which was that the restructuring was of these debt instruments to provide for reduced debt payments but over a longer period.

MR. SIEGEL: As I understand it, Ozy, as I understand it, which --

THE COURT: Why don't we let the defense. So Ms. Gilbert, we're turning back to you in a moment on the relevance question. Turning back to you on the production issue, do you have any --

MS. GILBERT: Still figuring it out, Judge.

THE COURT: What's the relevance angle? I understand you to say earlier that Mr. Zahlraddin, when we say he was restructuring contracts, those were debt instruments and that he was trying to reduce the current debt load of the company. Now I'm hearing from the Government that the restructuring actually extended to advertising agreements.

MS. GILBERT: Yes, that's true.

THE COURT: Is it both?

MS. GILBERT: Yes.

THE COURT: Over what period is that happening?

MS. GILBERT: Starts in 2020 and then in 2021.

THE COURT: So, basically, the production issue, if it's a problem it's a problem for all of the categories of proffered testimony because they all happened during the period for which the Government says they have no material.

MS. GILBERT: Yes.

THE COURT: Okay. If you could answer that question in the next seven minutes, we'll hear from Mr. Zahlraddin today. If not --

MR. SIEGEL: Your Honor, just the final issue is

there's a real privilege being used as a sword and shield here. They did assert privilege as to Mr. Zahlraddin, and so --

THE COURT: So you produced documents to them that the prosecution team did not read. They were produced by the --

MR. SIEGEL: Yes. All from the 2020 --

THE COURT: We're doing a balancing act here. So you get the 26.2 material June 26th and 28th, mostly.

MR. SIEGEL: That's 279 documents.

THE COURT: Okay. That was 11, 13 days ago. I understand there's been a lot going on the last 11, 13 days, but if they produced all these emails, maybe that's a saving. Maybe it's not.

MR. SIEGEL: Except, your Honor, that 279 we know is not complete because the index, including the things that are filtered, have an additional 3,000 documents.

THE COURT: That you still haven't looked at because the defense never sent you a privilege log, and you said you would be using that material potentially for cross here or you don't know?

MR. SIEGEL: Had this come out before last night and, for example, if they were going to waive privilege, that would be a subject matter waiver. That would have opened up --

THE COURT: Didn't they waive the privilege at least when they said we're calling this person as a witness?

MR. SIEGEL: Well --

THE COURT: On June 26th or 28th, even if implicitly.

MS. GILBERT: Yes.

THE COURT: Let me just hear the final answer from the Government.

MR. SIEGEL: Your Honor, just one moment. I think we have emails from the defense about this, but I don't want to quote something without looking at it.

(Pause.)

MR. SIEGEL: Your Honor, on June 1st I e-mailed Mr. Sullivan, Ms. Frison, and Ms. Gilbert and said your witness list includes at least two attorneys. We understand your inclusion of them to mean that Ozy and Watson are waiving any privilege as to communications with those attorneys. If that's not right, let's please discuss it with the Court.

Mr. Sullivan responded, no, we are not waiving privilege. You should feel free to raise with the Court. We then raised with the Court our concern that there was going to be some type of advice of counsel defense, which the defense represented they were not going to make any advice of counsel defense. We considered the matter put to bed until last week, or I've lost sense of time, but maybe ten days ago when they

provided some 26.2 for Mr. Zahlraddin, which we then moved to preclude and that's where we've been ever since.

THE COURT: Okay. It's 4:30, which is the seven-minute mark. Is there any additional information?

MS. GILBERT: The additional information is that -- from what I understand, it was in the link we sent but I also understand that they didn't get it. So I don't know what to say.

THE COURT: You also produced a log that doesn't include -- what was the Government's point about the log again?

MS. GILBERT: Right.

THE COURT: This is a question for the Government.

MR. SIEGEL: So on the link, at least based on our prior discussions, on June 30th a link was sent to us that included a word 26.2 index.

That link, when we downloaded it, contained additional defense exhibits. The word index included an index, as I understand it, of materials that we've already received. In addition, there's the Excel index that was filed today and also e-mailed last night. That Excel index does not include any documents from 2020, and that Excel index is consistent --

THE COURT: What does the Excel index purport to be?

MR. SIEGEL: Give me one moment, your Honor.

MS. GILBERT: Can I answer that question?

THE COURT: Yes, you may.

MS. GILBERT: It's an index of documents from Rafael Zahlraddin, a document that relates to him.

THE COURT: That index does describe the contents?

MS. GILBERT: It has a brief description.

THE COURT: Okay. Do any of those brief descriptions suggest that there were emails from the relevant period included?

MR. SIEGEL: Your Honor, just reading from the letter, it's attached. This is the cover letter for that index. Attached hereto is a spreadsheet with an overinclusive list of all discovery materials the Government has pertaining to Rafael Zahlraddin, including all Rule 26.2 material. That index, one, has Bates numbers; and two, has a column for date sort, which appears to be the date of the email.

The dates in that date sort column are all from 2022 or 2023, or I believe beginning October 31, 2021. There are also about 150 that have a date of 1969, which I think is an error.

THE COURT: Is it possible that the 1969 documents are the ones that the defense thinks they're talking about?

MR. SIEGEL: No, because those are not documents that were produced by the defense. Those are documents from the phones that were filtered.

MS. GILBERT: Those are phone documents. Apparently when they go through the system they get -- they all get this 1969 date for some reason.

MR. SIEGEL: In addition --

THE COURT: So I just want to bear down on this one last point.

MR. SIEGEL: On that point, in addition to relying on the spreadsheet, we have also clicked through all the documents that were sent, which do align.

THE COURT: Including the 1969 documents?

MR. SIEGEL: No. All the documents that were sent by defense counsel. I'm not including things on the filter side.

THE COURT: So you haven't seen the 1969 documents, because those are documents in which the defense asserted a privilege and never waived it, at least explicitly?

MR. SIEGEL: Yes.

THE COURT: Let me just ask this question, which is the thing I'm trying to resolve. If everybody could just focus on this one question for a moment.

Ms. Gilbert, do you have any reason to believe that the 1969 documents are the emails from the time period at issue?

MS. GILBERT: No. I believe they're actually telephone communications of some sort.

THE COURT: Okay. So they're not the emails at issue?

MS. GILBERT: I don't think so. I'm looking for the email from --

THE COURT: Okay. I'm going to be writing, or publishing, in the relatively near future an order explaining my reasons for excluding the Beverly Watson testimony, and a lot of what I say in that order will apply here, as well.

I think what I understand, just to summarize a bit as to these issues, is that Mr. Zahlraddin would testify, among other things, that he worked on restructuring contracts for Ozy. Those contracts included at least two categories of contracts, which are debt instruments, which he was involved in restructuring to reduce the size of Ozy's current obligations, presumably by extending the maturity of those debt obligations.

The defense should correct me if I get any of this wrong. He was also restructuring ad agreements to provide discounts as needed after the Ben Smith article was published.

MS. GILBERT: Not discounts, your Honor. The ad agencies basically abandoned the agreement. He was trying to restructure them so that the company could have the agreements again and have revenue again.

THE COURT: At the same rates, though, or lower rates or does it not matter? I don't think it matters.

Either way, that restructuring occurred, as I understand it, in 2020 and 2021, perhaps as well as later. But despite the fact that Mr. Zahlraddin was performing those legal services for Ozy during that period, the Government has not received, at least apart from the taint team, any emails relating to Mr. Zahlraddin's work during that period. It sounds like we think the taint team didn't receive them either; is that correct?

MR. SIEGEL: Yes. According to the index that was provided by the defense, the dates on the taint team documents are also all post New York Times article.

THE COURT: Okay. So the Government just didn't receive any email from that period. The defense had believed and had indicated that they had searched all of Ozy's databases of communications and documents, and had produced many emails from the relevant period, but despite best efforts this afternoon has not been able to validate that belief, at least with reference to documentary evidence.

MS. GILBERT: Yes, your Honor.

That's because all of the links are expired at this point. So we're not able to go back into the links to determine what was produced when.

THE COURT: Okay. But the best evidence we have of what was produced when may be these indexes, one in Word and one in Excell that do say something, especially with respect to the Excel index, about the contents of the defense

productions and the Excel spreadsheet, among other things, indicates it is an overbroad production of all discovery materials, including 26.2 materials.

And in the descriptions of the contents that it offers, there is no reference to emails from this time period. In addition, the Government has gone through the materials they have and reported that they do not see any emails from this time period.

On top of that, Mr. Zahlraddin was among the lawyers as to whom the defense team asserted a privilege after the Government seized electronic devices from Mr. Watson. And the defense did not, thereafter, either (a) Produce a privilege log, despite the fact that one was promised; and (b) The defense never revoked its assertion of privilege, or waived privilege, at least not explicitly.

I understand they may have done so implicitly by indicating that they were going to call Mr. Zahlraddin as a witness, although even that is complicated because of the communications that the Government referred to where they raised this issue with the defense team after seeing Mr. Zahlraddin's name on a witness list, and the defense indicated that they were continuing to assert privilege as to the materials from Mr. Zahlraddin.

So for all those issues, plus the issues of relevance that we have been discussing, Mr. Zahlraddin's

testimony will be excluded.

MS. GILBERT: Your Honor, I wanted to add one more thing with respect to the relevance, if that's possible.

THE COURT: Yes, please.

MS. GILBERT: Mr. Zahlraddin also would have testified to the fact that Samir Rao approached him on a few occasions to find out if he could falsify UCC 3s, in order to get rid of liens.

And Mr. Zahlraddin told Samir that he could not do that, and his understanding, or his experience at that time, was that Samir was the one who on his own accord had approached Mr. Zahlraddin to find out if he could do that.

THE COURT: All right. So two points about that. Number one, we've had a series of proffers of Mr. Zahlraddin's testimony, what it will be, why it would be relevant. I don't believe I've heard that before.

MS. GILBERT: I kept getting cut off before.

THE COURT: We've had proffers in letters, as well as here on the record. And second, that might tend to undermine Mr. Rao's credibility a bit, but Mr. Rao has already admitted to participating in a tidal wave of other misrepresentations. And so at best it would be relatively cumulative. In any event --

MS. GILBERT: That was in the 26.2 disclosures because it was in my notes that I took of my conversation with

Mr. Rao.

MR. SIEGEL: What notes? There are notes?

MS. GILBERT: I know that I turned over my notes.

THE COURT: Either way, this dispute is not going to be material to my ruling. My ruling stands. Mr. Zahlraddin is excused.

MR. SIEGEL: I want to make clear on the record that we did not receive those notes. I know it doesn't affect your Honor, but in case there's an appeal on this, there's an index, we have productions, and now we're finding out there are notes of this. It only makes it more extreme.

MS. GILBERT: There was one page of notes that I believe I sent to you directly as a PDF document. I can double check my email, but I'm almost 100 percent sure that I sent it to you directly and that it was also produced. I wanted to make sure that you had those notes.

MR. SIEGEL: Your Honor, we don't agree with that but as your Honor said, it doesn't affect your ruling.

THE COURT: Okay. This is defense, I think that comes to the end of the list of defense witnesses; is that correct?

MR. SULLIVAN: That's correct.

THE COURT: What I think, or the next steps here are (a) For the defense to rest before the jury; (b) For the Government to put on a rebuttal case, which tell me if you

want to start that today or tomorrow.

MR. SIEGEL: We have a civilian witness who has been waiting. So we'd like to get him on.

THE COURT: Let's bring in the jury.

MS. GILBERT: May I tell Mr. Zahlraddin he can leave?

THE COURT: You may. I'm going to tell the jury to come in, to come in --

MR. STERN: Maybe at the end of the day we can talk about the charge conference.

MR. SIEGEL: We're available to stay late and get it done. I don't think it's that big a deal.

THE COURT: Thank you.

(Jury present.)

THE COURT: Ladies and gentlemen, once again, thank you for your patience. We are making progress here, even when it doesn't feel like it. Everyone can please be seated.

Mr. Sullivan.

MR. SULLIVAN: Yes, your Honor. On behalf of Mr. Watson, the defense rests.

THE COURT: Okay. Does the Government have a witness?

MR. SIEGEL: Your Honor, for Ozy.

THE COURT: I'm sorry, yes. For Ozy.

MS. FRISON: On behalf of Ozy Media, the defense

rests.

THE COURT: Does the Government have a witness in rebuttal?

MR. STERN: Yes, your Honor. The Government calls Dan Fox.

THE COURTROOM DEPUTY: Raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY: Have a seat. State your name for the Court and spell your first and last name for the Court reporter.

THE WITNESS: Daniel Fox, D-A-N-I-E-L F-O-X.

MR. STERN: May I proceed, your Honor?

THE COURT: You may.

(Continued on the following page.)

**DANIEL FOX**,

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. STERN:

Q Good afternoon, Mr. Fox.
A Good afternoon.
Q Where do you currently work?
A Warner Brothers Discovery.
Q From 2017 to 2020, where did you work?
A At the time it was called Discovery Communications.
Q During that time, what was your role at Discovery?
A I was a senior vice president of US Corporate Development.
Q I'm just going to ask you to talk a little closer to the microphone.
A Sure. Do I need to repeat that?
Q What was your role during Discovery at that time?
A I was senior vice president of Corporate Development.
Q What does it mean to be in Corporate Development?
A We have three main functions. We do the company's mergers and acquisitions, we do its joint ventures, and we do its minority investments.
Q So as a company, does Discovery ever invest in other

companies?
A Yes.
Q What is the process by which Discovery decides to invest in other companies?
A Well, we would typically identify a potential investment target. We would do due diligence on that company, and we would seek approval for that investment.
Q Mr. Fox, are you familiar with an entity called Harpo Productions or Harpo Studios?
A Yes.
Q What is Harpo?
A I believe it's a production company that is owned by Oprah Winfrey.
Q Is there a relationship between Discovery and Harpo?
A Yes. We're partners in a joint venture.
Q So you said you're partners in a joint venture. Can you explain what is a joint venture?
A Sure. It's when two companies jointly own a third entity. In this case OWN, the Oprah Winfrey Network.
Q So to be clear, the joint venture between Discovery and Harpo is a company OWN, or the Oprah Winfrey Network?
A Yes.
Q When was the Oprah Winfrey Network created through this joint venture?
A I believe the deal originally closed in January of 2008.

Q Following this joint venture for the creation of OWN, did Oprah Winfrey gain ultimate control over Discovery?
A No.
Q Was Ms. Winfrey in charge of Discovery from 2017 to 2020?
A No.
Q Did Ms. Winfrey ever control Discovery?
A No.
Q Does Oprah Winfrey decide what companies Discovery invests in?
A No.
Q Has Ms. Winfrey ever decided which companies Discovery would invest in?
A No.
Q Has Discovery ever invested on behalf of Ms. Winfrey?
A No.
Q Is Ms. Winfrey involved in the approval process for Discovery's investments?
A No.
Q Is an investment by Discovery the same as an investment by Oprah Winfrey?
A No.
Q Or her network?
A No.
Q Mr. Fox, did you ever work for Oprah Winfrey?
A No.

Q Did you ever work with her?
A No.
Q Have you ever spoken on her behalf?
A No, I have not.
Q Have you ever met her?
A I was on one Zoom call with her a couple years ago, but I didn't say anything.
Q Mr. Fox, do you know Carlos Watson?
A I do.
Q When did you first meet him?
A Probably at least ten years ago when he was a banker at Goldman Sachs.
Q Did you get back in touch with him in or around late 2017?
A Yes.
Q What was the context for your getting back in touch?
A I believe that Discovery was in conversations with Ozy, as well as Andreessen Horowitz and Google about potentially investing in Ozy for the acquisition of Essence.
Q So Mr. Fox, I'm going to show you what's been marked as Defense Exhibit 627. This is already in evidence. Mr. Fox, is that up on your screen there?
A It's very small and dark.
Q We can make it larger. I'm not sure about the brightness.

A That's helpful. Thank you
Q Mr. Fox, is this a draft term sheet documenting the transaction you described before when Discovery was considering investing in Ozy for the purpose of the purchase of Essence?
A Yes, it appears to be.
Q So first, let's start at the top. By the way, Mr. Fox, as we go through, if you need us to move to any other parts of the document, let us know.
Is this a final signed agreement between the parties?
A It doesn't appear to be final, because if you scroll past a note to draft and there's no date. But as far as it being signed, I would need you to scroll to the signature page.
MR. STERN: Could we move to the signature page?
Q Once again, Mr. Fox, does that say final signed agreement between the parties?
A It is not.
Q So I'd like to go back to the top, please, first page. We could scroll down just a bit. You see there's a section there called investors and proceeds?
A I do.
Q So starting at that first paragraph, you don't have to read it word for word, but can you just describe what is written in that first paragraph, please?

A It's laying out the break down of how the $60 million investment would be split between the three investors.
Q Which are those three investors again?
A Google, Andreessen Horowitz, and Discovery.
Q Focusing on Discovery, what does it say about Discovery's potential investment in Ozy in connection with the purchase of Essence?
A It says it would be up to $10 million from Discovery, or one of its consolidated subsidiaries.
Q So is Oprah Winfrey mentioned at all here?
A No.
Q Is the Oprah Winfrey Network mentioned at all here?
A No.
Q Was Ms. Winfrey involved in these negotiations?
A No.
Q Was this potential investment from Discovery Communications being done on behalf of Oprah Winfrey?
A No.
Q Now, you said, Mr. Fox, that the language here is Discovery Communications LLC, or one of its consolidated subsidiaries.
Did I read that correctly?
A Yes.
Q Does that language about consolidated subsidiaries refer to Oprah Winfrey or OWN?

A Not in this case, no.
Q Why not?
A Because as a part owner of the Oprah Winfrey Network, any cash that would be invested would have to come in part from Harpo or Oprah Winfrey as a part owner, and that was never a consideration.
Q Was an agreement for Discovery to invest in Ozy ever finalized?
A No.
Q Did Discovery ever commit to investing in Ozy?
A No.
Q Did Discovery end up investing in Ozy at all?
A No.
Q During this time, Mr. Fox, in approximately October 2017, did you discuss Discovery's potential investment in Ozy with Carlos Watson?
A Yes.
Q Did you ever tell him that Discovery's potential investment represented an investment by Oprah Winfrey?
A No.
Q Did you ever tell Mr. Watson that Ms. Winfrey was in charge of Discovery?
A No.
Q Did you ever tell Mr. Watson that an investment by Discovery was the same as an investment by Oprah Winfrey?

A No.
Q Mr. Fox, did this draft term sheet, Defense Exhibit 627, remain an ongoing topic of discussion between you and Mr. Watson into 2018?
A I don't believe so, no.
Q Did you have any discussions with Mr. Watson at all about any topic in 2018?
A Yes, I believe so.

(Continued on next page.)

EXAMINATION BY
MR. STERN:
(Continuing.)
Q What were those conversations?
A I don't recall the exact conversation but I do have e-mails. They sent me an update on the company's performance as of late 2018 and mentioned a possible, you know, further attempt to raise money for OZY. And the e-mails suggested that we schedule a call to suggest that update deck.
Q When you spoke to Mr. Watson in late 2018, did you commit to have Discovery invest in OZY?
A I won have done that.
Q Did you tell Watson that Discovery would invest on Oprah Winfrey's behalf in that conversation?
A No.
Q What about 2019, Mr. Fox? Did you talk to Watson about an investment by Discovery in OZY in 2019?
A I don't believe so.
Q 2020?
A I don't believe so.
Q Did you, at any point, tell Carlos Watson that Discovery would lead an OZY investment round?
A No.
Q Did you, at any point, tell Carlos Watson that

Discovery would invest in OZY on behalf of Oprah Winfrey?
A No.
Q Based on your best recollection, Mr. Fox, when was the last time you spoke to Carlos Watson?
A It's not even recollection. The last e-mail exchange I had was late 2018, so I'm guessing that's the last time I spoke with Carlos Watson.
MR. STERN: Just one moment, please.
Nothing further, your Honor. Thank you.
THE COURT: Mr. Sullivan.
CROSS-EXAMINATION
BY MR. SULLIVAN:
Q Good afternoon, Mr. Fox.
A Good afternoon.
Q I know you said you reviewed e-mails. Did you review your text messages?
A No.
Q All right. Would it surprise you that you and Mr. Watson had text messages in 2019 and 2020?
A It would a little bit, yes.
Q Okay. You have no recollection of it as you sit here right this second?
A I actually don't, yeah.
Q Now, do you know someone named Ben Horowitz?
A The name sounds familiar.

Q Did you have e-mail conversations with a Ben Horowitz?
A I don't recall.
Q I'll ask it this way then. Have you ever worked with a Ben Horowitz?
A I mean, Ben Horowitz, it sounds like the name of, you know, somebody who worked at either Google or Andreessen, I don't know which. And so, it's very possible that that Ben Horowitz was involved in the same transaction and we all worked on that same transaction.
Q Okay. Who, at the time -- let's move to 2017. Who was your boss at that time?
A Bruce Campbell.
Q Now, you introduced Mr. Watson at some point to Bruce Campbell?
A I don't know if I did that.
Q All right. You were aware that Mr. Watson and Bruce Campbell met, though?
A I mean, I believe I was on calls or meetings that had all of them so I was aware they knew each other.
Q And you certainly are not prepared to tell this jury that you are in every meeting with Mr. Watson and Bruce Campbell, right?
A I am not prepared to tell them that, no.
Q You are also not prepared to tell this jury that you were on every telephone call with Mr. Watson and Bruce

Campbell, correct?
A That.
Q And the same is true for any Zoom meeting between Mr. Watson and Bruce Campbell?
A The question being, no, I can't say I was on every Zoom call with them, no.
Q And Bruce Campbell, it's fair to say, is not obligated to clear all of his decisions with you; right?
A That's very fair to say.
Q Right. Because he was your supervisor?
A That's correct.
Q Now, let's move very quickly to OZY and, I'm sorry, to the OWN Network.
Now, for projects that would appear on OWN, certainly, you're not suggesting that Discovery did not take Ms. Winfrey's input?
A When you say "projects," you mean programming?
Q Programs. I'm sorry, I'm not in the industry. Programs, yes?
A .Oprah Winfrey is the chief creative officer for the Oprah Winfrey Network. So those would ultimately be her decisions.
Q So it's fair to say, right, you don't -- Discovery didn't sort of get a program and say, OWN, you have to put this on your network?

A Definitely not, that's right.
Q And what was the title Ms. Winfrey had. Chief?
A Creative officer.
Q Chief creative officer.
In fact, it was common for Discovery to go through Ms. Winfrey for programs that would go on her network; right?
MR. STERN: Objection.
THE COURT: Is there an objection?
MR. STERN: Yes, objection. Beyond the scope and irrelevant.
THE COURT: Let's rephrase the question.
Q All right. So it's fair to say Ms. Winfrey was not some idle bystander in this relationship with Discovery and Oprah Winfrey Network, correct?
A She had a significant role with the Oprah Winfrey Network, yes.
MR. SULLIVAN: No further questions.
MS. FRISON: No questions.
THE COURT: The witness is excused. You may step down.
(Witness leaves the witness stand)
MS. KASSNER: Your Honor, at this time, the Government calls Cara Alpaugh back to the stand.
THE COURT: Please.

PMR. SULLIVAN: We didn't get any notice of this of witness I don't think, your Honor.

THE COURT: Well, let's not argue in the presence of the jury. Come to the sidebar.

(Continued on the next page.)

(Sidebar held outside the presence of the jury.)

THE COURT: It's recall of a witness.

MR. SULLIVAN: Okay. First, I want to say apologies, I didn't intend to do that in front of the jury, say anything in front of the jury. But your ruling was the night before to give us notice if they were calling a witness in. They only told us Dan Fox.

MS. KASSNER: Respectfully, your Honor.

THE COURT: It's 5:00 o'clock.

MS. KASSNER: Respectfully, I think the question is, it's like five questions. It's just to clarify her earlier testimony.

THE COURT: Regardless, we're going to go forward with this just to not waste the jury's time.

What's that?

MR. SIEGEL: This is just a script for myself. We're going to admit some additional business records. We had admitted the wire transactions, these are exhibits we've already disclosed.

THE COURT: Do you want to do that today and put on the FBI agent?

MR. SIEGEL: It will take me one second to read the script.

THE COURT: Then let's.

MS. KASSNER: Your Honor, for full disclosure, her

testimony is going to be limited to just speaking about her view of checks and ACH records that are already in. In other words, it's just --

THE COURT: How long is the testimony?

MS. KASSNER: Maybe five minutes, maybe ten minutes total.

THE COURT: If you want to do the cross tomorrow.

MR. SULLIVAN: Okay. Fair enough.

THE COURT: That will give you enough notice.

(Sidebar discussion concludes.)

(Continued on the next page.)

(In open court.)

MR. SIEGEL: Your Honor, at this time, the Government moves to admit Government Exhibits 8001 through 8069. That's Silicon Valley Bank records pursuant to Rule 902(11) with a certification that was produced at Government Exhibit 1502.

MR. SULLIVAN: Without objection.

THE COURT: Hold on. Ms. Frison, no objection on behalf of OZY?

MS. FRISON: No objection.

MR. SIEGEL: So, your Honor, 8001 through 8069 are admitted?

THE COURT: They are received without objection.

(Government's Exhibits 8001 through 8069 were marked in evidence.)

MR. SIEGEL: And the Government moves to admit Government Exhibits 8070 and 8071 which are Wells Fargo records for OZY pursuant to Rule 902(11) and their certification as previously produced as Government Exhibit 1518.

MR. SULLIVAN: Without objection.

MS. FRISON: No objection.

THE COURT: Received.

(Government's Exhibits 8070 and 8071 were marked in evidence.)

THE COURT: Ms. Kassner.

CARA ALPAUGH, called as a witness, having been previously duly sworn, was examined and testified as follows:

THE COURT: You were previously sworn. You remain under oath having already testified in this trial. Please be seated.

Just remind us of your name and title.

THE WITNESS: My name is you Cara, C-a-r-a. Last name, Alpaugh, A-l-p-a-u-g-h, and I'm a forensic accountant.

THE COURT: Forensic accountant for what?

THE WITNESS: With the FBI.

THE COURT: Okay.

DIRECT EXAMINATION

BY MS. KASSNER:

Q Ms. Alpaugh, welcome back. Can you hear me?

A Yes, I can.

Q Earlier in this case, you testified about your review of Silicon Valley Bank and Wells Fargo Bank wire transaction records for OZY Media, Inc., do you remember that?

A I do.

Q Did you have an occasion to review any additional records in connection with OZY Media's bank accounts?

A Yes, I did.

Q Were those records marked Government Exhibits 8001

through 8071?
A Yes, they were.
Q What kinds of records were contained in those exhibits?
A They are bank statements and deposit records.
Q Did those records include checks and ACH records?
A Yes.
Q What does ACH stand for?
A Automated Clearinghouse.
Q What is an ACH transfer?
A It's a form of Electronic Funds Transfer.
Q Did you review all of those records including checks and ACH records for the name Oprah Winfrey?
A Yes, I did.
Q Did you identify any transactions for Oprah Winfrey in that search?
A No, I did not.
Q Did you review all of those records including checks and ACH records for OWN, O-W-N?
A Yes, I did.
Q Did you identify any additional transactions for OWN in that search?
A No, I did not.
Q Did you also review those records for the entity OW Management?
A Yes.

Q Did you identify any additional transactions for OW Management in that search?
A No, I did not.
Q Did you review those records for Mark Lasry?
A Yes.
Q Did you identify any additional transactions for Mark Lasry in that search?
A No, I did not.
Q Did you review those records for Interlock?
A Yes.
Q And did you identify any additional records of transactions between Interlock and OZY as part of that search?
A No, I did not.
Q Did you review those records for Live Nation?
A Yes, I did.
Q Did you identify any additional transactions from Live Nation where Live Nation was giving money to OZY as part of that search?
A No, I did not.
Q And finally, did you review those records for the name Alex Rodriguez?
A Yes, I did.
Q Did you identify any transactions, checks, or ACH transactions where Alex Rodriguez sent OZY money as part of

that search?

A No, I did not.

MS. KASSNER: Nothing further, your Honor. Thank you.

THE COURT: Should we break here for the day?

MR. SULLIVAN: Yes, your Honor.

THE COURT: Ladies and gentlemen, we are going to break here for the day. We'll ask you to be here at 9:30 tomorrow given that we're again making progress and we will look forward to seeing you rested and ready then.

Have a great evening and remember the usually rules you'll.

(Jury exits courtroom at 5:10 p.m.)

THE COURT: You can step down.

THE WITNESS: Thank you, your Honor.

(Witness leaves the witness stand.)

THE COURT: Should we take a five-minute break here and then do 20 minutes worth of work on the jury instructions.

MR. SIEGEL: As long as the Court wants that sounds great.

THE COURT: Let's try to make progress while we can. I'll be back momentarily and whenever the lawyers are back we'll kick off.

(A recess in the proceedings was taken.)

THE COURT: Everybody should please be seated.

So we're going to go 20 minutes or thereabouts. Question number one for me was we had a motion essentially to dismiss or to preclude the aiding and abetting charge.

Is that live or not live?

MR. SULLIVAN: Yes, very much live.

THE COURT: Did you see my order of last night?

MR. SULLIVAN: With respect to aiding and abetting? I don't know. Aiding and abetting order?

THE COURT: We put up a docket order, it was three sentences. It said, I see a reference to 18 U.S. Code Section 2 in Count Three. I would have though that that sufficed for notice of aiding and abetting charge, let me know if you still disagree.

MR. SULLIVAN: It is still live and I apologize, I did not see the order. I did not see the order last night. But our position still would remain the same that the indictment only charges or alleges the substantive count in all the text and we put on an entire case based on the substantive count of aggravated identity theft.

THE COURT: Why does that have to be in the text rather than in the statutory citations?

MR. SULLIVAN: Because that seems -- that is the basis upon which the Government said it was said it was proceeding. So if the text that included in effect an

entire different count, then we would have been on notice. So it's important here, again, as we put in our papers that it's not a lesser included.

So when the Government makes its allegations in a quite voluminous indictment, we certainly relied on those allegations in preparing for a case and went through an entire case and it wasn't until literally the eve of trial early May that we got a first mention of aiding and abetting and --

THE COURT: No, but it's in the indictment or at least the statute is.

MR. SULLIVAN: No, I see your Honor's point. But there is absolutely nothing that points to the indictment. No substantive underpinning that reasonably puts us on notice that the Government is proceeding under that theory. The description is simply aggravated identity theft and not aiding and abetting.

THE COURT: Okay.

MR. SULLIVAN: That's simply nothing in the language that points us to aiding and abetting.

THE COURT: Does the Government want to be heard on this?

MR. SIEGEL: Your Honor, aiding and abetting is not a separate crime, it's a means of committing a crime. The language that's included here including stating that

Mr. Watson committed the crime together with others and citing to Section 2 is the language that is used as far as I know in every aiding and abetting case.

THE COURT: That's what I'm used to seeing. That's why I was asking.

MR. SULLIVAN: I would also note it's actually my understanding that under Second Circuit law, even if you don't include Section 2 that you can still charge the jury with aiding and abetting because it is part of -- it is a means of committing a crime, not a separate crime. We obviously don't have to get there but this is just well settled.

THE COURT: Okay.

MR. SULLIVAN: Well, separate crime as distinguished from a lesser included because there are different elements involved. And we have different elements involved and the proofs are different. When the proofs are different, you try a case differently and that is our point. Whether it's done like this a lot, I can't speak to that. It may be done incorrectly a lot. But the defense should be on notice and we are prejudiced if the Government is allowed to proceed under a theory that it simply did not aver in its you charging papers a.

THE COURT: Okay. All right. I will take that under advisement. I haven't seen a case in the defense

submission that would suggest to me that the aiding and abetting charge is defective under Supreme Court or Second Circuit law. If there's any additional authority that defense wants to call to my attention, I will, of course, look at it. Otherwise, I'll give you my ruling.

All right. I have a consolidated copy of the jury charge and I think we should just start flipping through page by page.

(Continued on the next page.)

(Continuing)

MR. SIEGEL: Your Honor, I think --

THE COURT: Is there anything that the Government wants to add language about: You may not consider any answers that I sustained an objection to.

I think that is fairly standard. I would have thought we had that in here.

I have directed you to disregard or struck from the record -- yeah, that probably is incomplete.

MS. GILBERT: Which page, your Honor?

THE COURT: I am on page 6 of what I am looking at.

MR. SULLIVAN: We had --

THE COURT: This is instruction -- I guess we should have a single copy for everybody that -- well, this is instruction number 2, role of the jury.

The paragraph in question begins: The evidence does not include questions, only the answers are evidence, but you may not consider any answer that I directed you to disregard or that I directed struck from the record. Do not consider such answers.

The Government would have me add: The evidence does not include questions -- oh, the Government would have me add the phrase: But you may not consider any answer that I sustained an objection to, comma.

MS. GILBERT: Your Honor, I have a question about

that.

THE COURT: Yes.

MS. GILBERT: The evidence does not include questions, only the answers are evidence.

Shouldn't it be: The evidence does not include questions or -- sorry.

The evidence includes questions and answers taken together. Because, for instance, if the question were a yes-or-no question, and you're not allowed to consider the question, only the answer, then all you can consider is the yes or no.

So I mean, I know that in state court we certainly always use the charge, the question and answer taken together.

MR. SIEGEL: Your Honor, this is the standard.

THE COURT: Yes.

MR. SIEGEL: This is the standard language that I've seen in every jury charge in Federal Court that I've ever seen.

MS. GILBERT: I understand. I'm just making --

THE COURT: I will think about it.

MS. GILBERT: -- making a recommendation.

THE COURT: Okay.

The defense would add, at the end of paragraph that begins: Since you are the sole and exclusive judges of the facts, the defense would insert: My legal rulings are not

evidence.

I think that's self-evident.

Again, all of this, I think, comes relatively directly from Sand and is -- and is fairly standard in this district.

Defendants, I am on page 8, instruction 7 --

MR. SIEGEL: Your Honor, the defendants had a request that the jury not consider Your Honor's questions?

MR. SULLIVAN: Next page.

THE COURT: Oh, yes. That is what I was just responding to. I am sorry I did not frame that explicitly.

We have said that all questions are not evidence. The evidence does not include questions, only the answers are evidence. I think that -- yeah, that covers that.

MS. FRISON: Your Honor, I think your questions are in a different -- hold a different importance than the lawyers' questions. To the jury. Your relationship with the jury is special and I -- I'm not sure that it's clear that your questions and your rulings are on the same level as ours; that they're not to be considered as evidence.

So I would just make another request on behalf of Ozy for that particular language, because there were a fair amount of questions from the Court.

THE COURT: Yeah, I can -- how about this? Up top where we say: The evidence does not include questions.

I am happy to say: Dash, by any party, or the Court.

Which I think makes the point that you are asking me about. And I am happy to do that.

MR. SIEGEL: The Government has no objection, your Honor.

THE COURT: Okay.

MR. SULLIVAN: It's agreeable with us.

THE COURT: All right.

Indictment is not evidence. Instruction 7.

MR. SIEGEL: Your Honor, on page 7, the defense had a --

THE COURT: Oh, yes. Sorry. These comments are so small and my eyesight is so bad that I am going to miss them as we go.

MR. SULLIVAN: It's under equality of the parties.

THE COURT: Equality of parties before the Court, yeah, think language is, I think, also universal or something close to it. And so I am not going to change this.

MR. SULLIVAN: We'll just make a record then that there's a disequality here. Criminal law is a matter of primary concern to the community is rather noble language and then the next line is equally as important to the defendants who are charged with serious crimes.

Just by way of comparison. Those two, the former

seems much more high minded than the latter. Maybe the Court would consider something like equally, it is important to the defendants to, to -- indicate the presumption of innocence. I can think about something that's on par with the -- if the Court is disinclined to strike it, as we suggest, I can think of language that at least balances out the first sentence.

THE COURT: I am not inclined to strike it.

MR. SULLIVAN: Okay. Then --

May I suggest some language?

THE COURT: Yes.

MR. SULLIVAN: Thank you.

THE COURT: All right.

The next question I see is now on page 8, instruction 7: Indictment is not evidence.

The defendants renew their objection to providing the jury with a copy of the indictment for the reasons explained at docket 198.

So we have talked about this a little bit and I have thought about it a lot, and you can caucus with some colleagues on the question. When the case is complex, like this one, it seems almost unfair to the jury to ask them to vote on charges that they are not permitted to read. And so you have to -- we would either have to add 15 pages to these instructions to explain the indictment or send the indictment back.

I have said before, I do not mean to suggest that I would grant such a motion, but I would consider a motion -- if there is some part of the indictment that the defense thinks is especially inflammatory, and by inflammatory, I mean unfairly prejudicial, not just prejudicial, obviously.

I would think about redactions, but I am not going to withhold the indictment in its entirety from the jury.

Defense would insert also in instruction 7 that: The indictment's, quote, purpose is to inform you of the charges brought against the defendants. It does not prove any of those charges.

I think that is the same as saying it is not evidence, especially when you take these instructions as a whole.

The Government makes a good point at the bottom of this, that there may actually be a -- I may be misstating the law -- at the bottom when I say that: Your verdict as to any defendant on any count should not dictate your decision as to any other defendant on any other count.

And they would modify this to say: Other than the special rules for corporations, which I will instruct you about later, comma, the case against each defendant stands or falls on its own.

And I think that is legally more accurate than what I had otherwise proposed to say. And so we will include that.

Next, instruction number 9, meaning of and in the indictment. The Supreme Court just decided a case all about what the word "and" means. I do not know if anybody has thoughts about that.

MR. SIEGEL: Your Honor, we agree with the defense that that case is not applicable.

THE COURT: Okay. Good.

And so, nevertheless, the defendants propose omitting this section because it risks confusing the jury.

Did knowingly and intentionally transfer.

I am sensitive to the point the defense is making here, that knowingly and intentionally does not mean knowingly or intentionally. And so therein lies the conundrum.

MR. SIEGEL: Your instructions later on make clear that -- when you describe the elements, make clear that they have to find knowingly and intentionally.

THE COURT: They do. They do. But does this conceivably compete with that?

MR. SULLIVAN: -- for the point --

THE COURT: Does this compete with that instruction in any way?

Why doesn't the Government, when you mean or, in an indictment say or instead of and?

MR. SIEGEL: I think there's actually Second Circuit law that you have to say and. That if you say or, it's --

you're not being precise about what you're alleging. So you have to allege each of the three provisions.

THE COURT: Oh, I see. Interesting.

MR. SIEGEL: But there are cases that require you to say and instead of or, as confusing as it may be.

THE COURT: And what if we point to -- what if we move this instruction? Maybe it is in the wrong place, because up front here -- I mean, it is with other instructions that are about how to read the indictment, but.

I mean, does the defense -- you want me to delete this? What is it that you are asking me to do?

MR. SULLIVAN: Yes, to delete this for the reasons we suggested; that it's confusing, at best.

And as the Court mentioned, you deal with it later more specifically and accurately, and so why have something that's duplicative and confusing?

THE COURT: Okay.

Why not just add a sentence at the end of this that says, you know: This instruction -- hmm.

Maybe the parties can get together and propose something jointly here. I do think there is a --

MR. SIEGEL: Your Honor.

THE COURT: I know these are standard in every set of instructions in this Court, but I -- I view the defense request here as nonfrivolous, even though they are asking to

change the instructions that are used in every trial in this jurisdiction. Like, they're conceivably on to something here. Maybe you should change Sand as well.

But, yeah, the parties should try to figure that out in the first instance, together.

MR. SIEGEL: Well, your Honor, perhaps the -- the complaint -- the issue being raised by the defense is about the mens rea issue. The defense -- excuse me, the instruction speaks to different ways an offense may be committed.

THE COURT: Right.

MR. SIEGEL: Which gets to the actus reus.

THE COURT: Actus reus.

Yes, but those are categories that are going to be lost on the jury.

MR. SIEGEL: Well, I think if there's some way that it's -- to just clarify, that where a state of mind is alleged, such as knowing and willfully, as I will instruct you, each must be proven.

THE COURT: Okay.

As I say, I think you guys are going to work this out with each other.

MR. SIEGEL: Mr. Sullivan?

MR. SULLIVAN: Yes, that's fine.

THE COURT: All right.

Can the Government just email that language --

MR. SULLIVAN: No, it's fine. We can work it out together, I'm not --

THE COURT: Oh, okay.

MR. SULLIVAN: Yeah.

THE COURT: I thought you meant the exact language that Mr. Siegel just said was --

MR. SULLIVAN: Right.

THE COURT: Instruction number 12 is next, correct?

MR. SULLIVAN: 10.

THE COURT: Oh, 10.

Also, do not allow yourselves to be -- or yourself, to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases.

I think this is duplicative of things we are saying not only in this instruction, but also in others as well, and I will omit that.

Okay. In instruction 12 the defense would delete the phrase: Hard core.

And I am fine with that.

MR. SIEGEL: No objection.

THE COURT: All right.

MR. SIEGEL: No objection.

THE COURT: No objection. Yes, I am not sure what it means.

The addition of: On every element of every charge.

That, I think, is not exactly what this instruction is about, and that we do get that point clearly made elsewhere in the instructions.

MR. SULLIVAN: I guess my concern is then that that could, to use your language, compete with the later instruction and certainly, proof beyond a reasonable doubt of each and every element is something that tends not to be intuitive for a layperson.

So I think it's important to, any time you're talking about proving the guilt, that we emphasize that proof requires proof beyond a reasonable doubt of every element, every required element of every charge, not just -- as stated, this is an incorrect statement of the law. Or the question points to an incorrect statement of the law.

MR. SIEGEL: Your Honor, but it's -- the jury also does not have to either find him guilty on every charge or not on every charge.

THE COURT: Right.

MR. SIEGEL: So then we'd have to get into the idea of --

THE COURT: It is confusing.

MR. SIEGEL: -- that there are instructions that deal with that and we become pretty duplicative and verbose.

THE COURT: Yes.

I am very much against competing instructions, but I do not see this instruction as competing with the instruction where we tell the jurors to consider each count individually, against each defendant and indeed, each element of each count. I think they are symbiotic.

So on page 11, I am deleting: Hard core, but declining the other suggestions there.

Charts and summaries. Am I right, instruction 15?

MR. SULLIVAN: That's correct, let me find it.

THE COURT: So I know the Government had classic summary witness testimony through the FBI agent. The defense used demonstrative aids, but I am not sure this -- that was a chart, it was not an exhibit of a chart. And so this instruction starts by saying: The Government and defense have presented exhibits in the form of charts and summaries.

Is that true, that we have had charts and summaries from both -- like exhibit charts and summaries from both parties?

MR. SULLIVAN: Well, not exhibits. So we'd have to alter the language. Ours is a demonstrable or illustrative aid. Exhibits in forms of charts...

The Government presented exhibits -- we'd have to work with this language a little bit.

THE COURT: Or add another instruction.

MR. SULLIVAN: Or add another instruction for an

illustrative aid, which I'm happy to draft and send to the Court.

MR. SIEGEL: I suspect there's one in Sand.

THE COURT: I suspect there is, too.

So as to this instruction, are we striking the word: And defense.

And changing it out to --

MR. SULLIVAN: Yes, as the Government has.

THE COURT: Okay.

And I will say: Consider demonstratives.

And maybe we should even tell the jury what we are talking about, just so they do not have to divine it.

MR. SULLIVAN: Oh, just so they have something about white board?

THE COURT: Yeah.

MR. SULLIVAN: Okay.

THE COURT: And something about FBI summary charts.

All right. Nothing on page 13.

MR. SIEGEL: Your Honor, on page 12, we had noted that the preparation of witnesses instruction is duplicative of the interview of witnesses instruction on page 18.

THE COURT: So you want to strike this?

MR. SIEGEL: Well, I -- we should strike one or the other. I leave it to the Court which one. They're slightly different and so whichever one the Court prefers, but I just

want to flag that duplication.

THE COURT: Sorry.

Interviews is what number?

MR. SIEGEL: Page 18, number 23.

THE COURT: I am going to strike 23. I mean, I think the bigger question is where does this go? I do not really care which of these two we include, but I would like this to be in a sensible place.

Yes. I think I am going to strike 23, unless I hear something to the contrary.

MR. SIEGEL: I'm not sure that there was -- if we keep 16, I don't know that there was testimony about the defense interviewing witnesses.

(Continued on following page.)

THE COURT: What did we say, government or defense, and/or defense?

MR. SIEGEL: That's fine.

MR. SULLIVAN: I'm fine with that.

THE COURT: Okay. Oh, we're going to break for the day. Sorry. We're making as good a use of time as we can here, but I also want to be respectful of the Court staff's time. We have a hard stop today.

MR. SIEGEL: Your Honor, in terms of scheduling for tomorrow, there will be the cross of Ms. Alpaugh, which I expect will be fairly short.

And then, do we want to do the charge conference before then, do we want to let the jury go for a few hours, and then even when we finish the charge conference we'll need a little bit of time to incorporate that into our closing.

THE COURT: The charges, oh, okay.

MR. SIEGEL: For example, if there's no aiding and abetting instruction that's going to change our closing.

THE COURT: Unless somebody shows me a case I haven't seen, there is going to be a standard aiding and abetting instruction.

MR. SIEGEL: There are several places where we want to make sure that when we talk about the charges we're tracking the Court. I'm not saying we need hours, but if we need to build in time between when we finish the charge

conference, have a final copy of the charge, and do closings.

THE COURT: The jury may get to explore the neighborhood a little bit tomorrow.

We'll do the best we can. Okay. It sounds like we're imagining the closing arguments will begin in the afternoon tomorrow.

MR. SIEGEL: Possibly in the morning. It depends on how long the charge conference goes. We're ready.

THE COURT: Finish all the charges, incorporate these into a final set of jury instructions, which I would like everybody to read and make sure you're all signed off that we've incorporated everything we've said correctly, have the Government and defense alter their summations in any way you want to reflect any changes we make to the instructions, my guess is we're starting summations after the lunch break but hope springs eternal.

MS. FRISON: Your Honor, is it possible to do the final witness, the charge conference and anything else we need to do, let the jury go during that and close Thursday morning?

MR. SIEGEL: Your Honor, we would like to move this along.

THE COURT: We have to use the time we have. Thank you, all. Have a good evening and we will see you tomorrow.

(Matter adjourned to Wednesday, July 10, 2024, 9:00 a.m.)

INDEX


WITNESS: PAGE:

CARLOS WATSON

CROSS-EXAMINATION

BY MR. SIEGEL.......................... 3787

REDIRECT EXAMINATION

BY MR. SULLIVAN:....................... 3852

KOSMAS KALLIAREKOS

DIRECT EXAMINATION

BY MR. SULLIVAN:....................... 3919

CROSS-EXAMINATION

BY MR. STERN........................... 3929

REDIRECT EXAMINATION

BY MR. SULLIVAN........................ 3943

CARLOS WATSON

RECROSS EXAMINATION (Continuing)

BY MR. SIEGEL.......................... 3970

DANIEL FOX

DIRECT EXAMINATION

BY MR. STERN:.......................... 3999

CROSS-EXAMINATION

BY MR. SULLIVAN........................ 4008

CARA ALPAUGH
DIRECT EXAMINATION
BY MS. KASSNER.......................... 4016

*****

INDEX OF EXHIBITS

PAGE:
Court's Exhibit 8 was marked in evidence............ 3785
Court's Exhibit 8 .................................. 3970
Government's Exhibits 8001 through 8069 were marked in evidence................................. 4015
Government's Exhibits 8070 and 8071 were marked in evidence......................................... 4015

*****